# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

JULIE ALLEMAN, ET AL.

CIVIL ACTION

VERSUS

NO. 24-877-JWD-EWD

SHANNAE N. HARNESS, ET AL.

## RULING AND ORDER

This matter comes before the Court on two motions. The first is *Defendants' Joint Motion to Dismiss* (Doc. 22) ("*MTD*") filed by Shannae Harness, Shavaun Sam, Michelle Moore, Matthew Holcomb, Shawanda Woods-Smith, Jamie Monic, Courtney Newton, and the District Attorney of East Baton Rouge Parish (collectively, "Defendants"). Plaintiffs Julie Alleman, Juliet Catrett, and P. Wellness Institute, LLC, (together, "Plaintiffs") oppose the motion, (Doc. 25), and Defendants have filed a reply, (Doc. 27). The second motion is *Plaintiffs' Motion for a Preliminary Injunction* (Doc. 29) ("*MPI*"). Defendants oppose that motion, (Doc. 39), and Plaintiffs have filed a reply, (Doc. 40).

Oral argument was previously scheduled for the *MPI* for May 5, 2025. (Doc. 37.) However, all parties agreed that the hearing on the preliminary injunction would only involve oral argument, with no witnesses being called. (*Id.* at 1.) The Court thus found that oral argument was no longer necessary and canceled it. (Doc. 41.)

The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *MTD* is granted in part and denied in part. More specifically, the *MTD* is denied as to the jurisdictional issues, but the Court finds that Plaintiffs have failed to state viable overbreadth and as-applied challenges, to which Defendants specifically objected. These claims will be dismissed without prejudice, but the

Court will give Plaintiffs leave to amend to cure these deficiencies. In the meanwhile, the *MPI* will be denied without prejudice to Plaintiffs' right to refile after the *Complaint* is amended.

## I.   RELEVANT FACTUAL BACKGROUND

### A.  Introduction

#### 1.  *Statutory Framework*

##### a.   Psychologists

Title 37 of the Louisiana Revised Statutes is entitled "Professions and Occupations," and Chapter 28 of Title 37 is entitled "Psychologists." This chapter defines the "practice of psychology" as "the observation, description, evaluation, interpretation, and modification of human behavior, by the application of *psychological principles, methods, and procedures*, for the purpose of eliminating symptomatic, maladaptive, or undesired behavior, and of improving interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health, and mental health." La. Rev. Stat. § 37:2352(8) (emphasis added). This statute continues:

> The practice of psychology includes but is not limited to psychological testing and evaluation or assessment of personal characteristics such as intelligence, personality, abilities, interests, aptitudes, and neuropsychological functioning; counseling, psychoanalysis, psychotherapy, hypnosis, stress management, biofeedback, behavior analysis and therapy; diagnosis and treatment of mental and emotional disorder or disability, alcoholism and substance abuse, and of the psychological aspects of physical illness, accident, injury, or disability; psycho educational evaluation, therapy, remediation, and consultation. Psychological services may be rendered to individuals, families, groups, institutions, organizations, and the public. The practice of psychology shall be construed within the meaning of this definition without regard to whether payment is received for services rendered.

*Id.*

Additionally, a different subsection defines "psychologist" as "any person licensed as a psychologist in accordance with the provisions of this Chapter." *Id.* § 37:2352(10). This case turns on the following language from this provision:

> A person represents himself to be a psychologist by using any title or description of services incorporating the words "psychology", "psychological", or "psychologist", or by using any other terms which imply that he is qualified to practice psychology or that he possesses expert qualification in any area of psychology, or if that person offers to the public or renders to individuals or to groups of individuals services defined as the practice of psychology in this Chapter.

*Id.*

Section 37:2360(A) makes it a misdemeanor (1) "[f]or any person not licensed in accordance with the provisions of this Chapter . . . to represent himself as a psychologist" and (2) "[f]or any person not licensed in accordance with the provisions of this Chapter . . . to engage in the practice of psychology." *Id.* § 37:2360(A)(1), (2). Such a misdemeanor "shall be prosecuted by the district attorney of the judicial district in which the offense was committed in the name of the people of the state of Louisiana." *Id.* § 37:2360(B). Penalties include up to six months imprisonment and a fine of "not less than one hundred dollars nor more than five hundred dollars, or both." *Id.* § 37:2360(C). "Each violation shall be deemed a separate offense." *Id.*

Additionally, "[t]he [Louisiana State Board of Examiners of Psychologists (the "Board")] may investigate any evidence or allegation which appears to show that any person is or may be in violation of any provision of this Chapter." La. Rev. Stat. § 37:2361(A); *see also id.* § 2352(2) (defining "Board" in this Chapter). "The [B]oard may apply for an injunction in any court of competent jurisdiction to enjoin any person from committing any act which is in violation of this Chapter." *Id.* § 37:2361(B). "If it be established that the defendant has been or is committing an act which is in violation of this Chapter, the court shall enter a decree perpetually enjoining said

defendant from further committing such act." *Id.* § 37:2361(C). Violations of such an objection may be tried summarily and punished with contempt of court. *Id.* § 37:2361(D). "The injunctive proceedings provided for in this Section shall be in addition to, and not in lieu of, all penalties and other remedies as provided in this Chapter." *Id.* § 37:2361(E).

b. Licensed Professional Counselor

Further, Chapter 13 of Title 37 is called "Mental Health Counselors." A "licensed professional counselor" is defined as:

> any person who holds himself out to the public for a fee or other personal gain, by any title or description of services incorporating the words "licensed professional counselor" or any similar term, and who offers to render professional mental health counseling services denoting a client-counselor relationship in which the counselor assumes responsibility for knowledge, skill, and ethical considerations needed to assist individuals, groups, organizations, or the general public, and who implies that he is licensed to practice mental health counseling pursuant to this Chapter.

La. Rev. Stat. § 37:1103(5). Under this law:

> "Mental health counseling services" means rendering or offering prevention, assessment, diagnosis, and treatment, which includes psychotherapy, of mental, emotional, behavioral, and addiction disorders to individuals, groups, organizations, or the general public by a licensed professional counselor, that is consistent with his professional training as prescribed by R.S. 37:1107(A)(6), by a provisional licensed professional counselor, that is consistent with the requirements as prescribed by R.S. 37:1107(F), and code of ethics/behavior involving the application of principles, methods, or procedures of the mental health counseling profession.

*Id.* § 37:1103(7).

But, this statute places certain restrictions on what constitutes "mental health counseling." *Id.* Relevant here, "nothing in this Chapter shall be construed to authorize any person licensed hereunder to administer or interpret intellectual, personality, developmental, or neuropsychological tests in accordance with the provisions of R.S. 37:2352(7), except as provided

by LAC 46:LXIII.1702(E), or engage in the practice of psychology . . . ." *Id.* Further, "[i]f intellectual, personality, developmental, or neuropsychological tests are deemed necessary, the licensed professional counselor or provisional licensed professional counselor shall make an appropriate referral." *Id.*

### c.  Social Workers

Additionally, Chapter 35 of Title 37 is entitled "Social Workers." This chapter defines "social worker" as "a person who holds a degree in social work, having successfully completed an undergraduate or graduate level academic social work program." La. Rev. Stat. § 37:2703(17). "Social work practice" is defined as:

> [T]he professional application of social work values, theories, and interventions to one or more of the following: enhancing the development, problem-solving, and coping capacities of people; promoting the effective and humane operations of systems that provide resources and services to people; linking people with systems that provide them with resources, services, and opportunities; developing and improving social policy; and engaging in research related to the professional activities.

*Id.* § 37:2703(15)(a). Under this subsection:

> The practice of social work shall include but not be limited to clinical social work, planning and community organization, policy and administration, research, and social work education. Social work practice is guided by knowledge of human behavior, biopsychosocial development, social systems and resources, economic and cultural institutions, and their interactions.

*Id.*

Critically, "[n]othing in this Chapter shall be construed to authorize any social worker licensed, certified, provisionally certified, or registered under this Chapter to administer or interpret psychological tests, or to engage in the practice of psychology, as defined by the provisions of R.S. 37:2352 . . . ." *Id.* § 37:2703(15)(c). However, "[n]otwithstanding any

provisions of R.S. 37:2352, persons covered by this Chapter may, based upon scope of practice, administer, use, or interpret tests of language, education and achievement, adaptive behavioral tests, and symptom screening checklists instruments, as well as tests of abilities, interests, and aptitudes." *Id.*

### 2.  *The Parties*

The following allegations are taken from the *Complaint* (Doc. 1). The well-pled facts are assumed to be true for purposes of the instant motion. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (describing Rule 12(b)(1) standard); *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (describing standard for Rule 12(b)(6) motions).

Defendants Shannae Harness, Shavaun Sam, Michelle Moore, Matthew Holcomb, and Shawanda Woods-Smith are members of the Board. (*Compl.* ¶¶ 4–7, Doc. 1.) Harness is the Chair of the Board. (*Id.* ¶ 4.) Defendant Jamie Monic is the Executive Director of the Board and is responsible for enforcing its decisions. (*Id.* ¶ 8.) Defendant Courtney Newton is the Executive Counsel and Prosecuting Attorney for the Board who "is responsible for pursuing legal action on behalf of the Board." (*Id.* ¶ 9.) The Board, Monic, and Newton are, collectively, the "Board Defendants." (*Id.* ¶ 10.) The Board Defendants are each sued in their official capacity. (*Id.* ¶¶ 4, 6–9.)

Plaintiffs also sue the District Attorney for East Baton Rouge Parish. ("EBRP DA"). (*Id.* ¶ 11.) This defendant "is responsible for bringing prosecutions of violations of Louisiana law in Baton Rouge." (*Id.*)

Plaintiffs Julie Alleman and Juliet Catrett own Plaintiff P. Wellness Institute, LLC. (*Id.* ¶ 3.) P. Wellness Institute offers counseling for adults (age 18 and up) and specializes in the treatment of trauma-related disorders, mood disorders, and anxiety disorders. (*Id.* ¶ 20.)

Alleman is a Licensed Professional Counselor, a Licensed Marriage and Family Therapist, and a Licensed Addiction Counselor under the laws of Louisiana. (*Id.* ¶ 21.) Catrett is a Licensed Clinical Social Worker. (*Id.* ¶ 22.) Plaintiffs allege that both Alleman and Catrett have "studied principles, methods, and procedures of psychology and use[ ] those principles in [their] work at P. Wellness Institute to improve [their] clients' lives by supporting and encouraging them to modify their behavior." (*Id.* ¶¶ 21–22.) Both plaintiffs also "clearly identify the licenses that they possess" and "have never represented to the public or told their clients that they are licensed psychologists." (*Id.* ¶ 23.) According to Plaintiffs, "Louisiana law permits Alleman and Catrett to treat their patients consistent with their professional training provided that they do not represent themselves as psychologists or their work as psychological." (*Id.* ¶ 24.)

### B.  Source of the Dispute

Before 2024, P. Wellness Institute was known as Psychological Wellness Institute, LLC. (*Compl.* ¶ 25, Doc.1.) However:

> In January 2024, a representative of the Board apprised Alleman and Catrett that a complaint had been filed alleging that they were in violation of Louisiana law by using the word "psychological" in the name of their business. The representative further stated that a preliminary investigation has substantiated the allegations of the complaint and supported multiple violations of Louisiana law.

(*Id.* ¶ 26.)

To comply, Plaintiffs changed the name of their company to P. Wellness Institute. (*Id.* ¶ 27.) The Board later dismissed the complaint against them. (*Id.* ¶ 28.)

Plaintiffs want to return the name of their company back to "Psychological Wellness Institute." (*Id.* ¶ 29.) "They believe it accurately describes the services they provide." (*Id.*)

Additionally, given Louisiana law, Alleman and Catrett currently do not use the term "psychological" to describe any of the services they provide to clients or potential clients. (*Id.*

¶ 30.) They want "to explain to their clients, when appropriate, that, although they are not licensed psychologists, they have studied psychological principles, methods, and procedures, and apply them in their treatment to help clients modify their behavior and improve their lives." (*Id.* ¶ 31.) According to Plaintiffs, "Defendants lack any reasonable basis for believing that Alleman and Catrett's use of the word psychological would mislead any potential or actual consumers or clients." (*Id.* ¶ 32.)

Plaintiffs plead that the Board Defendants will charge Alleman and Catrett with violating Louisiana law if they either restore the earlier name of their company or use the term "psychological" to "accurately describ[e] their services to their clients." (*Id.* ¶ 33.) Moreover, unless enjoined, the Board Defendants will refer these violations to the EBRP DA. (*Id.* ¶ 34.) And, without an injunction, the EBRP DA will charge Alleman and Catrett with "misdemeanor[s] . . . if they change their company name back to Psychological Wellness Institute or use the term 'psychological' in accurately describing their services to their client." (*Id.* ¶ 35.)

### C. Claims

Plaintiffs bring two claims for relief. (*Compl.* ¶¶ 36–48, Doc. 1.) Plaintiffs first assert an as-applied challenge. (*Id.* ¶¶ 36–37.) Plaintiffs argue that Louisiana law violates Alleman and Catrett's First Amendment rights to the extent it "precludes [them] from accurately using the word 'psychological' in the name of their company or in a description of their services[.]" (*Id.* ¶ 37.)

Plaintiffs also assert a "First Amendment overbreadth" claim. (*Id.* at 6; *see id.* ¶¶ 39–48.) According to Plaintiffs, "anyone who has studied psychological principles, methods, and procedures, and attempts to use them to improve someone else's life has engaged in the practice of psychology and represented himself or herself as a licensed psychologist." (*Id.* ¶ 40.) Thus, "life coaches," "Alcohol[ics] Anonymous members," and parents could be "engag[ed] in the practice

of psychology and represent[ ] themselves as licensed psychologists" if they "have studied psychological principles, methods, and procedures, and attempt to use them to help" clients, members, or their children, respectively. (*Id.* ¶¶ 41–43.) "Indeed, anyone who has studied psychological principles, methods, and procedures, and attempts to use them to help a friend or relative, or gives a lecture to an audience with the hope of improving their lives, has engaged in the practice of psychology and represented themselves as licensed psychologists." (*Id.* ¶ 44.)

But, "[e]ach of the persons . . . has a First Amendment right to speak[,]" and "Louisiana has no valid interest in preventing them from doing so" as long as they "do not explicitly misrepresent themselves as licensed psychologists[.]" (*Id.* ¶ 45.) Plaintiffs assert "[a] substantial number of applications of Louisiana's restriction on free speech in precluding people from engaging in the 'practice of psychology' are unconstitutional and outweigh its limited legitimate sweep." (*Id.* ¶ 46.) Plaintiffs also claim that the statute is "vague and overbroad" for failing to define "psychological principles, methods, and procedures[.]" (*Id.* ¶ 47.) "Accordingly, Louisiana's law prohibiting people from engaging in the practice of psychology or representing themselves as psychologists is overbroad and unconstitutional." (*Id.* ¶ 48.)

Plaintiffs seek, inter alia:

> A. A declaratory judgment that defendants are violating plaintiffs' First and Fourteenth Amendments rights by enforcing Louisiana's prohibition on using forms of the word "psychological";
>
> B. A declaratory judgment that the definition of "practice of psychology" is overbroad and thus violates the First and Fourteenth Amendments; [and]
>
> C. Injunctive relief precluding defendants from commencing any action against plaintiffs to enforce any prohibition against using a form of the word "psychology" or against engaging in the practice of psychology[.]

(*Id.* at 8.)

II.    **MTD: JURISDICTIONAL CHALLENGES**

A.    **Rule 12(b)(1) Standard**

In a Rule 12(b)(1) motion, a party may raise the defense of lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But, "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010; *see also Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss.* with approval).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson*, 644 F.2d at 523. "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands."

*Paterson*, 644 F.2d at 523. Whereas, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

### B. Standing

#### 1. *Parties' Arguments*

##### a. Defendants' Original Memorandum (Doc. 22-1)

Preliminarily, Defendants focus on three aspects of the Board Defendants' licensure law:

> [O]nly those having earned a psychology license can "represent himself as a psychologist" to unknowing customers, La. R.S. 37:2360(A)(1), by either (1) "using any title . . . incorporating the words 'psychology,' 'psychological,' or 'psychologist,'" or like terms, "which imply that he is qualified to practice psychology or that he possesses expert qualification in any area of psychology," (the "Title Provision") or (2) "using . . . description of services incorporating th[ose] words," (the "Services Provision"). La. R.S. 37:2352(10). Neither can one "engage in the practice of psychology" without a license. La. R.S. 37:2360(A)(2) (the "Practice Provision"); *see* La. R.S. 37:2352(8) (defining "practice of psychology").

(Doc. 22-1 at 9–10.)

Turning to the argument, Defendants concede that Plaintiffs have standing to pursue alleged injuries arising from the "Title Provision," but that "does not give them *carte blanche* standing to seek relief from all the State's regulations of the practice of psychology." (*Id.* at 14.) Plaintiffs must show standing for each claim, for each defendant, and for each form of relief they seek, and they fail to do so. (*Id.* at 15.) Defendants see this as a traceability problem—Plaintiffs must show traceability for the "*specifically challenged* conduct—not *all* unlawful conduct." (*Id* at 15–16.) "Nor can a plaintiff bootstrap an injury-in-fact traced from *one* provision of the law to challenge a *different* provision." (*Id.* at 16.)

Here, Plaintiffs' requests for declaratory and injunctive relief "lack[ ] any factual allegations of any cognizable injury-in-fact traceable to either the discrete Practice Provision or the Services Provision." (*Id.*) And to show a pre-enforcement challenge, Plaintiffs must demonstrate "circumstances that render the threatened enforcement sufficiently imminent." (*Id.* (citations omitted).) Plaintiffs do not believe that what they are doing violates Louisiana law, and they have not shown that "their current practices have been chilled or otherwise affected." (*Id.* at 17 (cleaned up).)

As to the Practice Provision, Plaintiffs do not allege that they engage in the practice of psychology or that they intend to do so; in fact, they claim that Louisiana law allows them to treat their patients as long as they don't represent themselves or their work as psychological. (*Id.*) Thus, by their own admission, they do not violate the statute. (*Id.* at 17–18.)

Concerning the Services Provision, Plaintiffs again fail to allege that their services have been chilled or affected by this law. (*Id.* at 18.) Plaintiffs treat their patients consistent with their professional training as a licensed counselor and social worker, as "Louisiana law permits." (*Id.*) Further, Plaintiffs allege "that they 'would like to explain to their clients' that they 'apply

[psychological principles, methods, and procedures] in their treatment to help clients modify their behavior and improve their lives[,]' [b]ut Plaintiffs do not allege anywhere that they actually intend to apply those principles, methods, or procedures." (*Id.*)

In sum, Defendants argue: "Plaintiffs have thus failed to show that they are actually violating [the Practice Provision and the Services Provision], much less that they face a credible threat of enforcement. They therefore do not have standing to challenge those provisions." (*Id.* (cleaned up).)

### b. Plaintiffs' Opposition (Doc. 25)

Plaintiffs respond that they satisfied the requirements of standing. (Doc. 25 at 16.) They pled that they want (a) to change the name of their business back to Psychological Wellness Institute and (b) "to explain to their clients their familiarity with, and use of, psychology in describing the services they are providing." (*Id.* at 16–17.) Plaintiffs also pled "facts suggesting a credible threat of prosecution because it alleges that plaintiffs already have been threatened with prosecution and were forced to change the name of their company as a consequence." (*Id.* at 17.)

Plaintiffs then assert that "Defendants cannot slice and dice the Representation Law." (*Id.* (cleaned up).) Plaintiffs say there is no authority for the proposition that the Representation Law is in fact three provisions, and Defendants' authority requiring a provision-by-provision analysis is distinguishable. (*Id.* at 17–18.) Such parsing is also particularly inappropriate for the Plaintiffs' overbreadth challenge, as that relies on application to other people. (*Id.* at 18.)

Plaintiffs then say that Defendants misstate their interest and standing. Plaintiffs specifically allege that they "would like to explain to their clients, when appropriate, that, although they are not licensed psychologists, they have studied psychological principles, methods, and procedures, and apply them in their treatment to help clients modify their behavior and improve

their lives." (*Id.* at 18 (quoting *Compl.* ¶¶ 30–31, Doc. 1).) They also allege that Defendants will take adverse action against them if they use the term "psychological" to describe their services. (*Id.* (quoting *Compl.* ¶¶ 33–35, Doc. 1).) Thus, "Plaintiffs are 'seriously interested' in disobeying the prohibition in the Representation Law against using certain words in describing their services, and defendants are 'seriously intent on' enforcing it." (*Id.* at 19.) Plaintiffs only currently do not use the term to describe their services because Louisiana law forbids it, and they are not required to violate the law to confer standing. (*Id.*) Finally, Defendants ignore the part of their *Complaint* which states that Plaintiffs "studied principles, methods, and procedures of psychology and use[ ] those principles in [their] work at P. Wellness Institute to improve [their] clients' lives[.]" (*Id.* (emphasis omitted) (quoting *Compl.* ¶¶ 21–22, Doc. 1).)

Finally, even if Defendants were correct, Plaintiffs would have standing to assert their facial overbreadth challenge. (*Id.* at 19–20.) Plaintiffs cite *Board of Trustees v. Fox*, 492 U.S. 484 (1989), where the Supreme Court purportedly allowed an overbreadth challenge even though the case involved commercial speech. (*Id.* at 19–20.) Further, even if Defendants are correct, the Representation Law involves non-commercial and commercial speech, so the Court can analyze those parts that involve non-commercial. (*Id.* at 20–21.)

### c.  Defendants' Reply (Doc. 27)

Defendants begin by re-emphasizing that standing must be evaluated claim-by-claim and for each form of relief. (Doc. 27 at 6–7.) "[W]hat Plaintiffs derogatorily term slicing and dicing is what precedent requires: limiting the lawsuit to the actual controversy between the parties." (*Id.* at 7.) Using that framework, "the 'Representation Law' is not some omnibus law capable of wholesale judicial suppression, as Plaintiffs try to package it." (*Id.* at 7.) The Court must look to the specific provision at issue, including for First Amendment claims. (*Id.* at 7–8.)

Here, Plaintiffs admit that "their case depends entirely on a pre-enforcement challenge premised on *future* injuries based on possible violations of these provisions." (*Id.* at 8.) "Even a 'pre-enforcement review' cannot escape the fundamental requirements of standing—they are permitted only under circumstances that render the threatened enforcement sufficiently imminent." (*Id.* (cleaned up).) "And here, Plaintiffs cannot meet this requirement, as they themselves do not view their conduct as violating the Practice or Service Provisions." (*Id.* (citations omitted).) Without an actual violation, Plaintiffs cannot say they face imminent threatened enforcement. (*Id.* at 8–9.)

> To be clear, Plaintiffs might have philosophical objections to Louisiana law, and we invite them engage in the democratic legislative process to cure any foibles. But a case in *federal* court (especially one seeking to override *state* law) must center around what injuries *these plaintiffs* have suffered, how those injuries are traceable to Louisiana's law—as enforced by *these* Defendants— and how the Court can redress those injuries. And even then, the relief must be tailored to Plaintiffs' *actual* injury. *See Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("limited to the inadequacy that produced the injury in fact that the plaintiff has established"). As pled, Plaintiffs plainly lack standing to challenge the Practice and Service Provisions and are not entitled—in any justiciable world— to the associated requested relief.

(Doc. 27 at 9.)

### 2. *Applicable Law*

"A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1985–86 (2024) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)). A plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* at 1986 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

(2013) (internal quotation marks omitted)). "These requirements help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [his or her] invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

"The plaintiff 'bears the burden of establishing standing as of the time [he or she] brought th[e] lawsuit and maintaining it thereafter.'" *Murthy*, 144 S. Ct. at 1986 (first alterations by this Court; second by *Murthy*) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. 555, 561). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted)).[1]

Critically, "standing is not dispensed in gross." *Murthy*, 144 S. Ct. at 1988 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Thus, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Id.*

"To establish Article III standing, an alleged 'injury in fact' must be 'concrete, particularized, and actual or imminent.'" *Consumer Data Indus. Ass'n v. Texas ex rel. Paxton*, No.

---

[1] "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that [he or] she is 'likely' to establish each element of standing." *Murthy*, 144 S. Ct. at 1986 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis deleted)). "Where . . . the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks omitted)).

21-51038, 2023 WL 4744918, at *4 (5th Cir. July 25, 2023) (per curiam) (quoting *Clapper*, 568 U.S. at 409). "An allegation of future injury may establish standing if the threatened injury is 'certainly impending or there is a substantial risk that the harm will occur.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "Additionally, a plaintiff can demonstrate a cognizable injury in a pre-enforcement challenge only if it establishes that (1) it has 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and (2) 'there exists a credible threat of prosecution thereunder.'" *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 924–25 (5th Cir. 2023) (quoting *Driehaus*, 573 U.S. at 159). *See also Neese v. Becerra*, 123 F.4th 751, 753 (5th Cir. 2024) (per curiam) ("The right to pre-enforcement review is qualified and permitted only 'under circumstances that render the threatened enforcement sufficiently imminent.'" (quoting *Driehaus*, 573 U.S. at 159)).

Further, "[w]hen a party asserts a facial challenge to a statute under the First Amendment, courts may permit third-party standing when a plaintiff demonstrates that a provision that validly restricts its own speech is overbroad." *Nat'l Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (citing *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 956–57 (1984)). "A[ ] statute is overbroad if it validly regulates some expressive conduct but also reaches substantial protected speech." *Id.* (citing *City of Houston, Tex. v. Hill,* 482 U.S. 451, 456–57 (1987)). "The overbreadth doctrine permits a litigant to 'challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612 (1973)).

Nevertheless, "the overbreadth doctrine applies on a *provision by provision* basis: 'the plaintiff must establish injury under a particular provision of a regulation that is validly applied to

its conduct, then "assert a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the court *under that provision.*"'" *Id.* (quoting *SEIU, Local 5 v. City of Hous.,* 595 F.3d 588, 598 (5th Cir. 2010) (quoting *CAMP Legal Def. Fund, Inc. v. City of Atlanta,* 451 F.3d 1257, 1271 (11th Cir. 2006))).

"Article III standing retains rigor even in an overbreadth claim." *Id.* (quoting *Fairchild v. Liberty Indep. Sch. Dist.,* 597 F.3d 747, 754 (5th Cir. 2010)). "[I]f [Plaintiffs are] limited by one provision of an ordinance and make[ ] a facial challenge due to the overbreadth of a different provision, there is no constitutional standing, *i.e.,* there is no 'case or controversy,' as to the separate provision." *Id.* (quoting *SEIU, Local 5,* 595 F.3d at 598). "Although various prudential standing principles have been relaxed in some First Amendment cases, this relaxation does not eliminate the distinct and independent requirement of Article III that the dispute between the parties must amount to a case or controversy." *Id.* (quoting *Henderson v. Stalder,* 287 F.3d 374, 385 n.4 (5th Cir. 2002) (Jones, C.J., concurring)). *See also id.* at 209–10 (dismissing First Amendment overbreadth claim as to one provision of challenged law for lack of standing because the plaintiff Charities "have not offered any evidence to show that they intend to hire professional resellers to engage in activity covered by' the [other] provisions.").

However, "whereas there must be some evidence that a rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge, that is not the case for facial challenges." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (cleaned up). "Instead, when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* (cleaned up).

### 3. *Analysis*

The Court makes two points at the outset. First, Defendants concede that there is standing for the Title Provision claim. (*See* Doc. 22-1 at 14–15.) Thus, that provision warrants no further analysis here.

Second, both sides make valid points about the approach the Court must take. On the one hand, as Defendants contend, the Court must conduct an issue-by-issue and claim-by-claim analysis for standing—first under the Services Provision and then under the Practice Provision. On the other hand, Plaintiffs are correct that the various provisions are interconnected, and that will be relevant to the analysis as well.

With those guideposts established, the Court agrees with Plaintiffs; the *Complaint* alleges standing as to each claim.

As to the Services Provision, La. Rev. Stat. § 37:2352(10) provides in relevant part:

> A person represents himself to be a psychologist by using any title or description of services incorporating the words "psychology", "psychological", or "psychologist", or . . . or if that person offers to the public or renders to individuals or to groups of individuals services defined as the practice of psychology in this Chapter.

*Id.*

Here, Plaintiffs claim that a representative of the Board notified them that they violated Louisiana law "by using the word 'psychological' in the name of their business" and that "a preliminary investigation has substantiated the allegations of the complaint and supported multiple violations of Louisiana law." (*Compl.* ¶ 26, Doc. 1.) Plaintiffs changed the name of their business, but they would like to restore the previous name of "Psychological Wellness Institute" because "[t]hey believe it accurately describes the services they provide." (*Id.* ¶¶ 27–29.) Further, Plaintiffs claim that they at present do not use the term "psychological" to describe their services, but they

want "to explain to their clients, when appropriate, that, although they are not licensed psychologists, they have studied psychological principles, methods, and procedures, and apply them in their treatment to help clients modify their behavior and improve their lives." (*Id.* ¶¶ 30–31.) According to the *Complaint*, if they do either, they will be charged with violating Louisiana law and referred by the Board Defendants to the EBRP DA for prosecution for the above-described misdemeanors. (*Id.* ¶¶ 33–35.) And the provisions, Plaintiffs allege, violate the First Amendment. (*Id.* ¶¶ 36–48.)

Likewise, as to the facial challenge, the *Complaint* pleads that "anyone who has studied psychological principles, methods, and procedures, and attempts to use them to help a friend or relative, or gives a lecture to an audience with the hope of improving their lives, has engaged in the practice of psychology *and represented themselves as licensed psychologists*." (*Id.* ¶ 44.) Further, Plaintiffs claim that "Louisiana's law prohibiting people from engaging in the practice of psychology or *representing themselves as psychologists* is overbroad and unconstitutional." (*Id.* ¶ 48 (emphasis added).)

Considering these allegations, Plaintiffs have clearly alleged a sufficiently imminent injury-in-fact, traceable to these Defendants, which is redressable through declaratory and injunctive relief. That is, Plaintiffs have shown "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and "a credible threat of prosecution thereunder.'" *Braidwood Mgmt.,* 70 F.4th at 924–25; *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) ("These overlapping policies strongly suggest that enforcement of one produces a credible threat of enforcement of the others. Speech First has clearly shown a credible threat of enforcement of those policies upon its members.").

Likewise, as to the Practices Provision, Louisiana law defines "practice of psychology" as "the observation, description, evaluation, interpretation, and modification of human behavior, by the application of *psychological principles, methods, and procedures*, for the purpose of eliminating symptomatic, maladaptive, or undesired behavior, and of improving interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health, and mental health." La. Rev. Stat. § 37:2352(8) (emphasis added). Louisiana law then makes it a misdemeanor "[f]or any person not licensed in accordance with the provisions of this Chapter . . . to engage in the practice of psychology." *Id.* § 37:2360(A)(2).

Here, Plaintiffs allege that both Alleman and Catrett have "studied principles, methods, and procedures of psychology *and use[ ] those principles in [their] work at P. Wellness Institute to improve [their] clients' lives by supporting and encouraging them to modify their behavior.*" (*Id.* ¶¶ 21–22 (emphasis added).) And, again, Plaintiffs have already been the subject of one complaint and investigation for similar conduct, so it is reasonable to infer they could be again for violating this interrelated provision. Further, for their facial challenge, "courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Speech First*, 979 F.3d at 335 (cleaned up). Thus, Plaintiffs have engaged in conduct prohibited by the Practice Provision, and they face a credible threat of enforcement. Once again, they have standing.

Defendants rely heavily on *Neese*, but the Court finds that case distinguishable. There, certain doctors brought a pre-enforcement challenge to certain parts of the Affordable Care Act and Title IX. *Neese*, 123 F.4th at 752. The Notice at issue prohibited discrimination on the basis of sexual orientation or gender identity. *Id.* Both doctors "claim to be 'unwilling to provide gender-affirming care, in at least some situations, to patients who assert a gender identity that departs from

their biological sex. . . . Put another way, the doctors want to be sure that the physical bodies of

their patients are cared for properly.'" *Id.* at 753. The Fifth Circuit explained:

> Neither Plaintiff believes that their medical practices constitute
> gender-identity discrimination. However, they are fearful that HHS
> will view their practices as violating the Notification. Plaintiffs fear
> that HHS will bring an enforcement proceeding against them and
> terminate their federal funding if they do not "provide everything a
> transgender patient might demand" (even if it is not doable in their
> body) or "unconditionally play along with a patient's asserted
> gender identity."

*Id*.

The district court granted summary judgment to the plaintiffs, but the Fifth Circuit found

that Plaintiffs lacked Article III standing. *Id.* at 752. The appellate court explained:

> Plaintiffs have not met their burden to establish standing in this case
> because they have not shown how their conduct constitutes gender-
> identity discrimination under any plausible reading of the
> Notification. Plaintiffs themselves do not view their conduct as
> gender-identity discrimination, nor do they offer any evidence that
> HHS will view it as such. They have valid, non-discriminatory
> reasons for their medical practices, including that acting otherwise
> would be malpractice or would require them to provide services
> outside of their specialty areas. Lastly, their current practices have
> not been chilled or otherwise affected, and there is no evidence that
> an enforcement proceeding is imminent. *Cf. Braidwood Mgmt. Inc.
> v. EEOC*, 70 F.4th 914, 929 & n.27 (5th Cir. 2023) (holding
> plaintiffs had standing to bring pre-enforcement challenge where the
> EEOC previously brought an enforcement action under similar
> circumstances).

*Id.* at 753–54.

Here, conversely, Plaintiffs allege that their First Amendment rights have been chilled and

affected; they were forced to change the title of their business, and a fair inference from their

*Complaint* is that they are prevented from describing their services in the manner in which they

would like for fear of an enforcement action and prosecution. Further, another fair inference from

the *Complaint* is that, since Plaintiffs were investigated and threatened for violating the Title

Provision, they would also be investigated and threatened if they violated the Services Provision. Finally, Plaintiffs specifically allege that they currently engage in the "practice of psychology," as that statute is broadly written, and they likewise face a credible enforcement action here too. This is particularly true given that "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010.

Rather, the Court finds this case closer to *Braidwood*. There, two Texas employers sued the EEOC seeking declaratory judgments that they were exempt from Title VII's prohibitions on discrimination on the basis of sexual orientation or gender identity because of, *inter alia*, the First Amendment's free exercise and expressive association clauses. *Braidwood*, 70 F.4th at 918–921. On appeal, the EEOC's "most compelling" argument on justiciability was a lack of any injury-in-fact:

> The EEOC accurately notes that it has taken no enforcement action against these plaintiffs. And plaintiffs do not allege that they are aware of any applicants or current employees engaged in "homosexual or transgender behavior" or that they have taken any adverse employment action that could violate [the Supreme Court's] interpretation of Title VII. Thus, the EEOC says there is no standing.

*Id.* at 924. But the Fifth Circuit sided with Plaintiffs:

> To raise a constitutional challenge, the petitioner did not need to break the law and thereby expose himself to liability. Instead, he merely needed to show a "genuine threat" of enforcement. *Id.* Indeed, " '[t]he purpose of the Declaratory Judgment Act is to settle "actual controversies" before they ripen into violations of law or breach of some contractual duty.'" [*Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) (quoting *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949)).]

> Plaintiffs' credible-threat analysis is quite simple. First, they admit they are breaking EEOC guidance, which the EEOC does not seriously contest. They posit statutory and constitutional issues with

> the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their religious practices or to risk potential penalties. And the EEOC's actions in *Harris*, which the EEOC won under a less violative set of facts, indicate that plaintiffs, too, have a legitimate fear of prosecution, chilling their rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 [ ] (1976) (plurality opinion). Finally, the EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs' policies on homosexual and transgender behavior.

*Id.* at 926–927. Two cases, one of which was "landmark," "readily establish a credible threat to Braidwood's and Bear Creek's current practices." *Id.* at 927.

Further, *Braidwood* was not a situation where the Court was required to adjudicate a hypothetical situation:

> We know what the EEOC says violates its guidance and the law; we know what Braidwood's exact policies are; and we have admissions from the EEOC that Braidwood's current practices violate Title VII. Per *Harris*, we have evidence that the EEOC has brought an enforcement action against a similar violator. No party contests the facts or requests additional information to be presented to the court. There is remarkably little else needed to adjudicate the issue.

*Id*. at 929.

Ultimately, "Plaintiffs [were] reasonably worried about the implications of [*Harris*] on their practices. They [were] entitled to receive clarification from this court before stifling their constitutional practices or otherwise exposing themselves to punishment or enforcement action. That is a core purpose of a declaratory judgment." *Id.* at 927–28.

*Braidwood* is closer to the mark than *Neese*, as here too Plaintiffs have shown a "credible-threat" of enforcement under the Services and Practices Provisions. While they are not yet violating the Services law, they would but for the threat of enforcement. And, as alleged, their conduct falls within the broad language of the Practices Provision. (*See Compl.* ¶¶ 22, 40, 44–48,

24

Doc. 1.) Further, they too "posit statutory and constitutional issues with the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their [First Amendment rights] or to risk potential penalties." *Braidwood*, 70 F.4th at 926. And, like the EEOC's actions with *Harris*, here, the Board Defendants have already flexed their muscles and threatened prosecution with one of the three provisions at issue—meaning it is reasonable to infer that they would for the others. As in *Braidwood*, "[t]here is remarkably little else needed to adjudicate the issue[s]" with the Service Provision. *Id.* at 929. Finally, here too the Court must be concerned with "[t]he loss of First Amendment freedoms, for even minimal periods of time. . . ." *Id.* at 927.

For all these reasons, the Court finds that Plaintiffs have standing under the Title, Services, and Practices Provisions. As a result, Defendants' *MTD* will be denied on this issue.

### C. Sovereign Immunity

#### 1. *Parties' Arguments*

Defendants argue that the claims against the Board Defendants are precluded by sovereign immunity. (Doc. 22-1 at 19.) The Board is a state agency for purposes of the Eleventh Amendment, so the claims are barred without an applicable exception. (*Id.*) Further, Plaintiffs cannot rely on *Ex parte Young*, say Defendants, because (1) "at most, the Board has *discretion* to investigate violations," and that is insufficient on its own, (*id.* at 19–20); and (2) misdemeanors are prosecuted by the EBRP DA, not the Board, (*id.* at 20).

Plaintiffs dispute these arguments. (Doc. 25 at 21.) First, Defendants have not shown that the Board is an arm of the State, as they wholly fail to conduct the required analysis or offer any evidence. (*Id.* at 21–22.) Second, *Ex parte Young* is applicable because the Board is authorized to investigate and seek injunctive relief for violations of Chapter 28 under La. Rev. Stat. § 37:2361.

25

(*Id.* at 22.) Third, Defendants' arguments are wrong because (a) Defendants' discretion argument would gut sovereign immunity, as nearly every official (like prosecutors) have *some* discretion, (*id.* at 22–3); (b) "the Board Defendants have *already* exercised their discretion to enforce the Representation Law against *these plaintiffs*[,]" (*id.* at 23); and (c) "virtually every case challenging licensing schemes is brought against the board that enforces the scheme," (*id.* (citations omitted)). Plaintiffs then distinguish Defendants' two cases. (*Id.* at 23–24.) Finally, Defendants err in maintaining that the EBRP DA's authority to prosecute criminally somehow precludes an action against the Board Defendants for civil enforcement under a different statute. (*Id.* at 24–25.)

In reply, Defendants largely repeat themselves: (1) the Board is an arm of the state, and Plaintiffs have failed to show otherwise; (2) the Board has only discretionary authority, which is insufficient; and (3) the EBRP DA has ultimate authority, so the "sole justiciable claim is limited to District Attorney Moore." (Doc. 27 at 9–10.)

### 2. *Applicable Law*

"Generally, 'sovereign immunity bars private suits against nonconsenting states in federal court.'" *Book People, Inc. v. Wong*, 91 F.4th 318, 334 (5th Cir. 2024) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019)). "This bar also applies to suits like this one 'against state officials or agencies that are effectively suits against a state.'" *Id.* (quoting *City of Austin*, 943 F.3d at 997).

"Under the *Ex parte Young* exception to sovereign immunity, however, a plaintiff can seek prospective injunctive relief 'against individual state officials acting in violation of federal law.'" *Id.* (quoting *City of Austin*, 943 F.3d at 997 (citation omitted)). "To be a proper defendant under *Ex parte Young*, a state official 'must have some connection with the enforcement of' the law being

challenged." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (quoting *Ex parte Young*, 209 U.S. at 157). The three "guideposts" which "aid the decision" are:

> (1) the state official has "more than the general duty to see that the laws of the state are implemented," i.e., a "particular duty to enforce the statute in question"; (2) the state official has "a demonstrated willingness to exercise that duty"; and (3) the state official, through her conduct, "compel[s] or constrain[s persons] to obey the challenged law."

*Mi Familia*, 105 F.4th at 325 (quoting *Texas All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022)).

Thus, "[t]o satisfy the required enforcement connection, the state official must have a duty beyond 'the general duty to see that the laws of the state are implemented.'" *Book People*, 91 F.4th at 335 (quoting *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014))). *See also Mi Familia*, 105 F.4th at 325 n.7 (finding it "not legally significant" that this formulation combined the first and second "guideposts"). "Rather, the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Book People*, 91 F.4th at 335 (quoting *City of Austin*, 943 F.3d at 1000 (quoting *Morris*, 739 F.3d at 746)). "[This] analysis is '"provision-by-provision": The officer must enforce "the particular statutory provision that is the subject of the litigation."'" *Mi Familia*, 105 F.4th at 327 (quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020))). "We have defined 'enforcement' as 'compulsion or constraint,' so if the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (cleaned up).

"Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Id.* (quoting *Tex. Democratic Party*, 978 F.3d at 179 (internal quotation marks and citation omitted)).

The Fifth Circuit has "noted that the Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." *Id.* (cleaned up).

Additionally, "the inquiry into whether a suit is subject to the *Young* exception does not require an analysis of the merits of the claim." *City of Austin*, 943 F.3d at 998 (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 646 (2002)). "Rather, 'a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."'" *Id.* (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (alteration in original) (quoting *Verizon*, 535 U.S. at 645)).

### 3. Analysis

Having carefully considered the matter, the Court finds that Defendants are not entitled to dismissal on this ground. Preliminarily, the Court agrees with Defendants that the Board is an arm of the state for purposes of the Eleventh Amendment. While Defendants did not provide much argument or any evidence on this issue, they did cite *Cerwonka v. Louisiana*, No. 17-1095, 2018 WL 1867195, at *5 (W.D. La. Mar. 26, 2018), *report and recommendation adopted sub nom. Cerwonka v. Louisiana*, No. 17-1095, 2018 WL 1867094 (W.D. La. Apr. 18, 2018). *Cerwonka* persuasively found that the Board "is a state agency for purposes of Eleventh Amendment immunity[.]" *Id. Cerwonka* reasoned that the Board was similar to the Louisiana State Board of Medical Examiners, which was found by the Fifth Circuit to be a state agency for these purposes. 2018 WL 1867195, at *4–5 (citing *Fairley v. Louisiana*, 254 F. App'x 275, 277 (5th Cir. 2007)). This Court sees no reason to depart from those decisions.

That said, the *Ex parte Young* exception applies because the Board has established each of the *Mi Familia* guideposts. By law, the Board is "authorized and empowered to . . . [c]ause the

prosecution and enjoinder of all persons violating this Chapter, and incur necessary expenses therefor." La. Rev. Stat. § 37:2353 (C)(6). Accordingly, "[t]he [B]oard may apply for an injunction in any court of competent jurisdiction to enjoin any person from committing any act which is in violation of this Chapter." *Id.* § 37:2361(B). Likewise, the Board's enforcement letter stated: "As the regulatory authority charged with governing the practice of psychology in this state, the [Board] is *mandated by law* to take legal action against persons who engage in the unlicensed practice of psychology." (Doc. 29-4 (emphasis added).) The Board sought "voluntary corrective action," but the Board specifically said, "Failure to do so will result in the [Board] both filing for civil injunctive relief and making criminal referrals to the appropriate law enforcement agencies." (*Id.*) Again, Plaintiffs have shown (1) "more than the general duty" to enforce the law; (2) "a demonstrated willingness to exercise that duty[;]" and (3) "the state official, through her conduct, compels or constrains persons to obey the challenged law." *Mi Familia*, 105 F.4th at 325 (cleaned up).

Defendants rely on *Mi Familia* for the proposition that "Discretionary authority to act, on its own, is insufficient to give rise to a particular duty to act, i.e., a 'sufficient connection [to] enforcement,'" 105 F.4th at 327 (quoting *City of Austin*, 943 F.3d at 998 (alteration in original)), but Defendants put too much emphasis on the word "discretionary" and ignore the rest of the quote. What the Fifth Circuit ultimately decided on this issue provides clarity:

> In sum, "[t]o be amenable to suit under [*Ex parte Young*], the state actor must *both* possess the authority to enforce the challenged law and have a sufficient connection [to] the enforcement of the challenged act." *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (third alteration in original) (emphasis added) (quotation marks and citations omitted). Here, Ogg has discretionary authority to bring criminal prosecutions within her jurisdiction, including for violations of the Texas Election Code. This authority is not derived from that code itself but is rooted in the Texas constitution. Ogg has a general duty to "see that justice is done," TEX. CODE CRIM. P.

art. 2.01, but that is not enough. *Texas All.*, 28 F.4th at 674.

*Mi Familia*, 105 F.4th at 328.

Here, unlike *Mi Familia*, Plaintiffs are not relying on a general duty of the Board but on a specific grant of power to enforce the Board's licensure law and enjoin violations thereof—one which the Board itself recognized in its enforcement letter that it was "mandated by law to take[.]" (Doc. 29-4.) Thus, unlike *Mi Familia,* Plaintiffs are not relying on "[d]iscretionary authority to act, *on its own*;" rather, the Board has a "a particular duty to act" and thus a "sufficient connection to enforcement." *Mi Familia*, 105 F.4th at 327.

Next, Defendants quote *City of Austin* for the proposition that, "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends." 943 F.3d at 998. But this quote, again, needs to be seen in context; the Fifth Circuit provided the following immediately after that quote:

> For example, in *Morris v. Livingston*, an inmate in the custody of the Texas Department of Criminal Justice ("TDCJ") sued the Governor of Texas, challenging the constitutionality of a statute that required TDCJ inmates to pay a "health care services fee" if an inmate initiated a visit to a health care provider. 739 F.3d 740, 742 (5th Cir. 2014). The statute specifically tasked the TDCJ as responsible for its enforcement. *Id.* at 745-46. Thus, a panel of this court held that the Governor was an improper defendant and upheld the district court's dismissal of the inmate's claims against him. *Id.* at 746 ("[The challenged statute] makes clear that TDCJ is the agency responsible for the section's administration and enforcement . . . . It does not [ ] task [the] Governor [ ] with its enforcement.").

*Id.* Thus, the *City of Austin* line simply stands for the unremarkable proposition that a plaintiff seeking to use the *Young* exception must try to enjoin the right official.

But, at the heart of the argument, the Court agrees with Plaintiffs—the EBRP DA's authority to prosecute *criminal* misdemeanors does not gainsay the Board's independent authority to "*cause* the prosecution and *enjoinder*" of those in violation of the law governing psychologists,

La. Rev. Stat. § 37:2353 (C)(6) (emphasis added) (cleaned up), and to "fil[e] for civil injunctive relief[,]" (Doc. 29-4.) That is, even if the EBRP DA is charged with *criminal* enforcement, the Board is charged with *civil* enforcement, and *Young* can apply in such situations. *See Ex parte Young*, 209 U.S. at 155–56 ("individuals who, as officers of the state, are clothed with *some* duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, *either of a civil or criminal nature*, to *enforce* against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." (emphasis added)); *see also Inst. for Free Speech v. Johnson*, No. 23-1370, 2024 WL 4526047, at *9 (W.D. Tex. Aug. 30, 2024) (finding *Ex parte Young* exception applied to certain commissioners where law provided, inter alia, that "the commission may initiate civil enforcement actions and refer matters to the appropriate prosecuting attorney for criminal prosecution" (quoting Tex. Gov't Code § 571.171)).

For all these reasons, the Court finds that the claims against Defendants are not barred by the Eleventh Amendment. Their motion will be denied on this issue.

## III. MTD: PLEADING CHALLENGES

### A. Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Great Lakes*, 624 F.3d at 210 (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *Calhoun v. City of Hous. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

### B. Parties' Arguments

#### 1. Defendants' Original Memorandum (Doc. 22-1)

Defendants next argue that, if the Court proceeds on the merits, Plaintiffs have stated no viable First Amendment claim. (Doc. 22-1 at 20.) First, "Plaintiffs' only cognizable as-applied challenge concerns the Title Provision and the trade name for their business—core commercial

speech." (*Id.* at 21.) While the exact bounds of what constitutes "commercial speech" are not defined, trade names fall within that category. (*Id.*) So, here, Plaintiffs' use of the term "psychology" in their business name is a form of commercial speech. (*Id.* at 21–22.) Consequently, Plaintiffs cannot rely on the case of *Serafine v. Branaman*, 81 F.3d 354 (5th Cir. 2016), because that case involved political speech. (*Id.* at 22.)

Additionally, trade names are not protected by the First Amendment when they are "inherently misleading" or "inherently likely to deceive." (*Id.* at 22–23.) Trade names can be particularly misleading, especially in the medical profession. (*Id.* at 23 (collecting cases).) Here, Plaintiffs readily admit they do not engage in the practice of psychology, so their trade name is deceptive commercial speech.

Further, even if the trade name was not inherently deceptive, Defendants satisfy the factors from *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 561 (1980)). (*Id.* at 24.) The State has a compelling interest in protecting the public health and welfare from the unauthorized practice of psychology, and the Title Provision directly advances that interest. (*Id.* at 25.) Finally, the regulation is no "more extensive than is necessary to serve that interest" because it is in line with Fifth Circuit case law and directly addresses the relevant issue. (*Id.* at 25.)

Defendants argue that the overbreadth claim easily fails as well. The Fifth Circuit has recognized that "[t]he overbreadth doctrine does not apply to commercial speech," (*id.* at 26 (quoting *Serafine*, 810 F.3d at 364)), and so the challenge concerning the Title Provision cannot succeed. (*Id.*)

## 2. *Plaintiffs' Opposition (Doc. 25)*

Plaintiffs respond: "The complaint alleges that Louisiana law prohibits plaintiffs from saying things that are true about what they do: they provide services based in psychology. Defendants' Rule 12(b)(6) motion simply ignores the allegations of the complaint *and* Louisiana law." (Doc. 25 at 25.) The *Complaint* alleges that Plaintiffs have studied psychological principles, use those principles, and that Louisiana law allows this, and they would like to tell their clients this truth. (*Id.* at 25–26.)

Under the *Central Hudson* factors, this speech is not misleading, particularly since they do not represent themselves to be licensed psychologists. (*Id.* at 26.) Defendants ignore the allegations of the *Complaint*. (*Id.*) Plaintiffs argue:

> Whether plaintiffs may engage in the *practice* of psychology, as defined in La. R.S. § 37:2352(7), is not really relevant, but an appropriate reading of the complaint (and Louisiana law) suggests that they come pretty close. The complaint alleges that plaintiffs use "principles, methods, and procedures" of psychology to help clients modify their undesired behavior. That certainly sounds a great deal like the definition in Section 37:2352(7).

(*Id.* at 27.) Plaintiffs then cite to the licensure law for professional counselors and social workers to explain how they "engage in treatment that fits the definition of the practice of psychology." (*Id.*) For instance, both can lawfully use "psychotherapy" to treat patients. (*Id.* at 27.)

> Perhaps most tellingly, La. R.S. § 37:2365 states that other licensed professionals "shall be permitted to render services consistent with their professional training and code of ethics. . ." Plainly, there would be no *point* to this section if there were not at least some question as to whether the practice of other professionals constituted the practice of psychology. One does not need an exemption from a rule if it is not applicable in the first place. *See also* La. AG Op. 11-0276, 2012 La. AG LEXIS 208, at *14 (rejecting objection by the Board of Examiners of Psychologists to new rules promulgated by the Professional Counselors Board of Examiners that specified coursework for Licensed Marriage and Family Therapists in psychotherapeutic services and psychopathology; the Psychologists

> Board claimed that the rules violated the statute governing the practice of psychology, but the opinion notes that Section 37:2365 precludes any such argument). . . .
>
> But, again, whether plaintiffs engage in the *practice* of psychology is irrelevant. It is enough that they offer psychological services, and the complaint alleges that they do because they apply psychological principles, methods, and procedures in working with their patients.

(*Id.* at 27–28.)

Plaintiffs cite authority of their own purporting to hold that "the First Amendment generally precludes states from prohibiting the use of specificized words." (*Id.* at 28–29 (collecting cases).) Indeed, this case is stronger than that authority, because those sometimes deal only with the use of a job title, whereas, here, the Representation Law precludes more. (*Id.* at 29.)

Defendants also cite a number of cases to support their position that the use of the term "psychology" in any form is misleading, but these decisions are distinguishable. (*Id* at 30.) Some reached this decision after discovery, or evidence was produced, or even after trial. (*Id.*)

Defendants also only apply the *Central Hudson* factors as it relates to the Title Provision, but the "Representation Law . . . plainly prohibits far more." (*Id.* at 30.) Defendants fail to explain "why prohibiting the words 'psychology' or 'psychological' directly advances that interest, much less why any potential consumer misunderstanding could not be mitigated with a disclaimer." (*Id.*)

Plaintiffs next assert that the Representation Law also restricts non-commercial speech— namely, it prevents Plaintiffs from describing their services to their clients using certain barred words. (*Id.* at 30–31.) The law is thus content-based, which means it is presumptively unconstitutional and must pass strict scrutiny. (*Id.* at 31.) Defendants fail to make any effort to satisfy this standard. (*Id.*)

Defendants also fail to dispute the law's overbreadth. (*Id.*) This makes sense, say Plaintiffs, because *Serafine* found a narrower law overbroad and violative of the First Amendment. (*Id.* (citing *Serafine*, 810 F.3d at 369–70).)

Plaintiffs close by arguing that, if they fail to state a viable claim, the Court should give them leave to amend to cure any deficiencies. (*Id.* at 32.) That is, even if Defendants are correct that Plaintiffs need more detail, the Court should allow them to replead their claims. (*Id.*)

### 3. Defendants' Reply (Doc. 27)

Defendants begin their reply: "The errors that plague Plaintiffs' standing arguments bleed over into their commercial speech analysis. Do not lose the lede: Plaintiffs concede that Louisiana law regulates commercial speech twice over." (Doc. 27 at 11.) Defendants reiterate that "trade names are regulable commercial speech," and the laws here are permissible. (*Id.* (citations omitted).)

Defendants next reiterate that overbreadth challenges do not apply to commercial speech. (*Id.* at 12.) Plaintiffs cannot overcome their need for Article III standing to assert the non-commercial speech claims. (*Id.*) Ultimately, "Plaintiffs failed to state a claim for relief under the First Amendment on their only justiciable claim." (*Id.* at 13.)

### C. Preliminary Note

The Court must first emphasize what is and what is not before the Court. Defendants' Rule 12(b)(6) attack is limited to those allegations challenging the Title Provision. (*See* Doc. 22-1 at 21–26.) Thus, the Court does not consider whether Plaintiffs have stated viable claims (as applied or facial) under the Services Provision or Practice Provision. Instead, the Court will look solely to the Title Provision.

### D.  As-Applied Challenge

#### 1.  Applicable Law

Commercial speech is "[e]xpression related solely to the economic interests of the speaker

and its audience*." Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs &

Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019) (citing *Cent. Hudson*, 447 U.S. at 561). "Although

the Constitution protects commercial speech, that protection is more limited than for most other

speech." *Express Oil*, 916 F.3d at 487 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456

(1978)).

Government officials may regulate commercial speech only if they satisfy the following

test:

> At the outset, [a court] must determine whether the expression is
> protected by the First Amendment. For commercial speech to come
> within that provision, it at least must concern lawful activity and not
> be misleading. Next, [a court] ask[s] whether the asserted
> governmental interest is substantial. If both inquiries yield positive
> answers, [a court] must determine whether the regulation directly
> advances the governmental interest asserted, and whether it is not
> more extensive than is necessary to serve that interest.

*Id.* (quoting *Cent. Hudson*, 447 U.S. at 566). "The party seeking to uphold a restriction on

commercial speech carries the burden of justifying it." *Id.* (quoting *Bolger v. Youngs Drug Prods.

Corp.*, 463 U.S. 60, 71 n.20 (1983)). "This burden is a heavy one, and may not be satisfied by mere

speculation or conjecture." *Id.* at 487–88 (cleaned up).

"In order for commercial speech to be protected under the First Amendment, 'it at least

must concern lawful activity and not be misleading.'" *Id.* (quoting *Am. Acad. of Implant Dentistry

v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017) (quoting *Cent. Hudson*, 447 U.S. at 566)).

"Commercial statements that are actually or inherently misleading do not enjoy the protections of

the First Amendment." *Id.* (citing, inter alia, *In re R.M.J.*, 455 U.S. 191, 203 (1982) ("Misleading

advertising may be prohibited entirely.")). "Statements that are only potentially misleading, however, are safeguarded by the First Amendment." *Id.* "In such a case, a state actor must show that the restriction directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest." *Id.* (cleaned up).

### 2. *Inherently or Actually Misleading*

#### a. Applicable Law

"States' ability to limit the use of titles and trade names to protect the public from 'false, deceptive, and misleading.' advertising is well-established." *Serafine*, 810 F.3d at 360. These cases "arose in the context of commercial speech where a party was trying to use a professional title or trade name for business purposes." *Id.* (citing *Maceluch v. Wysong*, 680 F.2d 1062, 1068–70 (5th Cir. 1982) (per curiam) (upholding Texas licensing law that prevented doctors of osteopathy from using "M.D." in connection with their medical practice); *Accountant's Soc'y of Va. v. Bowman,* 860 F.2d 602, 605–06 (4th Cir. 1988) (upholding statute that prohibited unlicensed accountants from using the title "public accountant" because of the danger of "misleading commercial speech"); *Brandwein v. Cal. Bd. of Osteopathic Exam'rs,* 708 F.2d 1466, 1469–70 (9th Cir. 1983) (upholding restriction preventing doctor of osteopathy from holding himself out as an M.D. because of the danger of false or misleading commercial speech)). "[A] statement is actually or inherently misleading when it deceives or is inherently likely to deceive." *Express Oil*, 916 F.3d at 488 (quoting *Joe Conte Toyota, Inc. v. La. Motor Vehicle Comm'n*, 24 F.3d 754, 756 (5th Cir. 1994)).

Thus, in *Express Oil*, one key question was whether the trade name "Tire Engineers" was "actually or inherently misleading" when used by an automative services center rather than a licensed engineer. 916 F.3d at 489. The Fifth Circuit looked to dictionary definitions of the term

"engineer." *Id.* An "engineer" could be defined as "a person who carries through an enterprise or brings about a result esp[ecially] by skillful or artful contrivance" or "a person who is trained or skilled in the technicalities of some field ([such] as sociology or insurance) not usu[ally] considered to fall within the scope of engineering and who is engaged in using such training or skill in the solution of technical problems." *Id*. (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 752 (1986)). The Fifth Circuit also looked to the definition of "inherent," which means "involved in the . . . essential character of something. . . ." *Id.* (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 1163 (1986)). The Fifth Circuit concluded:

> That this definition of "engineer" does not meet the Board's preferred definition does not make its use inherently misleading. [*Am. Acad.*, 860 F.3d at 307–08 ("The problem here is the absence of any group imprimatur behind the label 'specialist.' Nonetheless, the term 'specialist' is not rendered devoid of intrinsic meaning, and thereby inherently misleading, simply because the organization responsible for conferring specialist credentials on a particular dentist is not identified in the advertisement."); *see also Byrum*, 566 F.3d at 447.] The term "engineer" can mean many things in different contexts, and it is certainly not limited to those professionals licensed by Mississippi to practice engineering. It is not, therefore, "devoid of intrinsic meaning." *Joe Conte Toyota*, 24 F.3d at 756 (quoting *Peel*, 496 U.S. at 112 (Marshall, J., concurring)). Additionally, as Express explains, "[t]he district court's analysis failed to account for the manner in which the [Tire Engineers] mark is transmitted—on the company's website, which describes its automotive services (not any professional engineering services), and at its retail stores, which appear like any other store that performs automotive services. . . ." Consequently, viewing the evidence in a light most favorable to the non-moving party—here, Express—the use of Tire Engineers is not inherently misleading under our precedent.

*Id.* at 489–90.

As to whether the name Tire Engineers was actually misleading, the Fifth Circuit found that it was not:

> A review of Supreme Court and Fifth Circuit precedent shows that the district court erred in deciding that the Tire Engineers name is actually misleading. In *Peel*, a four-Justice plurality suggested that evidence of deception is necessary to sustain a finding that commercial speech is actually misleading—a conclusion that the concurring and dissenting justices did not dispute. Based on *Peel*, as well as our own precedent, *Joe Conte Toyota*, 24 F.3d at 756, the Board was required to present evidence of deception. Because it did not, the district court erred in concluding that the Tire Engineers mark was actually misleading. . . . Again, even when the evidence is independently viewed in a light most favorable to the Board, there is no evidence in the record, including the affidavits of Josh Henderson, the decisions of the other state agencies, the news articles and website captures, and the survey, to support a holding of actual deception. . . . Given that the name is neither actually nor inherently misleading, it enjoys limited First Amendment protections, as discussed in *Central Hudson*.

*Id.* at 491 & n.14.

Similarly, *Abramson v. Gonzalez*, 949 F.2d 1567 (11th Cir. 1992), was cited with approval by Plaintiffs, (Doc. 25 at 29), and by *Express Oil*, 916 F.3d at 493 & n.15, and this case too warrants discussion. In *Abramson*, "dozens of practicing psychologists, clinical social workers and therapists" were "practic[ing] psychology or the allied fields in Florida[.]" 949 F.2d at 1569. They brought suit against, inter alia, members of the Florida Board of Psychological Examiners and the Florida Board of Clinical Social Work, Marriage and Family Therapy and Mental Health Counseling. *Id.* at 1570. Plaintiffs wanted to "hold themselves out as psychologists or allied professionals in advertising, telephone directories, office signs or stationary." 949 F.2d at 1574.

The Eleventh Circuit noted several times that there was no restriction on the plaintiffs practicing psychology. *See id.* at 1570 ("No laws in Florida prevent anyone from practicing psychology or one of the allied fields . . ."); *see also id.* at 1572 ("Since Florida law does not restrict the practice of psychology, several of the plaintiffs apparently practice what would commonly be referred to as psychology in the state."). Accordingly, this appellate court held:

> [A]s long as Florida has not restricted the practice of psychology, the state may not prevent the plaintiffs from calling themselves psychologists in their commercial speech. If they are allowed to practice psychology, . . . they must be allowed to say truthful things about their work. As long as the plaintiffs do not hold themselves out as *licensed* professionals, they are not saying anything untruthful, for they are in fact psychologists and are permitted to practice that profession under current state law.

*Id* at 1576. The Eleventh Circuit noted that it was "not bound by Florida's definition of a psychologist, but instead must consider whether allowing the plaintiffs to call themselves psychologists will be actually or potentially misleading." *Id.*

> Examining the commercial speech that the plaintiffs wish to make in light of the Supreme Court's instructions in *Peel*, we find the speech only potentially, not inherently misleading. The plaintiffs clearly would enjoy no right falsely to hold themselves out as "licensed psychologists." But under the laws of Florida, they may practice psychology without licenses, and truthful advertising which conveys this message would be neither false nor inherently misleading. As they argue in their own brief before this court, plaintiffs ask not for the right to call themselves "licensed psychologists," but only for the right to call themselves psychologists.

*Id.* at 1577. The Eleventh Circuit also found that the state's substantial interest could be "furthered by more, not less disclosure." *Id.* at 1578.

> If the state is concerned about the dangers posed by "unqualified persons," the current system whereby anyone may practice psychology seems an odd one indeed. Nonetheless, as long as that remains the system in Florida, the defendants must adopt narrowly tailored means for directly advancing the state's interest while preserving the plaintiff's right to disseminate truthful commercial speech. . . .

> In *Parker,* the court said a general dentist's advertising could avoid the potential for misleading the public by indicating that while he specialized in orthodontics, he did not hold an orthodontia specialty license. "A disclaimer to such an effect would adequately address the state's concern." *Parker*, 818 F.2d at 510. Just as *Parker* noted that there were separate telephone listings for "Dentists" and "Dentists–Orthodontists," there could be separate listings in Florida

> for "Psychologists" and "Psychologists–Licensed." As the Supreme
> Court said in *Peel,* we must assume that the public can distinguish
> between a university degree on the wall and a license issued by the
> state.

*Id.* In reversing the grant of summary judgment in favor of the defendants, the Eleventh Circuit

concluded:

> The Supreme Court has recognized the public's right to *receive*
> truthful commercial information under the first amendment, in
> addition to the speaker's right to disseminate information helpful to
> his or her commercial interests. "[T]he First Amendment protects
> the public's interest in receiving information." *Pacific Gas & Elec.
> Co.,* 475 U.S. at 8 [ ]. "[P]eople will perceive their own best interests
> if only they are well enough informed, and the best means to that
> end is to open the channels of communication, rather than to close
> them. . . . [T]he First Amendment presumes that some accurate
> information is better than no information at all." *Central Hudson,*
> 447 U.S. at 562  [ ] (citations and quotations omitted). The current
> versions of the Psychological Services Act and the Clinical
> Counseling Act place an unconstitutional burden on commercial
> speech.

*Id.*

But, in *Maceluch*, the Fifth Circuit looked at a similar issue and reached the opposite result.

In *Maceluch*, the plaintiffs were physicians who received degrees of "Doctor of Osteopathy" rather

than "Doctor of Medicine." 680 F.2d at 1064. They sued the Texas State Board of Medical

Examiners because the "Texas licensing scheme [ ] prevent[ed] them from using the designation

'M.D.' after their names on their letterhead and on other public listings of diverse nature." *Id.* The

parties stipulated that "(t)here is no substantial difference between accredited medical schools

irrespective of the terminology of the degree conferred, except that students attending medical

schools conferring the degree 'Doctor of Osteopath' are required to take, and be examined in,

several courses in manipulative therapy[.]" *Id.*

Plaintiffs argued in part that this restriction violated the First Amendment, "especially in light of the allegedly generic nature of the designation 'M.D,'" *id*., but the district court rejected the argument based on "the state's interest in protecting the public from the deceptive and misleading use of [ ] trade names." *Id.* at 1069 (quoting *Friedman v. Rogers*, 440 U.S. 1, 15 (1979)). The district court explained:

> Plaintiffs urge that the term "M.D." has become so synonymous in the public mind with qualified, licensed physicians, that to prevent osteopaths from describing themselves as M.D.'s will confuse the public as to the true nature of their profession and training. Conceding that some members of the public may indeed comprehend the term M.D. to connote competent physicians, it is not irrational for the state to conclude that for plaintiffs to use the designation "M.D." would nevertheless deceive those who know the difference between doctors who received M.D. degrees and D.O. degrees. Curiously, plaintiffs emphasize numerous instances where their possession of a D.O. rather than an M.D. degree led physicians with M.D.'s to view them with suspicion. This argument only suggests a rational basis for the legislative decision. Evidently, the market cares about the distinction. Courts should not end the dissemination of information reasonably perceived by the legislature to be useful to the functioning of the market, whether the Court thinks the market is correct in any normative sense.
>
> Plaintiffs' plight is not without appeal. The substantive content of the education and the level of clinical skills imparted to those graduating from osteopathic schools does not differ materially from that received by those who have graduated from schools graduating M.D.'s. Yet, osteopaths face a uniform licensing exam, and are likely to enjoy fewer financial and professional benefits from their calling. Still, the similar substantive content and skill level of osteopaths does not alter the fact that the osteopathic school which trained the plaintiffs has historically emphasized a different approach to the art of medicine. At least one solution is for the less well known D.O.'s themselves to provide the marketplace with the information necessary to make an informed choice. Where the legislature has implicitly required this solution, it is not for the courts to say otherwise.

*Id.* at 1069. Thus, there was no constitutional violation. *Id.* at 1069–70.

The Fifth Circuit "affirmed on the basis of the district court's opinion." *Id* at 1063. Significantly, *Maceluch* was cited with approval by the Fifth Circuit recently in *Serafine* for the proposition that the "[s]tates' ability to limit the use of titles and trade names to protect the public from 'false, deceptive, and misleading' advertising is well-established." 810 F.3d at 360.

b. Analysis

Having carefully considered the matter, the Court will grant the motion on this issue. Again, Plaintiffs want to return the name of their company back to "Psychological Wellness Institute." (*Compl.* ¶ 29, Doc. 1.) Plaintiffs allege that "Defendants lack any reasonable basis for believing that Alleman and Catrett's use of the word psychological would mislead any potential or actual consumers or clients." (*Id.* ¶ 32.)

But, even construing these allegations in a light most favorable to Plaintiffs and drawing reasonable inferences in their favor, the Court finds that Plaintiffs fail to plead that the desired trade name is not actually or inherently misleading. It's significant that, in the *Complaint*, the term "inherent" is completely absent. Indeed, the *Complaint* wholly fails to make any effort to explain how or why the trade name is not inherently misleading. Further, Plaintiffs alleges there is no reasonable basis for Defendants to believe that the term "psychological" would mislead consumers or clients, but this is wholly conclusory. Without more, Plaintiffs are not entitled to relief.

*Express Oil* does not save the *Complaint*. First, there is no allegation about "the manner in which the [desired] mark [will be] transmitted," which was a factor considered by *Express Oil* in evaluating whether the trade name was inherently misleading. 916 F.3d at 490. Second, and more importantly, Plaintiffs allege that both Alleman and Catrett have "studied principles, methods, and procedures of psychology and use[ ] those principles in [their] work at P. Wellness Institute to improve [their] clients' lives by supporting and encouraging them to modify their behavior."

(*Compl.* ¶¶ 21–22, Doc. 1.) But, these allegations are again conclusory; Plaintiffs do not describe what the relevant psychological "principles, methods, and procedures" are or how they use them in their practice. Thus, unlike *Express Oil*, the *Complaint* fails to explain how "[t]he term ['psychological'] can mean many things in different contexts" and how "it is certainly not limited to those professionals licensed by [Louisiana] to practice [psychology.]" 916 F.3d at 489.

But *Abramson* is even more fatal. *Abramson* was premised on the fact that Florida law allowed the plaintiffs to engage in the practice of psychology. *See Abramson*, 949 F.2d at 1576–77 ("But under the laws of Florida, they may practice psychology without licenses, and truthful advertising which conveys this message would be neither false nor inherently misleading."). Specifically, the Eleventh Circuit held:

> [A]s long as Florida has not restricted the practice of psychology, the state may not prevent the plaintiffs from calling themselves psychologists in their commercial speech. If they are allowed to practice psychology, . . . they must be allowed to say truthful things about their work. As long as the plaintiffs do not hold themselves out as *licensed* professionals, they are not saying anything untruthful, for they are in fact psychologists and are permitted to practice that profession under current state law.

*Id.* at 1576. But, critically, Louisiana law *does expressly prohibit* Plaintiffs from both engaging in the practice of psychology and representing themselves as psychologists. *See* La. Rev. Stat. § 37:1103(7) (stating, in the chapter governing "licensed professional counselors," that "nothing in this Chapter shall be construed to authorize any person licensed hereunder to . . . engage in the practice of psychology . . . ."); *see also id.* § 37:2703(15)(c) ("Nothing in this Chapter shall be construed to authorize any social worker . . . to administer or interpret psychological tests, or to engage in the practice of psychology, as defined by the provisions of R.S. 37:2352 . . . ."); *see also id.* § 37:2360(A)(1), (2) (making it a misdemeanor "[f]or any person not licensed in accordance with the provisions of this Chapter . . . to represent himself as a psychologist . . . [or] to engage in

45

the practice of psychology."). And the *Complaint* acknowledges this. (*See Compl.* ¶ 24, Doc. 1 ("Louisiana law permits Alleman and Catrett to treat their patients consistent with their professional training *provided that they do not represent themselves as psychologists or their work as psychological*." (emphasis added); *see id.* ¶ 48 (implicitly recognizing that "Louisiana[ ] law prohibit[s] people from engaging in the practice of psychology or representing themselves as psychologists . . .").) Thus, in Louisiana, unlicensed practitioners cannot represent themselves as psychologists or practice psychology without violating Louisiana law, and nothing in *Abramson* contradicts this outcome. That is, unlike *Abramson*, Plaintiffs would not be engaged in truthful speech permitted by Louisiana law, and that makes *Abramson* distinguishable.

Rather, the same reasoning from *Maceluch* applies here with greater force. M.D.'s and D.O.'s did not differ materially in their education or level of clinical skills, yet the Fifth Circuit still found that it would be misleading for D.O.'s to convey to the public false information in their trade name. 680 F.2d at 1069. And this was so even though their "plight [was] not without appeal." *Id.* Similarly, here, while the Court is sympathetic to Plaintiffs' position, they are specifically prohibited by Louisiana law from engaging in the practice of psychology, and, under *Maceluch*, it would be unlawfully deceiving to allow them to use the term "psychological" in their trade name.

Again, "[c]ommercial statements that are actually or inherently misleading do not enjoy the protections of the First Amendment." *Express Oil*, 916 F.3d at 488. As a result, Plaintiffs' as-applied challenge related to the Title Provision can be dismissed on this ground alone. However, for the reasons given below, the Court will grant leave to amend, and will thus proceed to the next part of the analysis.

### 3.  *Potentially Misleading*

a.  <u>Applicable Law</u>

"Under *Central Hudson*, a restriction on commercial speech survives First Amendment scrutiny if: (1) 'the asserted governmental interest is substantial,' (2) the regulation 'directly advances' that interest, and (3) the regulation 'is not more extensive than is necessary to serve that interest.'" *Express Oil*, 916 F.3d at 492 (quoting *Pub. Citizen Inc. v. Louisiana Att'y Disciplinary Bd.*, 632 F.3d 212, 219 (5th Cir. 2011) (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002))). "Each of these latter three inquiries must be answered in the affirmative for the regulation to be found constitutional." *Id.* (quoting *Thompson*, 535 U.S. at 367).

The first two requirements are straightforward in this case. The Fifth Circuit has recognized that a licensing board "has a substantial interest in 'ensuring the accuracy of commercial information in the marketplace[.]" *Id.* (quoting *Pub. Citizen*, 632 F.3d at 220). Moreover, "to satisfy the 'directly advances' inquiry,' [a] [b]oard [must] . . . 'demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.'" *Id.* (quoting *Pub. Citizen*, 632 F.3d at 221).

"The final inquiry is whether the regulation is more extensive than is necessary to serve the identified interest." *Id.* (quoting *Pub. Citizen*, 632 F.3d at 219 (quoting *Thompson*, 535 U.S. at 367)). "'[T]he free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing . . . the harmless from the harmful. . . .'" *Id.* at 492–93 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (quoting *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 478 (1988)). "The means employed by the government actor need not be the 'least restrictive means,' but it must be 'narrowly tailored to achieve the desired objective.'" *Id.* (quoting *Fox*, 492 U.S. at 480).

In *Express Oil*, the Court further explained:

> In *Byrum*, 566 F.3d at 449, concerning the terms "interior design" and "interior designer," we held that "the State could have eliminated any constitutional challenge here by not limiting use of the terms 'interior design' and 'interior designer' but by allowing only designers who satisfy its licensing qualifications to represent themselves as 'licensed' interior designers." *See also Am. Acad.*, 860 F.3d at 311–12. Further, this court and others have identified "[s]ufficient disclaimers [as] a means to address consumer deception." [*Am. Acad.*, 860 F.3d at 311; *Abramson*, 949 F.2d at 1575–78 (finding unconstitutional a Florida law regulating the use of the term "psychologist"); *see also Peel*, 496 U.S. at 110; *Bates v. State Bar of Ariz.*, 433 U.S. 350, 384 (1977).] This remedy seemingly derives from *Peel*, *Bates*, and earlier Supreme Court cases that "described various regulatory safeguards which the state may impose in place of [a] total ban on commercial speech." *Abramson*, 949 F.2d at 1577.

916 F.3d at 493. Thus, the Fifth Circuit reversed the lower court's decision in favor of the engineering board because it "fail[ed] to address why alternative, less-restrictive means, such as a disclaimer, would not accomplish its stated goal of protecting the public" and "thereby fail[ed] to satisfy the required burden of demonstrating a reasonable fit between its regulation and the constitutionally-protected speech." *Id.*

Similarly, in *Abramson*, the Eleventh Circuit concluded that allowing therapists and social workers to hold themselves out as psychologists would be potentially misleading, but the court still concluded that that a total ban on such speech was impermissible. 949 F.2d at 1577. The appellate court explained:

> Admittedly, some danger exists that the public will be misled if the plaintiffs are permitted to hold themselves out as psychologists. Yet when the first amendment is at issue, "the preferred remedy is more disclosure, rather than less." *Bates v. State Bar of Arizona,* 433 U.S. 350, 375 [ ] (1977) (attorneys' advertisements were protected by the first amendment). *Peel* and earlier cases have described various regulatory safeguards which the state may impose in place of the total ban on commercial speech now in effect. *See Peel,* [496 U.S. at 100] ("a State might consider . . . requiring a disclaimer about . .

. the standards of a specialty."); *Bates,* 433 U.S. at 384 [ ] (states may require "some limited supplementation, by way of warning or disclaimer or the like, . . . so as to assure that the consumer is not misled.").

The first amendment dictates that commercial speech not false or inherently misleading may be regulated, but may not be banned. If in the legislature's wisdom, all persons are allowed to practice psychology, they may not ban entirely some of those practitioners' rights to advertise, for the public has a right to truthful information about the psychological services available to them. "To prefer more disclosure over an outright ban on particular forms of advertising not only protects the advertiser's right to communicate, but also protects the general public's interest in receiving information." *Parker v. Commonwealth of Ky.,* 818 F.2d 504, 509 (6th Cir. 1987) (citing *Bates,* 433 U.S. at 375).

*Id.* at 1577.

The Eleventh Circuit also rejected the defendants' efforts to distinguish contrary authority:

The defendants attempt to distinguish *Peel* and *Parker,* arguing that in both cases the respective states had already given some form of approval to the basic qualifications of each practitioner to practice law (*Peel* ) or general dentistry (*Parker* ). Though the courts held that the two practitioners could not be barred from advertising their respective specialties within their professions, the states could at least take comfort in the fact that both had been licensed as general practitioners within their fields. In contrast of course, the plaintiffs in our case have never received any official imprimatur to practice psychology.

Even so, we reject the alleged distinction, for in *Peel* and *Parker* the key finding was not that each practitioner had been licensed generally but that each was *engaging in professional activity permitted under state law.* As a result, the courts held that outright bans on truthful advertising could not stand under the first amendment. Here Florida law, curious though it may seem, allows anyone to practice psychology. Like the *Peel* attorney and *Parker* dentist, the plaintiff psychologists are engaged in professional activity permitted under state law. Consequently, their right to disseminate truthful commercial speech may be restricted, but may not be cut off completely.

*Id.* at 1577–78.

b. <u>Analysis</u>

Having carefully considered the matter, the Court will grant the motion to dismiss on this issue as well. In sum, Plaintiffs have failed to adequately plead that their Title Provision claim satisfies the *Central Hudson* test.

Preliminarily, the Court disagrees with Plaintiffs and finds that the use of the term "psychological" in their trade name is potentially misleading. Plaintiffs allege that "Defendants lack any reasonable basis for believing that Alleman and Catrett's use of the word psychological would mislead any potential or actual consumers or clients," (*Compl.* ¶ 32, Doc. 1), but the Court finds this allegation is simply too barebones to survive muster. Even putting this aside, the Court finds, like in *Abramson* and for the same reasons given above, that there is "*some* danger . . . that the public will be misled if the plaintiffs are permitted to hold themselves out as psychologists" or use the word "psychological" in their trade name. 949 F.2d at 1577 (emphasis added).

Thus, the Court turns to the *Central Hudson* factors. Even assuming Plaintiffs got past the first two factors—which is a questionable proposition in light of the interests identified by the Fifth Circuit in *Express Oil* and by Defendants in briefing, (*see* Doc. 22-1 at 25)[2]—Plaintiffs make

---

[2] Defendants argue:

> *First*, the States' interest is unquestionably compelling: "to safeguard life, health, property, and the public welfare of this state, and in order to protect the people of this state against unauthorized, unqualified, and improper application of psychology." La. R.S. 37:2351. Indeed, "ensuring the accuracy of commercial information in the marketplace" is alone sufficient under the *Central Hudson* factors. *Pub. Citizen,* [632 F.3d at 220]; *see also Ohralik*[, 436 U.S. at 460] (similar). The State plainly clears that bar.
>
> *Second*, the Title Provision directly advances that interest. Louisiana makes a guarantee to its citizens: Anyone engaging in the practice of psychology is, in fact, a licensed psychologist. *See* La. R.S. 37:2360(A)(2); *see also* La. R.S. 37:2352(10) (representation as a psychologist "impl[ies] that" someone is "qualified to practice psychology or … possess expert qualification in any area of psychology"). As a necessary corollary to that guarantee, Louisiana law promises consumers that no one will "represent himself as a psychologist" without that

absolutely no effort to plead that the "regulation [is] . . . more extensive than is necessary to serve [the Board's] interests." *Express Oil*, 916 F.3d at 492. Plaintiffs argue in their opposition that less restrictive means are available (such as disclaimers), (Doc. 25 at 30), but there are no such allegation pled in the *Complaint*. Without more—that is, without *any* allegation that less restrictive means would advance Defendants' interest—Plaintiffs' complaint fails. *See Atwood v. Strickler*, No. 19-1699, 2020 WL 3549662, at *9 (D. Or. June 29, 2020) ("Plaintiffs have not alleged facts that demonstrate that the OMIA restrictions are overly extensive. Because Plaintiffs fail to allege any facts showing that the restrictions on pre-existing sign permits are too broad, Plaintiffs' challenge under *Central Hudson* fails."); *cf. Valadez v. Paxton*, No. 21-519, 2022 WL 22895564, at *6 (W.D. Tex. Mar. 31, 2022) (denying defendant's motion as to as-applied claims because, "to state a claim at the motion to dismiss stage [for a First Amendment claim with intermediate scrutiny], Plaintiffs are not required to disprove this claim; they must merely allege facts to support their claim that the law does not further an important government interest *or is a greater infringement on expression than is necessary to protect such an interest*," and "[a]t this early stage, Plaintiffs have sufficiently alleged facts to support a claim that 'the government's interest could be adequately served by some less-speech-restrictive alternative'" and so "Plaintiffs have met their *low* burden here." (emphasis added)); *Kovac v. Wray*, 363 F. Supp. 3d 721, 748-49, 751–52 (N.D. Tex. 2019) (finding that plaintiffs adequately pled constitutional claim in part because they "allege that Defendants' interference is not necessary to further a compelling governmental interest and

---

license. La. R.S. 37:2360(A)(1). In that way, Louisiana's Title Provision goes directly to "protect[ing] the people of this state against unauthorized, unqualified, and improper application of psychology." La. R.S. 37:2351.

(Doc. 22-1 at 25.)

has not been narrowly tailored to achieve that interest, in violation of their constitutional right to substantive due process." (citing eleven paragraphs of complaint)).

Accordingly, Defendants' motion will be granted on this issue, and the as-applied claim will be dismissed. But, given the reasons cited below; the fact that this bar is "low," *Valadez*, 2022 WL 22895564, at *6; and the fact that *Abramson* and *Express Oil* readily identify ways in which Plaintiffs could satisfy this pleading requirement, the Court will grant Plaintiffs leave to amend to cure the deficiencies.

### E. Overbreadth Challenge

#### 1. Applicable Law

Critically, the Fifth Circuit has unambiguously said, "[t]he overbreadth doctrine does not apply to commercial speech." *Serafine*, 810 F.3d at 365 (quoting *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 496–97 (1982)). But, "where a statute applies to both commercial and non-commercial speech, an overbreadth challenge still may be considered with respect to non-commercial speech." *Id.* That is, where a provision "covers both commercial and non-commercial speech, [the Court] address[es] the overbreadth challenge, but [it] properly confine[s] [the] analysis to the providing of psychological services under that subsection or to offers to provide such services made without a commercial purpose (not for pecuniary gain)." *Id.*

Thus, the Court must determine as a threshold matter whether Plaintiffs' overbreadth challenge is related to commercial speech or non-commercial speech. Indeed, this is the sole ground on which Defendants seek dismissal of the overbreadth claim—and then only related to the Title Provision. (*See* Doc. 22-1 at 26.)

Again, "[c]ommercial speech is '[e]xpression related solely to the economic interests of the speaker and its audience.'" *Express Oil*, 916 F.3d at 487 n.2. That is, "[c]ommercial speech is

speech 'that *proposes* a commercial transaction,' not 'speech for profit.'" *Serafine*, 810 F.3d at 365 (quoting *Fox*, 492 U.S. at 482). Thus, for example, in *Express Oil*, the Fifth Circuit analyzed whether the trademark "Tire Engineers" was protected by the First Amendment as commercial speech. 916 F.3d at 487.

Likewise, in *Abramson*, the plaintiffs argued that the Florida law "place[d] an unconstitutional burden on both commercial and non-commercial speech" because they could not "use [the] word 'psychologist' or the related terms in their advertising or professional activities." *Id.* at 1572, 1574. The Eleventh Circuit recognized:

> Clearly the statutes do place restrictions on speech, for apparently *anyone* may currently *practice* psychology or the allied fields in Florida, but only those who have met the examination/academic requirements of the statutes can *say* that they are doing so or hold themselves out as psychologists or allied professionals in advertising, telephone directories, office signs or stationery.

*Id.* at 1574. *Abramson* next determined whether "these restrictions [were] limited to the commercial context, or whether they also limit[ed] the right of the plaintiffs to engage in non-commercial speech." *Id.* The Eleventh Circuit found:

> [T]he Psychological Services Act and the Clinical Counseling Act do not place an unconstitutional burden on the non-commercial speech of these plaintiffs because all of the speech restricted by the statutes is commercial in nature. The restriction on the plaintiffs' ability to hold themselves out as psychologists clearly limits only commercial speech, for surely the sole purpose for holding oneself out as a psychologist is to gain commercial advantages. Even if the plaintiffs wish to hold themselves out as psychologists at cocktail parties or over private dinners, such expression is "related solely to the economic interests of the speaker and its audience." [*Central Hudson*, 447 U.S. at 561] (defining commercial speech).
>
> In contrast to restrictions on expressive or non-commercial speech, the limit on speech in the Florida statutes does not "penalize[ ] the expression of particular points of view and force[ ] speakers to alter their speech to conform with an agenda they do not set." *Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Calif.*, 475 U.S. 1, 9 [ ]

(1986). Those cases in which a first amendment challenge to a non-commercial restriction on speech was recognized clearly involved a kind of expressive or political speech simply not present here. . . .

While a statute affecting commercial speech "inextricably intertwined with otherwise fully protected [non-commercial] speech" will be subject to the heightened scrutiny applicable to expressive, non-commercial speech, *Riley v. National Fed'n. of the Blind of North Carolina, Inc.,* 487 U.S. 781, 796 [ ] (1988), we simply fail to see how the expressive abilities of the plaintiffs are affected here. Though the public may have an interest in letting more psychologists hold themselves out as such, that interest arises for purely commercial reasons unrelated to the expression of differing viewpoints or alternative ideas that we traditionally associate with protected first amendment speech. The statutes at issue do not place an unconstitutional burden on non-commercial speech.

*Id.* at 1574–75.

### 2. Analysis

Having carefully considered the matter, the Court will grant the *MTD* as to the overbreadth challenge to the Title Provision. Here, Plaintiffs plead that "anyone who has studied psychological principles, methods, and procedures, and attempts to use them to improve someone else's life has engaged in the practice of psychology and represented himself or herself as a licensed psychologist." (*Compl.* ¶ 40, Doc. 1.) Further, "Louisiana's law prohibiting people from engaging in the practice of psychology or *representing themselves as psychologists* is overbroad and unconstitutional." (*Id.* ¶ 48 (emphasis added).) Thus, Plaintiffs challenge the restriction prohibiting the use of "psychological" in their business's name. (*See id.* ¶¶ 36, 48.)

This is clearly commercial speech. As in *Abramson*, "[t]he restriction on the plaintiffs' ability to hold themselves out as psychologists clearly limits only commercial speech, for surely the sole purpose for holding oneself out as a psychologist is to gain commercial advantages." 949 F.2d at 1574. Such "expression" is "related solely to the economic interests of the speaker and its audience," *Express Oil*, 916 F.3d at 487 n.2, and it is speech which "*proposes* a commercial

transaction," *Serafine*, 810 F.3d at 365. The Court "simply fail[s] to see how the expressive abilities of the plaintiffs are affected here." *Abramson*, 949 F.2d at 1575. Consequently, Defendants' motion will be granted, and Plaintiffs' facial challenge to the Title Provision will be dismissed.

### F.  Leave to Amend

Plaintiffs request leave to amend to cure any deficiencies found in the *Complaint*, (Doc. 25 at 32), and the Court will grant this request. As the Fifth Circuit stated in *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

313 F.3d 305, 329 (5th Cir. 2002). Further, this Court has reasoned:

> A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

*JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. 2018) (deGravelles, J.) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016)). Thus, the Court will grant Plaintiffs' request and allow leave to amend.

## IV.    MPI

Because the *MTD* has been granted, the *MPI* will be denied without prejudice to Plaintiffs' right to refile after the *Complaint* is amended. The Court is loathe to provide an advisory opinion on whether Plaintiffs will be able to cure the pleading deficiencies identified above, but the Court

does wish to provide some guidance in the event that they can and in the event that Plaintiffs again move for injunctive relief.

First, as the parties well know, to obtain an injunction, Plaintiffs must show, inter alia, that "there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction[.]" *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) (citation omitted). Defendants objected to the *MPI* for failing to satisfy this requirement; specifically, they contend that Plaintiffs waited too long to file their motion and that this undercuts any showing of irreparable injury. (*See* Doc. 39 at 16–18.) Defendants cite to *Western Surety Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764 M.D. La. 2018) (deGravelles, J.), which said:

> [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.

*Id.* at 799 (citations omitted).

However, Defendants do not reconcile this with other law governing injunctions and First Amendment cases. This Court has also said:

> "[W]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People*, 91 F.4th at 340–41 (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012)); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2024) (same). "Indeed, the Supreme Court has said that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Book People*, 91 F.4th at 341 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 [ ] (1976)).

*Roake v. Brumley*, No. 24-517, --- F. Supp. 3d ----, 2024 WL 4746342, at *82 (M.D. La. Nov. 12, 2024) (deGravelles, J.), *hearing en banc denied,* No. 24-30706, 2024 WL 5496967 (5th Cir. Dec. 30, 2024).

However, this Court located at least one case that reached a different result in the context of commercial speech. In *Keyoni Enterprises, LLC v. County of Maui*, the district court found:

> [T]he speech involved here involves no urgency in timing, is not expressive, and admittedly only involves potential economic consequences, which can be compensated with damages . . . . The Enterprises have simply not shown any harm that would be *irreparable*. Essentially, the Enterprises are arguing that because they are alleging a violation of their commercial speech rights, they will suffer irreparable harm without an injunction. The line, however, is simply not that bright. *See, e.g.,* [*Naser Jewelers, Inc. v. City of Concord*, 2007 WL 1847307, at *9 (D.N.H. June 25, 2007)] (rejecting in the commercial speech context "the proposition that any infringement on First Amendment rights causes irreparable harm"); *Hohe v. Casey,* 868 F.2d 69, 72–73 (3d Cir. 1989) ( "[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury . . . . Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."); *Amwest Sur. Ins. Co. v. Reno,* 1995 WL 230357, at *1 n. 1 (9th Cir.1995) (unpublished) ("We reject [plaintiff's] argument that economic harm constitutes irreparable injury when a . . . right protected by the Constitution has been impaired."). The Enterprises candidly complain that without an injunction, their businesses would suffer a 75% loss in sales, fines totaling as much as $1,000 per day from the date the NOVs were issued, and ultimately, the potential shuttering of operations. Without minimizing the import of these effects, real or not, none of them are irreparable.

No. 15-86, 2015 WL 1470847, at *9 (D. Haw. Mar. 30, 2015). While *Keyoni* appears from the Court's research to be the minority position (and possibly not indicative of the rule in this circuit), both parties should elaborate on these issues out if another motion for preliminary injunction is filed.

Second, again, in the *MTD*, Defendants limited their arguments about the Services and Practice Provisions to jurisdictional challenges. If Defendants file a later motion to dismiss for failure to state a claim, they should advance specific arguments related to the Services and Practice Provisions or consider such unmade arguments waived. *See Payton v. Town of Maringouin*, No.

18-563, 2021 WL 2544416, at *26 (M.D. La. June 21, 2021) (deGravelles, J.), *aff'd*, No. 21-30440, 2022 WL 3097846 (5th Cir. Aug. 3, 2022) (collecting authorities on waiver).

Third, this Court has provided detailed reasons above, and any subsequent motion or pleading should be consistent with the Court's ruling. The parties are reminded of their obligations (1) under Rule 11 to only advance arguments if there is a good faith basis in law or fact to do so; and (2) under Rule 1 to "construe[], administer[], and employ[ ]" the federal rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1, 11.

## V.    CONCLUSION

According,

**IT IS ORDERED** that the *Defendants' Joint Motion to Dismiss* (Doc. 22) filed by Shannae Harness, Shavaun Sam, Michelle Moore, Matthew Holcomb, Shawanda Woods-Smith, Jamie Monic, Courtney Newton, and the District Attorney of East Baton Rouge Parish is **GRANTED IN PART** and **DENIED IN PART**. The *MTD* is **DENIED** as to standing and sovereign immunity. The *MTD* is **GRANTED** as to Plaintiffs' as-applied and overbreadth challenges to the Title Provision, and these claims are **DISMISSED WITHOUT PREJUDICE.** Plaintiffs shall have twenty (28) days in which to amend the operative complaint to cure the deficiencies identified in this ruling. Failure to do so will result in the dismissal of these claims with prejudice. Further, if Plaintiffs fail to file an amended complaint by the designated time, Defendants shall file a notice in the record advising the Court of same.

**IT IS FURTHER ORDERED** that *Plaintiffs' Motion for a Preliminary Injunction* (Doc. 29) is **DENIED WITHOUT PREJUDICE** to Plaintiffs' right to refile after the *Complaint* is amended.

Signed in Baton Rouge, Louisiana, on <u>April 25, 2025</u>.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**