**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**JULIE ALLEMAN, ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 24-877-JWD-SDJ**

**SHANNAE N. HARNESS, ET AL.**

## RULING AND ORDER

Before the Court are two interrelated motions. The first is *Defendants' Joint Motion to Dismiss* ("*MTD*") (Doc. 71), filed by Defendants Shannae Harness, T. Shavaun Sam, Michelle Moore, Matthew Holcomb, Shawanda Woods-Smith, Jaime Monic, Courtney Newton, and the East Baton Rouge Parish District Attorney ("the DA") (collectively, "Defendants"). Plaintiffs Julie Alleman, Juliet Catrett, and P. Wellness Institute, LLC (collectively, "Plaintiffs") oppose the motion. (Doc. 82.) Defendants have filed a reply. (Doc. 84.)

The second motion is *Plaintiffs' (Amended) Renewed Motion for a Preliminary Injunction* ("*MPI*") (Doc. 85). Defendants oppose this motion, (Doc. 88), and Plaintiffs have filed a reply, (Doc. 90). Given the considerable overlap between these motions, the Court sees fit to resolve both in this consolidated *Ruling and Order*. Having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court now denies Defendants' *MTD*. The Court grants Plaintiffs' *MPI* with respect to Plaintiffs' as-applied challenges.

## TABLE OF CONTENTS

I.   Preliminary Note ........................................................................................................... 2
II.  Relevant Background ..................................................................................................... 3
   A.  Statutory Scheme ...................................................................................................... 3
      1.  Title 37, Chapter 28 ............................................................................................ 3
      2.  Title 37, Chapters 13, 35, 50-A.......................................................................... 6
   B.  Factual Background ................................................................................................... 9
      1.  The Parties ........................................................................................................... 9
      2.  The Dispute........................................................................................................11

3.    Claims & Relief Sought ..................................................................................... 13
III.  MTD: Jurisdictional Challenges ................................................................................ 14
A.    Rule 12(b)(1) Standard ............................................................................................ 14
B.    Article III Standing ................................................................................................. 15
1.    Parties' Arguments ........................................................................................... 15
2.    Applicable Law .................................................................................................. 19
3.    Analysis .............................................................................................................. 21
C.    Sovereign Immunity ................................................................................................ 27
1.    Parties' Arguments ........................................................................................... 27
2.    Applicable Law .................................................................................................. 30
3.    Analysis .............................................................................................................. 32
IV.  MTD: Pleading Challenges ....................................................................................... 35
A.    Rule 12(b)(6) Standard ............................................................................................ 35
B.    As-Applied Challenges ............................................................................................ 36
1.    Parties' Arguments ........................................................................................... 36
2.    Applicable Law .................................................................................................. 40
3.    Analysis .............................................................................................................. 42
C.    Overbreadth Challenges ......................................................................................... 51
1.    Parties' Arguments ........................................................................................... 51
2.    Applicable Law & Analysis .............................................................................. 52
V.    Motion for Preliminary Injunction .......................................................................... 54
A.    Preliminary Injunction Standard .......................................................................... 54
B.    As-Applied Challenges ............................................................................................ 55
1.    Parties' Arguments ........................................................................................... 55
2.    Jurisdictional Challenges ................................................................................. 60
3.    Title Provision ................................................................................................... 62
4.    Services Provision ............................................................................................. 68
5.    Practice Provision ............................................................................................. 70
C.    Overbreadth Challenges ......................................................................................... 75
D.    Remaining Factors .................................................................................................. 77
1.    Parties' Arguments ........................................................................................... 77
2.    Irreparable Injury ............................................................................................ 78
3.    Balance of Equities & Public Interest ............................................................ 80
VI.  Conclusion ................................................................................................................... 81

## I.    PRELIMINARY NOTE

In April 2025, this Court issued its *Ruling and Order* (Doc. 44) on *Defendants' Joint Motion to Dismiss* (Doc. 22) and *Plaintiffs' Motion for a Preliminary Injunction* (Doc. 29). On that occasion, the Court granted in part (and denied in part) Defendants' motion, dismissing Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) but allowing Plaintiffs to amend their

*Complaint* (Doc. 1). *See Alleman v. Harness*, 780 F. Supp. 3d 608, 650 (M.D. La. 2025) (deGravelles, J.). Accordingly, the Court denied Plaintiffs' motion for preliminary injunction, albeit without prejudice. *Id.*

Plaintiffs availed themselves of the opportunity to amend, filing their *Amended Complaint* (Doc. 50) in May 2025. They subsequently renewed their motion for preliminary injunction. (*See* Docs. 56, 85.) Defendants again moved for dismissal, raising the same issues as before: sovereign immunity and Article III standing under Rule 12(b)(1), and failure to state a claim under Rule 12(b)(6). (*See* Doc. 71.) The Court initially scheduled a hearing for May 6, 2026, (Docs. 86, 91, 92), but later determined that a hearing was unnecessary given the parties' representations that no witnesses would testify and that no new evidence would be presented, (Doc. 94).

Although the parties' arguments have shifted somewhat and sharpened considerably, there remains substantial overlap between the instant motions and those previously considered. (*Compare, e.g.*, Doc. 71-1 at 13–25, *with* Doc. 22-1 at 13–20.) The Court sees no reason to re-invent the 43-page wheel. *See Alleman*, 780 F. Supp. 3d at 608–50. Here, the Court incorporates its initial *Ruling and Order* and, where appropriate, will reproduce and/or refer to same.

## II.   RELEVANT BACKGROUND

### A.   Statutory Scheme

#### 1.  Title 37, Chapter 28

Title 37 of the Louisiana Revised Statutes covers "Professions and Occupations." Chapter 28 of that title concerns "Psychologists." La. R.S. § 37:2351. The chapter opens with the following "[d]eclaration of purpose": "It is hereby declared that the creation of a state board of examiners of psychologists is necessary in order to safeguard life, health, property, and the public welfare of this

3

state, and in order to protect the people of this state against unauthorized, unqualified, and improper application of psychology." *Id.*

Here, the term "psychologist" means "any person licensed as a psychologist in accordance with the provisions of [Chapter 28]." *Id.* § 37:2352(10). A person[1] represents herself to be a psychologist by "using any title or description of services incorporating the words 'psychology', 'psychological', or 'psychologist'"; "using any other terms which imply that [a person] is qualified to practice psychology or . . . possesses expert qualification in any area of psychology"; or "offer[ing] to the public or render[ing] to individuals or to groups of individuals services" which Chapter 28 defines as the "practice of psychology." *Id.*

The "practice of psychology" is "the observation, description, evaluation, interpretation, and modification of human behavior, *by the application of psychological principles, methods, and procedures*, for the purpose of eliminating symptomatic, maladaptive, or undesired behavior, and of improving interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health, and mental health." *Id.* § 37:2352(8) (emphasis added). It encompasses:

> psychological testing and evaluation or assessment of personal characteristics such as intelligence, personality, abilities, interests, aptitudes, and neuropsychological functioning; counseling, psychoanalysis, psychotherapy, hypnosis, stress management, biofeedback, behavior analysis and therapy; diagnosis and treatment of mental and emotional disorder or disability, alcoholism and substance abuse, and of the psychological aspects of physical illness, accident, injury, or disability; psycho educational evaluation, therapy, remediation, and consultation.

*Id.*

It is a misdemeanor "[f]or any person not licensed in accordance with the provisions of [Chapter 28] or Part VI of Chapter 15 of [Title 37]" to (1) "represent h[erself] as a psychologist," (2) "engage in the practice of psychology," or (3) "otherwise violate the provisions of [Chapter

---

[1] Here, a "person" can be an "individual, firm, partnership, association, or corporation." La. R.S. § 37:2352(6).

28]." *Id.* § 37:2360(A)(1)–(2), (4). Any such misdemeanor "shall be prosecuted by the district attorney of the judicial district in which the offense was committed." *Id.* § 37:2360(B).

Title 37, Chapter 28, also provides for the creation of the Louisiana State Board of Examiners of Psychologists ("the Board"). *Id.* § 37:2353. The Board is empowered to "investigate any evidence or allegation which appears to show that any person is or may be in violation of any provision of [Chapter 28]." *Id.* § 37:2361(A). Additionally, the Board "may apply for an injunction in any court of competent jurisdiction to enjoin any person from committing any act which is in violation of [Chapter 28]." *Id.* § 37:2361(B). These injunctive proceedings may be brought in addition to any criminal proceedings. *Id.* § 37:2361(E).

Defendants propose that the above statutory scheme imposes three separate-but-related restrictions. (*See, e.g.*, Doc. 22-1 at 9–10; Doc. 71-1 at 9.) The "Title Provision" prohibits any person who is not a licensed psychologist from using "any title . . . incorporating the words 'psychology', 'psychological', or 'psychologist'" or from using "any other terms which imply that [the person] is qualified to practice psychology or . . . possesses expert qualification in any area of psychology." *See* La. R.S. § 37:2352(10); *see also id.* § 37:2360(A)(1). The "Services Provision" prohibits any person who is not a licensed psychologist from using "any . . . description of services incorporating the words 'psychology', 'psychological', or 'psychologist'" or from using "any other terms which imply that [the person] is qualified to practice psychology or . . . possesses expert qualification in any area of psychology." *See id.* § 37:2352(10); *see also id.* § 37:2360(A)(1). And the "Practice Provision" prohibits any person who is not a licensed psychologist from "offer[ing] to the public or render[ing] to individuals or to groups of individuals services defined as the practice of psychology in [Chapter 28]." *See id.* § 37:2352(8), (10); *see also id.* § 37:2360(A)(1)– (2). As in its initial *Ruling and Order*, the Court will generally use this framework, both because

5

of its relative conceptual ease and because the parties argue in terms of these provisions. *See Alleman*, 780 F. Supp. 3d at 621–22, 626.

### 2. *Title 37, Chapters 13, 35, 50-A*

It warrants mentioning some additional chapters of Title 37 related to the instant case. *See Alleman*, 780 F. Supp. 3d at 617–18 (doing the same). Relevant to each of the following, members of professions other than psychology "who are licensed or certified in accordance with" Louisiana law may "render services consistent with their professional training and code of ethics," so long as "they do not represent themselves as psychologists or their work as psychological." La. R.S. § 37:2365(A); *see also id.* § 37:2352(10) (defining how a person "represents h[erself] to be a psychologist," including by using proscribed terms).

### a. Licensed Professional Counselor

Chapter 13 concerns "Mental Health Counselors." *See* La. R.S. § 37:1101. This chapter defines a "[l]icensed professional counselor" as:

> any person who holds h[erself] out to the public for a fee or other personal gain, by any title or description of services incorporating the words "licensed professional counselor" or any similar term, and who offers to render professional *mental health counseling services* denoting a client-counselor relationship in which the counselor assumes responsibility for knowledge, skill, and ethical considerations needed to assist individuals, groups, organizations, or the general public, and who implies that [s]he is licensed to practice mental health counseling pursuant to this Chapter.

*Id.* § 37:1103(5) (emphasis added). "Mental health counseling services" consist of:

> rendering or offering prevention, assessment, diagnosis, and treatment, which includes psychotherapy, of mental, emotional, behavioral, and addiction disorders to individuals, groups, organizations, or the general public by a licensed professional counselor, that is consistent with h[er] professional training as prescribed by R.S. 37:1107(A)(6), by a provisional licensed professional counselor, that is consistent with the requirements as prescribed by R.S. 37:1107(F), and code of ethics/behavior involving the application of principles, methods, or procedures of the mental health counseling profession.

*Id.* § 37:1103(7). Chapter 13 does *not* authorize licensed professional counselors "to administer or interpret intellectual, personality, developmental, or neuropsychological tests in accordance with the provisions of [La.] R.S. 37:2352(7), except as provided by LAC 46:LXIII.1702(E), *or engage in the practice of psychology* or to prescribe, either orally or in writing, distribute, dispense, or administer any medications." *Id.* (emphasis added).

### b.    Licensed Marriage & Family Therapist

Chapter 13 also defines "[m]arriage and family therapy" as "the professional application of psychotherapeutic and family systems theories and techniques in the prevention, diagnosis, assessment, and treatment of mental, emotional, and behavioral disorders in an individual and relational disorders in couples and families." *Id.* § 37:1103(6); *see also id.* § 37:1103(9) (defining "[p]ractice of marriage and family therapy"); *id.* § 37:1116 (establishing licensure requirements, including proof of training in, *inter alia*, "diagnostic psychopathology," or "systematically collect[ing] and analyz[ing] data based on" the International Classification of Diseases and/or the Diagnostic and Statistical Manual of Mental Disorders ("DSM")). Like licensed professional counselors, licensed marriage and family therapists may not "engage in the practice of psychology," among other things. *See* La. R.S. § 37:1103(7) ("[N]othing in [Chapter 13] shall be construed to authorize *any* person licensed hereunder . . . ." (emphasis added)).

### c.    Licensed Addiction Counselor

Chapter 50-A concerns addiction counselors. *See id.* §§ 37:3386–3386.1. An "[a]ddiction counselor" is any person who is properly licensed, certified, or registered "and who, by means of h[er] special knowledge acquired through formal education or practical experience, is qualified to provide addiction counseling services to those individuals afflicted with or suffering from an addictive disorder or certain co-occurring disorders." *Id.* § 37:3386.1(1); *see also id.* § 37:3387

(discussing licensed addiction counselors and the scope of their practice). An "[a]ddictive disorder" is "the repeated pathological use of substances including but not limited to alcohol, drugs, or tobacco, or repeated pathological compulsive behaviors . . . which cause physical, psychological, emotional, economic, legal, social, or other harms to the individual afflicted with the addiction or to others affected by the individual's affliction." *Id.* § 37:3386.1(2).

d. Licensed Social Worker

Finally, Chapter 35 concerns "Social Workers." *See id.* § 37:2701; *see also id.* § 37:2703(17) (defining "[s]ocial worker"). "Social work practice" is "the professional application of social work values, theories, and interventions to one or more of the following:"

> enhancing the development, problem-solving, and coping capacities of people; promoting the effective and humane operations of systems that provide resources and services to people; linking people with systems that provide them with resources, services, and opportunities; developing and improving social policy; and engaging in research related to the professional activities.

*Id.* § 37:2703(15)(a). This practice includes clinical social work and "is guided by knowledge of human behavior, biopsychosocial development, social systems and resources, economic and cultural institutions, and their interactions." *Id.*; *see also id.* § 37:2708(B) ("Treatment methods include the provision of individual, marital, couple, family, and group psychotherapy."). Social workers *cannot* "administer or interpret psychological tests, or . . . engage in the practice of psychology, as defined by the provisions of R.S. 37:2352." *Id.* § 37:2703(15)(c). *But see id.* ("Notwithstanding any provisions of R.S. 37:2352, persons covered by this Chapter may, based upon scope of practice, administer, use, or interpret tests of language, education and achievement, adaptive behavioral tests, and symptom screening checklists instruments, as well as tests of abilities, interests, and aptitudes.").

B.    **Factual Background**[2]

*1. The Parties*

Defendants Shannae Harness, T. Shavaun Sam, Michelle Moore, Matthew Holcomb, and Shawanda Woods-Smith were/are members of the Board.[3] Defendant Jaime Monic is the Executive Director of the Board and is "responsible for enforcing its decisions." (Doc. 50 at 4, ¶ 14.) Defendant Courtney Newton is Executive Counsel and Prosecuting Attorney, "responsible for pursuing legal action on behalf of the Board." (*Id.* at 4, ¶ 15.) For simplicity's sake, the Court will refer to the above Defendants as "the Board Defendants." (*See id.* at 4, ¶ 16.) The Board Defendants have been sued in their respective official capacities. (*Id.* at 3–4, ¶¶ 10–16.)

Plaintiffs have also sued the East Baton Rouge Parish DA, who is responsible for prosecuting violations of Louisiana law in East Baton Rouge Parish. (*Id.* at 5, ¶ 19.) Plaintiffs note that, when enforcing the statutory scheme challenged here, the DA "acts under color of state authority." (*Id.*) Presumably, then, the DA has also been sued in his official capacity. (*See id.*)

Plaintiffs Julie Alleman and Juliet Catrett co-own Plaintiff P. Wellness Institute, LLC. (*Id.* at 3, ¶ 9.) P. Wellness Institute "offers counseling for adults . . . [and] specializes in the treatment of trauma-related disorders, mood disorders, and anxiety disorders." (*Id.* at 7, ¶ 29.)

---

[2] The following factual allegations come primarily from the *Amended Complaint* (Doc. 50). For purposes of Defendants' *MTD*, the Court accepts as true Plaintiffs' well-pleaded factual allegations. *See, e.g.*, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (reciting the Rule 12(b)(1) standard); *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (reciting the Rule 12(b)(6) standard).

[3] Plaintiffs' *Amended Complaint* notes substantial changes in the Board's composition, including the departures of Shannae Harness and Michelle Moore. (Doc. 50 at 4.) The Board's website reflects that the Board currently consists of Matthew Holcomb (Chairperson), Shawanda Woods-Smith (Vice-Chairperson), T. Shavaun Sam (Member), Marc Zimmerman (Member), and Adrianne Brennan (Member). *Board Information*, La. State Bd. of Exam'rs of Psychs., https://lsbep.org/board-information/ (last visited July 30, 2026). The "Public Board Member" position is vacant. *Id.* Any changes in the Board's composition do not affect the instant case. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

9

Plaintiff Alleman "is a Licensed Professional Counselor, a Licensed Marriage and Family Therapist, and a Licensed Addiction Counselor." (*Id.* at 7, ¶ 30.) She earned her Bachelor of Science "with a double major in Psychology and Sociology." (*Id.* at 7, ¶ 31.) She then earned her Master of Education in Community Counseling. (*Id.*) In order to obtain this advanced degree, Alleman "took a wide variety of courses related to psychological topics, including classes that taught about diagnosing psychological disorders using the DSM." (*Id.*; *see also id.* at 8–9, ¶¶ 37–39.) She has extensive training in and experience with applying psychological "principles, methods, and procedures." (*See, e.g.*, *id.* at 7, ¶¶ 30, 32.)

Plaintiff Catrett "is a Licensed Clinical Social Worker." (*Id.* at 8, ¶ 33.) In order to obtain her Master of Social Work, "she took a wide variety of courses related to psychological topics, including 'Psychodynamic Psychotherapy/DSM,' in which she learned about diagnosing [psychological disorders] using the DSM." (*Id.* at 8, ¶ 34; *see also id.* at 8–9, ¶¶ 37–39.) Like Alleman, Catrett has extensive training in and experience with applying psychological principles, methods, and procedures. (*See, e.g.*, *id.* at 8, ¶¶ 33, 35–36.)

In their work at P. Wellness Institute, "Alleman and Catrett diagnose and treat severe mental illness, major disorders, and mental disorders." (*Id.* at 9, ¶ 40.) "Each [Plaintiff] is qualified and able to use" psychological methods, including Eye Movement Desensitization and Reprocessing ("EMDR") and "Brainspotting" for post-traumatic stress disorder ("PTSD"). (*See id.* at 9–10, ¶¶ 40–43, 48.) "Louisiana law permits Alleman and Catrett to use psychotherapy with their clients." (*Id.* at 10, ¶ 45 (citing La. R.S. §§ 37:1103(10), 37:2708(B)); *see also id.* at 11, ¶ 49 (citing La. R.S. § 37:2365(A)) ("Louisiana law permits Alleman and Catrett to treat their clients consistent with their professional training and code of ethics." (emphasis omitted)); *id.* at 11, ¶¶ 50–52.)

Alleman and Catrett "clearly identify the licenses that they possess" and "have never represented to the public or told their clients that they are licensed psychologists." (*Id.* at 10, ¶ 47.) They "do not engage in conduct not consistent with their professional training and [respective] code[s] of ethics." (*Id.* at 11, ¶ 53.)

### 2. *The Dispute*

Formerly, Plaintiffs' business was called "Psychological Wellness Institute, LLC." (*Id.* at 12, ¶ 58.) But in a letter dated January 3, 2024, the Board informed Plaintiffs that they were the subject of a complaint for allegedly "illegally representing themselves to the public as licensed psychologists." (*Id.* at 12, ¶¶ 59–60 (quoting Doc. 50-2 at 2).) The January 2024 letter advised: "As the regulatory authority charged with governing the practice of psychology in this state, the [Board] is mandated by law to take legal action against persons who engage in the unlicensed practice of psychology." (Doc. 50-2 at 2; *see also* Doc. 50 at 12, ¶ 61.) The letter urged Plaintiffs to take corrective action and cautioned that failure to do so would "result in the [Board's] both filing for civil injunctive relief and making criminal referrals to the appropriate law enforcement agencies." (Doc. 50 at 12, ¶ 61 (quoting Doc. 50-2 at 2).) After discussion and correspondence with a Board representative, Plaintiffs changed the name of their business to "P. Wellness Institute." (*Id.* at 13, ¶¶ 62–64 (citing Doc. 50-3 at 2).) "The Board subsequently dismissed the complaint against [Plaintiffs]." (*Id.* at 13, ¶ 65.)



**LOUISIANA STATE BOARD OF EXAMINERS OF PSYCHOLOGISTS**
4334 South Sherwood Forest Boulevard, #C-150
Baton Rouge, Louisiana 70816

Voice:    (225) 295-8410
Fax:      (225) 295-8412
Email:    admin.lsbep@la.gov
Website:  lsbep.org

USPS Certified #7020 2450 0001 9081 4539

January 3, 2024

Psychological Wellness Institute, LLC
ATTN:  Juliet Catrett
4451 Bluebonnet Blvd., Ste. G
Baton Rouge, LA  70809

RE:  NP22-23-13P

Ms. Catrett,

The Louisiana State Board of Examiners of Psychologists ("LSBEP") has received a complaint alleging that both the Psychological Wellness Institute, LLC, and its members, in their individual capacities, are illegally representing themselves to the public as licensed psychologists.  A preliminary investigation of this complaint has substantiated the allegations by confirming multiple violations of La. R.S. 37:2352(9).

As the regulatory authority charged with governing the practice of psychology in this state, the LSBEP is mandated by law to take legal action against persons who engage in the unlicensed practice of psychology. In an attempt to prevent the escalation of this matter, the LSBEP is sending you this notice to inform you of the laws applicable to your situation in the hopes that you will take voluntary corrective action within the next thirty days.  Failure to do so will result in the LSBEP both filing for civil injunctive relief and making criminal referrals to the appropriate law enforcement agencies.

Thank you in advance for your assistance with this matter.  Please do not hesitate to contact me if you have any questions (225) 295-8410.

Sincerely,

Jonathen Wagner
Executive Counsel, LSBEP

Enclosures:    La. R.S. 37:2352
               La. R.S. 37:2360
               La. R.S. 37:2361
               Secretary of State Business Filing

La. R.S. 44:33.1 - In compliance with La. R.S. 44:33.1, the LSBEP hereby gives notice that information submitted to the LSBEP may become public record pursuant to the provisions of Louisiana Public Records Law, La. R.S. 44:1, et seq.

| Michelle B. Moore, Psy.D. Chairperson | Shannae Harness, Ph.D. Vice Chairperson | D. Chance McNeely Member | T. Shavaun Sam, Ph.D. Member | Matthew J. Holcomb, Ph.D. Member | Shawanda Woods-Smith, Psy.D. Member | Jaime T. Monic Executive Director |

(Doc. 50-2 at 2.)

Plaintiffs wish to revert the name of their business—and to resume using terms like "psychology," "psychological," and "psychologist" when communicating with clients and non-clients alike. (*See* Doc. 50 at 12, 14–15, ¶¶ 55–57, 69, 71, 76–77.) They aver that such terms are broad enough to be used accurately "in titles and descriptions of services by those not licensed as psychologists." (*Id.* at 13, ¶ 68; *see id.* at 14–15, ¶¶ 69–70, 72, 78; *see also id.* at 13–15, ¶¶ 66–67, 72–73 (providing definitions of "psychology" and "psychological").) Thus, Plaintiffs say, Louisiana's statutory scheme prohibits accurate speech, both commercial and non-commercial. (*Id.* at 15, ¶ 74; *see also id.* at 21, ¶ 106 (suggesting that Plaintiffs cannot even "explain that they share mutual clients with psychologists, and, as part of their services, will refer clients to psychologists when necessary")).)

### 3. *Claims & Relief Sought*

Plaintiffs filed suit in this Court on October 22, 2024. (Doc. 1.) Their *Amended Complaint* challenges the purpose of Louisiana's statutory scheme, as well as its tailoring. (*See* Doc. 50 at 15–20, ¶¶ 75, 79–101.) Relatedly, they contend that "[t]he failure to define 'psychological principles, methods, and procedures' in [La. R.S. § 37:2352(8)] . . . renders [La. R.S. §] 37:2360(A)(1) and (A)(2) vague and overbroad." (*Id.* at 20, ¶ 102.) Accordingly, Plaintiffs bring four claims: as-applied and facial challenges to La. R.S. § 37:2360(A)(2), and as-applied and facial challenges to La. R.S. § 37:2360(A)(1). (*Id.* at 23–25, ¶¶ 117–30.)

Plaintiffs seek, *inter alia*, declaratory relief, an injunction prohibiting Defendants "from commencing any action against [P]laintiffs" pursuant to La. R.S. § 37:2360(A)(1)–(2), and an injunction prohibiting Defendants "from taking any action against [P]laintiffs for changing the name of their company back to Psychological Wellness Institute"; for using the terms "psychology," "psychological," and "psychologist" when "accurately describing their services to

13

their clients or others"; for using terms implying Plaintiffs' "true expert qualifications in an area of psychology"; and/or for speaking with their clients in ways which "use [Plaintiffs'] knowledge [of] and experience with psychology" and which are "consistent with their professional training and codes of ethics." (*Id.* at 25.) Plaintiffs aver that, unless so enjoined, Defendants will charge Plaintiffs with violations of Louisiana law and prosecute them therefor. (*Id.* at 22–23, ¶¶ 114–16.)

### III.    MTD: JURISDICTIONAL CHALLENGES

#### A.    Rule 12(b)(1) Standard

A party may raise the defense of lack of subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)); *accord Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010.

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that

challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Paterson*, 644 F.2d at 523. "If those jurisdictional allegations are sufficient the complaint stands." *Id.*

On the other hand, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "[N]o presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Mortensen*, 549 F.2d at 891). Given a factual attack, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

**B.    Article III Standing**

*1. Parties' Arguments*

a.   Defendants' *MTD* (Doc. 71)

Defendants "readily agree[]" that Plaintiffs have Article III standing to challenge the Title Provision.[4] (Doc. 71-1 at 17.) "But standing to challenge *that* provision does not somehow establish" standing to challenge the Services Provision or the Practice Provision. (*Id.* at 17–18

---

[4] As indicated above, the Title, Services, and Practice Provisions capture violations of La. R.S. § 37:2360(A)(1)–(2). The parties frame their analysis in terms of these provisions. Typically, the Court will do the same.

(citing *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014) (per curiam); *Attala Cnty., Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1042 (5th Cir. 2022)).) Defendants assert that "the Board expressly declined to invoke the Services Provision or [the] Practice Provision." (*Id.* at 18 (referencing Docs. 50-2, 50-3).) They add that Plaintiffs' challenge to these provisions "is especially problematic" given the apparent consensus "that Plaintiffs' services and practice are not violating Louisiana law at all." (*Id.* (citing Doc. 50 at 11, ¶¶ 49, 53; *Neese v. Becerra*, 123 F.4th 751, 753 (5th Cir. 2024) (per curiam)).)

Defendants raise a second threshold issue: traceability. (*Id.*) Specifically, Defendants argue that "[i]t is difficult to see how *the Board's* prior citation of the Title Provision creates a 'real and immediate threat' of future injury arising from another provision (indeed, any provision) that is traceable to the *district attorney*." (*Id.* (quoting *Murthy v. Missouri*, 603 U.S. 43, 70 (2024)).)

Defendants then consider the Services and Practice Provisions independently. As far as the Services Provision, Defendants observe that Plaintiffs' website has never described Plaintiffs' services as "psychological." (*Id.* at 23.) From this fact, Defendants extrapolate that Plaintiffs "do not currently use the term 'psychological' in describing their services." (*See id.*) Defendants also assert that the statutory scheme does not prohibit Plaintiffs from accurately describing their services; rather, it "bars unlicensed persons from misrepresenting their . . . services as licensed psychology." (*Id.* at 23–24 (citing La. R.S. § 37:2360(A)(2)).) Thus, Defendants argue, Plaintiffs cannot show injury-in-fact. (*Id.* at 24.) Nor can Plaintiffs show redressability, (*id.* (citing *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023))), given that their respective professional codes also prohibit them from misrepresenting their services as psychology, (*id.* (citing Doc. 50 at 10–11, ¶¶ 45, 49)).

As far as the Practice Provision, Defendants contend that Plaintiffs cannot show injury-in-fact because "Plaintiffs readily admit [that] Louisiana law has not . . . chilled" the practice of their

16

respective professions. (*Id.* at 19 (citing Doc. 50 at 10–11, ¶¶ 48, 50–52).) That is, Plaintiffs' "fear of future prosecution . . . is not so substantial that it has chilled or altered their ordinary counseling services." (*Id.*; *see also id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)) (arguing that Plaintiffs cannot base Article III standing upon self-inflicted injury); *id.* at 20 (citing *Neese*, 123 F.4th at 753) ("Plaintiffs themselves do not view their conduct as violating the Practice Provision."); *id.* at 21 (citing *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215–16 (5th Cir. 2023); *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008)).)[5]

Defendants also argue that, even if Plaintiffs' conduct were proscribed, Plaintiffs cannot demonstrate a "credible threat of prosecution." (*Id.* at 22.) "Plaintiffs have been openly engaged in the same counseling work for close to two years since the Board's January 2024 letter," without triggering another investigation or otherwise activating the Board or the DA. (*Id.* (citing Doc. 50 at 12–13, ¶¶ 59–65; Docs. 50-2, 50-3).) Thus, even if Plaintiffs' fear of prosecution were an injury-in-fact, it would not be "traceable to any action by Defendants []or redressable by this Court." (*Id.* at 22 (citing *Murthy*, 603 U.S. at 69); *see id.* at 22–23.)

### b. Plaintiffs' *Opposition* (Doc. 82)

Plaintiffs respond that Defendants' standing arguments "differ little from the ones this Court previously rejected." (Doc. 82 at 16 (referencing *Alleman*, 780 F. Supp. 3d at 626–30).) First—and contrary to Defendants' assertions—Plaintiffs *have* changed their conduct on account of the Practice Provision. (*Id.* at 17.) Specifically, Plaintiffs have re-named their business and now "avoid using certain prohibited terms" (e.g., "psychology," "psychological," "psychologist"). (*Id.* (citing Doc. 50 at 13, 21, ¶¶ 64, 105–06).) Plaintiffs emphasize that the Title Provision and the

---

[5] In a footnote, Defendants also argue that, despite the Court's initial *Ruling and Order*, *Neese v. Becerra* is on-point, and *Braidwood Management, Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023), confirms rather than undermines Defendants' position. (Doc. 71-1 at 20 n.2.) The Court addresses these arguments below. *See also Alleman*, 780 F. Supp. 3d at 627–28 (discussing *Neese* and *Braidwood Management* at length).

Practice Provision are interrelated—to such a degree that "[D]efendants' defense of the Title Provision is dependent upon the validity of the Practice Provision." (*Id.* at 17–18 (citing *Alleman*, 780 F. Supp. 3d at 627).) Defendants concede that Plaintiffs "have standing to challenge the former," so Plaintiffs must also "have standing to challenge the latter." (*Id.* at 18.)

As for the Services Provision, Plaintiffs explain that they have refrained from describing their services using terms like "psychology" and "psychological," even though such terms are accurate. (*Id.* (citing Doc. 50 at 12, 20–21, ¶¶ 55–56, 104).) According to Plaintiffs, "[t]hat is all that is required to show standing." (*Id.* at 18–19 (citing *Alleman*, 780 F. Supp. 3d at 629–30).)

c.    Defendants' *Reply* (Doc. 84)

Defendants note that "standing is not dispensed in gross" and argue that, as a consequence, Plaintiffs cannot "bootstrap the resolved Title-Provision episode into a roving license to litigate the Practice and Services Provisions." (Doc. 84 at 8–9 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).) Defendants also repeat that, as a threshold matter, Plaintiffs have not established traceability or redressability with respect to the DA. (*Id.* at 9 (citing *Murthy*, 603 U.S. at 70).) In a similar vein, Plaintiffs have not "identif[ied] any injury traceable to the Practice Provision." (*Id.* at 10 (citing Doc. 82 at 17–18).) Defendants deny that Plaintiffs' changing the name of their business or refraining from using certain terms falls under the Practice Provision. (*Id.*) And Defendants emphasize that Plaintiffs still apply psychological principles, methods, and procedures. (*Id.* (citing Doc. 50 at 10–11, 20, 23, ¶¶ 48, 50–52, 103, 118).) "If [Plaintiffs'] conduct is lawful counseling within their existing licenses, then the Practice Provision does not restrict them from that conduct." (*Id.* at 11.)

Finally, Defendants argue that "Plaintiffs again fail to tie any concrete injury to the Services Provision." (*Id.* at 12 (citing Doc. 82 at 18–19).) The January 2024 letter has been the extent of

18

enforcement. (*Id.*) Thus, Defendants say, Plaintiffs' "only purported 'injury' is self-censorship." (*Id.* (citing *Clapper*, 568 U.S. at 416); *see also id.* (citing *Turtle Island Foods*, 65 F.4th at 215–16) (requiring, *inter alia*, a credible threat of enforcement).)

### 2. *Applicable Law*

"A proper case or controversy exists only when at least one plaintiff establishes that she has standing to sue." *Murthy*, 603 U.S. at 57 (cleaned up). In order to establish standing, a plaintiff "must show that she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* (quoting *Clapper*, 568 U.S. at 409). The plaintiff must also support each of these elements "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 58 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561 (cleaned up)).

"[S]tanding is not dispensed in gross." *Murthy*, 603 U.S. at 61 (quoting *TransUnion*, 594 U.S. at 431). In other words, a plaintiff "'must demonstrate standing for each claim that [she] press[es]' against each defendant, 'and for each form of relief that [she] seek[s].'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Thus, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Id.* The foregoing requirements "help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [her] invocation of federal-court jurisdiction.'" *Id.* at 57 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

An injury-in-fact "must be 'concrete, particularized, and actual or imminent.'" *E.g.*, *Consumer Data Indus. Ass'n v. Texas through Paxton*, No. 21-51038, 2023 WL 4744918, at *4 (5th Cir. July 25, 2023) (per curiam) (quoting *Clapper*, 568 U.S. at 409). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted) (quoting *Clapper*, 568 U.S. at 410, 414 n.5). In a pre-enforcement challenge, a plaintiff can demonstrate a cognizable injury by establishing (1) her "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) the existence of "a credible threat of prosecution" under the statute. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 924–25 (5th Cir. 2023) (quoting *Susan B. Anthony List*, 573 U.S. at 159); *accord Turtle Island Foods*, 65 F.4th at 215–16.

For as-applied challenges, "[t]here must be some evidence that the rule would be applied to the plaintiff." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019); *accord Speech First, Inc. v. Fenves*, 979 F.3d 319, 334–35 (5th Cir. 2020). On the other hand, "courts may permit third-party standing when a plaintiff demonstrates that a provision that validly restricts [her] own speech is overbroad." *Nat'l Fed'n of Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (citing *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984)); *accord Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988). "A[] statute is overbroad if it validly regulates some expressive conduct but also reaches substantial protected speech." *Nat'l Fed'n of Blind*, 647 F.3d at 210 (citing *City of Houston v. Hill*, 482 U.S. 451, 456–57 (1987)). The standing requirements are relaxed for facial challenges "because of a judicial prediction or assumption that the [challenged] statute's very existence may cause others not before the court to

20

refrain from constitutionally protected speech or expression." *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

Importantly, though, "the overbreadth doctrine applies on a *provision by provision* basis: 'the plaintiff must establish injury under a particular provision of a regulation that is validly applied to [her] conduct, then assert a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the court *under that provision*.'" *Id.* (internal quotation marks omitted) (quoting *Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 598 (5th Cir. 2010)).

### 3. *Analysis*

Defendants again agree that Plaintiffs have standing to challenge the Title Provision. (Doc. 71-1 at 17; *see also* Doc. 22-1 at 14.) And for its part, this Court is satisfied that Plaintiffs have standing to challenge the Title Provision, as well as the Services and Practice Provisions.

### a. Threshold Issues

Defendants raise two threshold issues concerning Plaintiffs' standing to challenge the Services and Practice Provisions. The Court will take these arguments in turn. First, citing the January 2024 letter, Defendants aver that the Board has "expressly declined to invoke" either the Services Provision or the Practice Provision. (Doc. 71-1 at 18 (citing, *inter alia*, Doc. 50-2).) But the January 2024 letter cannot be construed so narrowly.[6] (*See* Doc. 50-2 at 2.) The letter did not single out the Title Provision, but rather notified Plaintiffs that the Board's investigation had "confirm[ed] *multiple* violations" of the statute, none of which were specified. (*Id.* (emphasis added).) The letter also characterized the Board as being "mandated by law to take legal action against persons who engage in the unlicensed *practice of psychology*" (writ large). (*Id.* (emphasis

---

[6] Nor does the subsequent e-mail from the Board representative to Plaintiffs change the Court's assessment of the January 2024 letter. (*See* Doc. 50-3 at 2.) Although the e-mail focused on the name of Plaintiffs' business, nowhere did the Board (via its representative) "expressly decline[] to invoke the Services Provision or [the] Practice Provision." (*See* Doc. 71-1 at 18 (citing, *inter alia*, Doc. 50-3).)

added).) And in an attachment, the Board highlighted that portion of La. R.S. § 37:2352 which encompasses the Title Provision *and* the Services Provision. (*See id.* at 3; *see also id.* at 4 (highlighting La. R.S. § 37:2360(A)(1)).)

Second, Defendants object that Plaintiffs cannot connect the January 2024 letter to some future injury "that is traceable to the *district attorney*." (Doc. 71-1 at 18 (emphasis in original).) This, too, is unpersuasive. The January 2024 letter explicitly warned that Plaintiffs' failure to take corrective action would "result in the [Board's] . . . making criminal referrals to the appropriate law enforcement agencies." (Doc. 50-2 at 2.) More importantly, though, under the statutory scheme, it is a misdemeanor for any person who is not a licensed psychologist to represent herself as such, to engage in the practice of psychology, or to "otherwise violate the provisions of [Title 37, Chapter 28]." La. R.S. § 37:2360(A)(1)–(2), (4). Any such misdemeanor "*shall* be prosecuted by the district attorney of the judicial district in which the offense was committed." *Id.* § 37:2360(B) (emphasis added). In other words, the DA is compelled to prosecute Plaintiffs for any violations of, *inter alia*, the Services Provision and the Practice Provision. *See id.*

### b. Services Provision

Defendants' more targeted arguments likewise do not pass muster. Again, the Services Provision prohibits any person who is not a licensed psychologist from using "any . . . description of services incorporating the words 'psychology', 'psychological', or 'psychologist'" or from using "any other terms which imply that [the person] is qualified to practice psychology or . . . possesses expert qualification in any area of psychology." *Id.* § 37:2352(10). According to the *Amended Complaint*, Defendants "will charge [Plaintiffs] with violations of Louisiana law" if Plaintiffs use the proscribed terms. (Doc. 50 at 22–23, ¶¶ 114–16.) Plaintiffs allege that, due to the Services Provision, they have refrained from describing their services using terms like

"psychological," even though such terms are accurate. (*See, e.g.*, Doc. 50 at 21–22, ¶¶ 105–12.) Plaintiffs also allege that the Services Provision violates the First Amendment, both as applied to Plaintiffs and facially. (*See id.* at 24–25, ¶¶ 122–30.) Plaintiffs wish to resume using the proscribed terms when describing their services. (*See, e.g., id.* at 12, 14–15, ¶¶ 55–57, 69, 71, 76–77.)

The injury-in-fact is apparent: (1) Plaintiffs wish "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) there is "a credible threat of prosecution" under the statute. *Braidwood Mgmt.*, 70 F.4th at 924–25 (quoting *Susan B. Anthony List*, 573 U.S. at 159); *accord Turtle Island Foods*, 65 F.4th at 215–16. Such injury is fairly traceable to these Defendants. *See, e.g.*, La. R.S. §§ 37:2360(B), 37:2361(A)–(B), (E) (providing for enforcement of the statute). And it is plausibly redressable by the declaratory and injunctive relief which Plaintiffs seek. (*See* Doc. 50 at 25.)

Defendants argue that Plaintiffs cannot show injury-in-fact because the statutory scheme does not prohibit Plaintiffs from accurately describing their services, but rather "bars unlicensed persons from misrepresenting their . . . services as licensed psychology." (Doc. 71-1 at 23–24 (citing La. R.S. § 37:2360(A)(2)).) This statement bespeaks some confusion on Defendants' part. Plaintiff Alleman "is a Licensed Professional Counselor, a Licensed Marriage and Family Therapist, and a Licensed Addiction Counselor." (Doc. 50 at 7, ¶ 30.) Plaintiff Catrett "is a Licensed Clinical Social Worker." (*Id.* at 8, ¶ 33.) Definitionally, these professions incorporate some psychological principles, methods, and procedures—or, at the very least, imply some qualification or expertise in same. *See, e.g.*, La. R.S. §§ 37:1103(5)–(7), (9), 37:1116(E)–(F), 37:2703(15)(a), 37:2708(B), 37:3386.1(1)–(2). Yet the Services Provision prohibits Plaintiffs from using "*any* . . . description," however accurate, "of services incorporating the words 'psychology', 'psychological', or 'psychologist'" or like terms. *Id.* § 37:2352(10) (emphasis added). Plaintiffs

therefore allege a functional inconsistency between licensing regimes, which has the effect of chilling Plaintiffs' speech. (*See* Doc. 50 at 24–25, ¶¶ 124–30; *see also id.* at 12, ¶¶ 55–57.)

For the as-applied challenge, there is "some evidence" (e.g., the January 2024 letter and attachments) that the Services Provision will be applied to Plaintiffs. *See Schlissel*, 939 F.3d at 766; *see also Alleman*, 780 F. Supp. 3d at 627 ("Plaintiffs have already been the subject of one complaint and investigation for similar conduct, so it is reasonable to infer they could be again for violating this interrelated provision."). For pre-enforcement facial challenges, courts "'assume[] a credible threat of prosecution in the absence of compelling contrary evidence,' so long as the challenged law is 'non-moribund.'" *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025) (quoting *Ostrewich v. Tatum*, 72 F.4th 94, 102 (5th Cir. 2023)). Here, Defendants have not disavowed enforcement, nor is there (1) other evidence undermining "the assumption of future enforcement," or (2) evidence that the challenged provisions are "dead-letter law." *Id.*; *see also Consumer Data Indus.*, 2023 WL 4744918, at *5 ("Paxton's submissions to the district court . . . lack a clear statement of intent regarding future enforcement . . . despite the obvious materiality of that information. Given the ease by which this point could be clarified . . . the omission is telling.").

### c.  Practice Provision

The Practice Provision prohibits any person who is not a licensed psychologist from "offer[ing] to the public or render[ing] to individuals or to groups of individuals services defined as the practice of psychology in [Chapter 28]." *See id.* § 37:2352(8), (10); *see also id.* § 37:2360(A)(1)–(2). With respect to this provision, Plaintiffs allege that they currently "avoid using" certain prohibited terms, including when communicating with clients (i.e., when practicing their respective professions). (*See* Doc. 50 at 21, ¶¶ 105–06.) Plaintiffs also allege that, unless

enjoined, Defendants will take action against Plaintiffs for their use of psychological principles, methods, and procedures. (*Id.* at 22–23, ¶¶ 114–16; *see id.* at 20, ¶ 103.)

Defendants argue that, because Plaintiffs continue to apply psychological principles, methods, and procedures in their respective practices, they cannot show injury-in-fact, nor can they show a credible threat of prosecution. (*See* Doc. 71-1 at 19, 22.) As the Court explained previously, the fact that Plaintiffs "have already been the subject of one complaint and investigation," raises the reasonable possibility that Defendants will seek to enforce this "interrelated provision" against Plaintiffs. *See Alleman*, 780 F. Supp. 3d at 627. And Defendants do not seriously contest Plaintiffs' allegation that Plaintiffs have altered how they practice their respective professions in order to comply with Chapter 28 (e.g., by avoiding terms like "psychology" and "psychological"). *See also* La. R.S. § 37:2352(8) (defining "practice of psychology" as, *inter alia*, the "description . . . of human behavior . . . by the application of psychological principles, methods, and procedures," including via counseling and psychotherapy).

Defendants also emphasize that "Louisiana law permits [Plaintiffs] to treat clients 'consistent with their professional training' so long as [Plaintiffs] do not represent themselves as psychologists or their work as psychological." (Doc. 71-1 at 20, 30–31 (quoting Doc. 50 at 11, ¶ 53)); *see also* La. R.S. § 37:2365(A) ("Members of other professions who are licensed or certified in accordance with the laws of this state shall be permitted to render services consistent with their professional training and code of ethics *if they do not represent themselves as psychologists or their work as psychological*." (emphasis added)). Defendants' contention overlooks Plaintiffs' allegations of inconsistency.

"A person represents h[erself] to be a psychologist . . . by using any . . . terms which imply that [s]he is qualified to practice psychology or that [s]he possesses expert qualification in any area

of psychology, or if [she] offers to the public or renders to individuals or to groups of individuals services defined as the practice of psychology in [Title 37, Chapter 28]." La. R.S. § 37:2352(10). Again, Plaintiffs' respective professions at the very least imply some qualification or expertise in applying certain psychological principles, methods, and procedures. *See, e.g.*, *id.* §§ 37:1103(5)–(7), (9), 37:1116(E)–(F), 37:2703(15)(a), 37:2708(B), 37:3386.1(1)–(2). Chapter 28 purports to allow Plaintiffs to "render services consistent with their professional training and code of ethics." *Id.* § 37:2365(A). But by applying the psychological principles, methods, and procedures incorporated into their respective professions—or, simply, by discussing same with clients—Plaintiffs represent themselves as psychologists. *Id.* §§ 37:2352(10), 37:2365(A).

At a minimum, then, Plaintiffs' injury-in-fact derives from the inability to "us[e] speech that incorporates their knowledge of psychology and psychological principles, methods, and procedures" when treating clients. (*See* Doc. 50 at 18, ¶ 89; *see also id.* at 12, ¶ 55 (citing La. R.S. § 37:2365) ("Louisiana law prohibits Alleman and Catrett from describing their work as 'psychological,' even though it is.").) Defendants nowhere propose a plausible alternative interpretation of Title 37, Chapter 28, but rather take the position that Plaintiffs cannot lawfully use the proscribed terms, including when practicing their respective professions. (*See, e.g.*, Doc. 71-1 at 12 ("[Plaintiffs] simply want to sell th[eir] counseling services as the licensed practice of psychology—precisely the kind of misleading commercial speech Louisiana law permissibly restricts."); *id.* at 21 ("Plaintiffs repeatedly acknowledge that they are not psychologists, [that] they cannot represent their services as psychology, and [that] their professional codes forbid them from practicing psychology without a license.").)

As before—and as with the Services Provision—the Court finds that Plaintiffs have presented "some evidence" that the Practice Provision will be applied to them, such that they can

26

bring an as-applied challenge. *See Schlissel*, 939 F.3d at 766; *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ."). And as with the Services Provision, Defendants have not disavowed enforcement, nor is there (1) other evidence undermining "the assumption of future enforcement," or (2) evidence that the challenged provisions are "dead-letter law." *Inst. for Free Speech*, 148 F.4th at 329. Thus, Plaintiffs can also bring a facial challenge.

Lastly, in a footnote, Defendants argue that, despite the Court's initial *Ruling and Order*, *Neese v. Becerra* is on-point, and *Braidwood Management, Inc. v. EEOC*, confirms rather than undermines Defendants' position. (Doc. 71-1 at 20 n.2.) The Court disagrees with both statements, for substantially the same reasons given in its initial *Ruling and Order*. *See Alleman*, 780 F. Supp. 3d at 627–30. Simply, *Neese* is distinguishable because, here, Plaintiffs were previously investigated for violating an interrelated provision, and they "specifically allege that they currently engage in the 'practice of psychology,'" as broadly defined in Chapter 28. *See id.* at 628. Contrary to Defendants' assertion, Plaintiffs do not "concede [that] they are complying with the law and face no realistic prospect of prosecution." (*See* Doc. 71-1 at 20 n.2; *see also* Doc. 50 at 10–12, 18, 20–21, ¶¶ 48–54, 89–90, 103, 105.) On the other hand, *Braidwood Management* is apposite given Plaintiffs' allegations that the practice of their respective professions *ipso facto* violates Chapter 28's prohibition of the "practice of psychology." *See Alleman*, 780 F. Supp. 3d at 628–30 (citing *Braidwood Mgmt.*, 70 F.4th at 926–29).

### C.    Sovereign Immunity

#### 1. *Parties' Arguments*

##### a.   Defendants' *MTD* (Doc. 71)

Defendants contend that Plaintiffs' claims against the Board Defendants "are plainly

foreclosed by sovereign immunity." (Doc. 71-1 at 14.) As this Court recognized previously, "the Board is an arm of the state for purposes of the Eleventh Amendment." (*Id.* (quoting *Alleman*, 780 F. Supp. 3d at 631).) "And, on this record," Defendants say, Plaintiffs cannot invoke *Ex parte Young*, for three reasons. (*Id.* (referencing *Ex parte Young*, 209 U.S. 123 (1908)).)

First, "*Ex parte Young* applies only when the state official has 'some connection with the enforcement of the challenged act.'" (*Id.* (quoting *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019)).) Here, the Board has the discretion to investigate alleged violations, but it lacks "independent power to prosecute or penalize." (*Id.* at 15 (citing La. R.S. §§ 37:2353(C)(6), 37:2361(A)–(B)).) Defendants therefore argue that the Board is insufficiently connected to enforcement. (*Id.* at 14–15 (citing *Mi Familia Vota v. Ogg*, 105 F.4th 313, 327 (5th Cir. 2024)).)

Second, the statutory scheme specifically tasks the DA with enforcement. (*Id.* at 15 (citing, *inter alia*, La. R.S. § 37:2360(B)).) Thus, with respect to the Board Defendants, the Court's *Ex parte Young* analysis must end, because the Board Defendants are not the proper state officials to be sued. (*Id.* at 15–16 (citing *City of Austin*, 943 F.3d at 998).)

Third, Defendants argue that Plaintiffs cannot challenge the Services Provision or the Practice Provision because *Ex parte Young* requires that the relevant state officials "'have taken some step to enforce' the statute." (*Id.* at 16 (quoting *Mi Familia Vota*, 105 F.4th at 329 (quoting *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020))); *see also id.* (citing *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022)).) Whereas Plaintiffs can show past enforcement of the Title Provision, correspondence between Plaintiffs and the Board representative reveals that "the Board took *zero* enforcement steps . . . under either the Services Provision or the Practice Provision." (*Id.* (citing Docs. 50-2, 50-3).) Relatedly, Defendants assert

28

that, based upon the record, "the Board has shown a clear willingness *not* to enforce" the Services Provision or the Practice Provision. (*Id.* at 17.)

b.    Plaintiffs' *Opposition* (Doc. 82)

Plaintiffs argue that Defendants are not immune, observing that the Court "previously rejected" this very claim. (Doc. 82 at 14 (referencing *Alleman*, 780 F. Supp. 3d at 631–33).) First, Plaintiffs explain, the fact that the Board Defendants have discretion does not, on its own, mean that the Board Defendants are insufficiently connected to enforcement. (*See id.* (citing *Book People, Inc. v. Wong*, 91 F.4th 318, 332–35 (5th Cir. 2024); *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 397 (5th Cir. 2025)).) And second, *City of Austin v. Paxton* is distinguishable because, here, "the Board is charged with civil enforcement," whereas the DA is charged with criminal enforcement. (*Id.* at 14–15 (citing *Alleman*, 780 F. Supp. 3d at 633; La. R.S. § 37:2361(E)).)

Third, Plaintiffs dispute Defendants' characterization of the January 2024 letter and Defendants' assertion that the Board Defendants "have not taken any steps to enforce" the Services Provision or the Practice Provision. (*Id.* at 15 (citing Doc. 71-1 at 16).) The letter "specifically stated that the Board was 'mandated by law to take legal action against persons who engage in the unlicensed practice of psychology.'" (*Id.* (quoting Doc. 50-2 at 2).) And regardless, Plaintiffs say, the "mere fact that [a provision] has not yet been enforced against a particular plaintiff" does not thwart a pre-enforcement challenge. (*Id.* at 15–16 (citing *Healthy Vision Ass'n*, 138 F.4th at 395, 398).) "Defendants already have investigated [P]laintiffs for a violation of [La. R.S. §] 37:2360(A)(1), a non-moribund statute that prohibits rendering 'services defined as the practice of psychology.'" (*Id.* at 16; *see also id.* (citing *Alleman*, 780 F. Supp. 3d at 627).)

c.    Defendants' *Reply* (Doc. 84)

Defendants reiterate that (1) "the Board's role is solely discretionary," (2) "Louisiana

assigns *actual enforcement* to the district attorney," and (3) "*Ex parte Young* cannot apply to the Practice and Services Provisions because the Board has taken *no positive act* to enforce *those provisions* against Plaintiffs." (Doc. 84 at 7 (emphasis in original) (citations omitted).) Plaintiffs point only to the January 2024 letter, which, according to Defendants, merely "invoked the Title Provision." (*Id.* at 8 (citing, *inter alia*, Doc. 71-1 at 16–17).) And the Board "closed out the complaint" as soon as Plaintiffs changed the name of their business, so Plaintiffs' *Ex parte Young* theory rests "entirely on speculation." (*Id.*; *see also id.* at 8 n.1 (citing *Mi Familia Vota*, 105 F.4th at 329) (arguing that the January 2024 letter's "boilerplate language" about the Board's mandate "does not equal enforcement")).)

### 2. *Applicable Law*

"Under the Eleventh Amendment, '[f]ederal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it.'" *Healthy Vision Ass'n*, 138 F.4th at 396 (quoting *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014)); *accord Book People*, 91 F.4th at 334. But under the *Ex parte Young* exception, "a plaintiff can seek prospective injunctive relief 'against individual state officials acting in violation of federal law.'" *Book People*, 91 F.4th at 334 (quoting *City of Austin*, 943 F.3d at 997); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (identifying "three criteria" for the exception).

In order for a state official to be a proper defendant pursuant to *Ex parte Young*, that official "'must have some connection with the enforcement of' the law being challenged." *Mi Familia Vota*, 105 F.4th at 325 (quoting *Ex parte Young*, 209 U.S. at 157). There are three "guideposts"

30

which aid courts in making this determination. *Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). These are:

> (1) the state official has "more than the general duty to see that the laws of the state are implemented," *i.e.*, a "particular duty to enforce the statute in question"; (2) the state official has "a demonstrated willingness to exercise that duty"; and (3) the state official, through her conduct, "compel[s] or constrain[s persons] to obey the challenged law."

*Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672); *see also id.* at 325 n.7.

The above analysis is "provision-by-provision." *Id.* at 327. That is, the state official "must enforce 'the particular statutory provision that is the subject of the litigation.'" *Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). The Fifth Circuit has "defined 'enforcement' as 'typically involv[ing] compulsion or constraint,'" so if the state official "does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (first quoting *City of Austin*, 943 F.3d at 1000; and then quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672).

"Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Book People*, 91 F.4th at 335 (quoting *Tex. Democratic Party*, 978 F.3d at 179). "[D]irect enforcement . . . is not required." *Healthy Vision Ass'n*, 138 F.4th at 396 (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017)); *see also Mi Familia Vota*, 105 F.4th at 329 (requiring "'some scintilla' of affirmative action" demonstrating a state official's willingness to enforce the relevant statute). Lastly, the Fifth Circuit has often observed that "Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the [state] official under the *Ex parte Young* exception." *Book People*, 91 F.4th at 335 (cleaned up).

31

### 3. *Analysis*

Preliminarily, the Court notes that Defendants' first and second contentions are more or less identical to those which Defendants raised in their original motion to dismiss. *See Alleman*, 780 F. Supp. 3d at 630 (citing Doc. 22-1 at 19–20). Once again, the Court disagrees with Defendants. The *Ex parte Young* exception applies here because the Board Defendants "have some connection with the enforcement of the law being challenged." *See Mi Familia Vota*, 105 F.4th at 325 (cleaned up). The guideposts clearly point in this direction. *See id.*

Title 37, Chapter 28, vests the Board with authority to "investigate any evidence or allegation which appears to show that any person is or may be in violation of any provision of [Chapter 28]," La. R.S. § 37:2361(A), and to "[c]ause the prosecution . . . of all persons violating th[e] Chapter," *id.* § 37:2353(C)(6). The Board is also empowered to seek civil enforcement of Chapter 28—namely, by applying for injunctive relief. *Id.* § 37:2361(B). The Board may seek civil enforcement in addition to any criminal proceedings. *Id.* § 37:2361(E). Safe to say, then, Chapter 28 bestows upon the Board a "particular" enforcement duty, including with respect to the provisions challenged here.[7] *See Mi Familia Vota*, 105 F.4th at 325, 327.

Moreover, the Board Defendants have "a demonstrated willingness" to perform their "particular" enforcement duty. *See id.* at 325 (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). In their January 2024 letter, the Board notified Plaintiffs that it had undertaken a "preliminary investigation" which had "confirm[ed] multiple violations" of Chapter 28. (Doc. 50-2 at 2.) The Board continued: "As the regulatory authority charged with governing the practice of psychology

---

[7] Notably, Defendants' third argument against the application of *Ex parte Young* belies the claim that the Board is insufficiently connected to enforcement of the challenged provisions. (*See* Doc. 71-1 at 16 ("[T]he Board took zero *enforcement* steps . . . ." (emphasis changed)); *id.* at 17 ("Plaintiffs cannot bootstrap the Board's isolated *enforcement* of one provision . . . ." (emphasis added)); *id.* ("[T]he Board has shown a clear willingness not to *enforce* . . . ." (emphasis changed)); Doc. 84 at 7 ("[T]he Board has taken no positive act to *enforce* . . . ." (emphasis changed)).)

32

in this state, the [Board] is mandated by law to take legal action against persons who engage in the unlicensed practice of psychology." (*Id.*) The Board urged "corrective action," cautioning that "[f]ailure to do so w[ould] result in the [Board's] both filing for civil injunctive relief and making criminal referrals to the appropriate law enforcement agencies." (*Id.*)

Finally, it is self-evident that such action by the Board "compels or constrains." *See Mi Familia Vota*, 105 F.4th at 325 (cleaned up) (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672).

Defendants cite *Mi Familia Vota v. Ogg* for the proposition that "[d]iscretionary authority to act, on its own, is insufficient to give rise to a particular duty to act." (*See* Doc. 71-1 at 14–15 (quoting *Mi Familia Vota*, 105 F.4th at 327).) Granted. But as this Court explained previously, it does not follow from this sentence that the fact of discretion *thwarts* application of *Ex parte Young*. *See Alleman*, 780 F. Supp. 3d at 632; *see also Mi Familia Vota*, 105 F.4th at 327–28 (citing *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021)) (observing that *Ex parte Young* requires that a state official have both the authority to enforce *and* a sufficient connection to enforcement). Indeed, the Fifth Circuit has clarified that a plaintiff can establish a state official's sufficient connection to enforcement by linking that official's discretion with "actual enforcement," *viz.*, by suggesting some "reasonable prospect of how that discretion is to be exercised." *Healthy Vision Ass'n*, 138 F.4th at 397 (citations omitted). Here, the Board's discretion to enforce the challenged provisions does not undermine its connection to enforcement.

Relatedly, Defendants cite *City of Austin* for the proposition that, "[w]here a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, [the court's] [*Ex parte*] *Young* analysis ends." (Doc. 71-1 at 15 (quoting *City of Austin*, 943 F.3d at 998).) This sentence has been taken out of context. *See Alleman*, 780 F. Supp. 3d at 633 (citing *City of Austin*, 943 F.3d at 998)). In *City of Austin*, the Fifth Circuit pointed to *Morris*

*v. Livingston*, where the plaintiff sued Texas's governor even though the relevant statute tasked the Texas Department of Criminal Justice with enforcement. *City of Austin*, 943 F.3d at 998 (citing *Morris v. Livingston*, 739 F.3d 740, 742 (5th Cir. 2014)). Here, *City of Austin* merely confirms that a plaintiff must seek to enjoin the "right" state official. *Alleman*, 780 F. Supp. 3d at 633.

As this Court has already explained, the DA's authority/responsibility to prosecute violations of Title 37, Chapter 28, does not gainsay the Board's authority to investigate violations, to cause the prosecution of violations, or to seek to enjoin violations.[8] *Id.* (citing La. R.S. § 37:2353(C)(6)); *see* La. R.S. §§ 37:2353(A)(1), 37:2361(A)–(B), (E); *see also Ex parte Young*, 209 U.S. at 155–56 ("[I]ndividuals who, as officers of the state, are clothed with *some* duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, *either of a civil or criminal nature*, to *enforce* against parties affected an unconstitutional act . . . may be enjoined . . . from such action." (emphasis added)).

Lastly, the Court rejects Defendants' third contention. The second guidepost—"a demonstrated willingness to enforce"—requires only "some scintilla of affirmative action by the [relevant] state official," *Mi Familia Vota*, 105 F.4th at 329 (cleaned up), which need not be "direct enforcement," *Air Evac EMS*, 851 F.3d at 519. "This guidepost must not be understood so rigidly as to thwart its orienting purpose." *Healthy Vision Ass'n*, 138 F.4th at 398. The Fifth Circuit "merely" requests "an evidence-based forecast" of enforcement. *Id.* (citing *Mi Familia Vota*, 105 F.4th at 329). "Of necessity in such a situation, circumstantial evidence will do." *Id.*

The January 2024 letter mentioned "multiple violations" by Plaintiffs and described the Board as being "mandated by law to take legal action against persons who engage in the unlicensed

---

[8] Defendants' argument is in tension with their Article III standing argument that any injury is not traceable to the DA. Defendants are, in other words, trying to have it both ways here: Under their Article III standing argument, the DA is the wrong target; under their sovereign immunity argument, the DA is the *only* conceivable target. As discussed above, the Court rejects both positions.

34

*practice of psychology*" (writ large). (Doc. 50-2 at 2 (emphasis added).) Both the Services Provision and the Practice Provision implicate/regulate the "practice of psychology." *See* La. R.S. §§ 37:2352(8), (10), 37:2360(A)(1)–(2). The January 2024 letter is at least some scintilla of affirmative action by the Board Defendants, demonstrating a willingness to enforce not only the Title Provision but also the rest of Chapter 28, including the Services and Practice Provisions. Defendants' argument to the contrary rests upon an untenably confined reading of the letter (i.e., as demonstrating a willingness to enforce the Title Provision but not interrelated provisions).[9] *See also Alleman*, 780 F. Supp. 3d at 627 (rejecting a similar argument, albeit in the context of Defendants' challenge to Plaintiffs' Article III standing).[10]

## IV.    MTD: PLEADING CHALLENGES

### A.    Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

---

[9] The Court likewise rejects the suggestion that the January 2024 letter's broad statement about the Board's mandate can be written off as "boilerplate language." (*See* Doc. 84 at 8 n.1.) And even if Defendants are correct that the statement does not itself "equal enforcement," (*see id.*), the Fifth Circuit asks only for "some scintilla of affirmative action" demonstrating a state official's *willingness* to enforce the relevant statute, not for direct enforcement. *See Mi Familia Vota*, 105 F.4th at 329 (cleaned up); *Healthy Vision Ass'n*, 138 F.4th at 398; *Air Evac EMS*, 851 F.3d at 513.

[10] The Court reiterates that the Fifth Circuit has "acknowledged that [its] Article III standing analysis and *Ex parte Young* analysis 'significantly overlap.'" *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac EMS*, 851 F.3d at 520). Accordingly, "a finding of standing tends toward a finding that the [*Ex parte*] *Young* exception applies to the state official(s) in question." *Id.* (citing *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010)). So here.

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court "do[es] not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [alleged misconduct].'" *Calhoun v. City of Houston Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

### B.    As-Applied Challenges

#### 1.  *Parties' Arguments*

##### a.   Defendants' *MTD* (Doc. 71)

Defendants argue that Plaintiffs have "fail[ed] to state a First Amendment claim." (Doc. 71-1 at 25.) The Court's previous determination that the Title Provision regulates commercial speech is, according to Defendants, dispositive of Plaintiffs' as-applied challenge to the Title

36

Provision. (*Id.* (citing *Alleman*, 780 F. Supp. 3d at 637–46).) Likewise, it is dispositive of Plaintiffs' as-applied challenge to the Services Provision, because "[d]escribing a service one sells as 'psychological,' or invoking 'expert qualifications in areas of psychology,' is a commercial representation about the nature and quality of services sold to clients." (*Id.* at 25–26.) Defendants deny that Plaintiffs can rely upon *Serafine v. Branaman* here, because that case "involved political speech . . . where the State's commercial-speech authority did not apply." (*Id.* at 26 (citing *Serafine v. Branaman*, 810 F.3d 354, 360–61 (5th Cir. 2016)).)

Defendants contend that the name "Psychological Wellness Institute" would "mislead consumers by implying" that Plaintiffs are licensed psychologists when, in fact, they are not. (*Id.* at 28; *see also id.* at 26–27 (citations omitted) (discussing misleading trade names).) The *Amended Complaint*'s statements to the contrary are, in Defendants' view, conclusory. (*Id.* at 28 (citing Doc. 50 at 21–22, ¶¶ 109–11).) Additionally, Plaintiffs do not purport to practice psychology, so it would be misleading to describe their services with terms like "psychology" or "psychological." (*Id.* (citing Doc. 50 at 11, ¶¶ 49, 53).) In short, Defendants say, Plaintiffs do not have a First Amendment right "to a deceptive trade name or services description." (*Id.* at 29.)

Even if the Court were to apply the *Central Hudson* factors, Plaintiffs' First Amendment challenges would fail. (*Id.* (referencing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)).) Here, Louisiana has a compelling interest in protecting the public, *viz.*, consumers. (*Id.* (citing La. R.S. § 37:2351).) And, according to Defendants, the Title Provision and the Services Provision both "directly advance that interest" by ensuring that only licensed psychologists practice psychology and represent themselves as psychologists. (*Id.* at 29–30 (citing La. R.S. §§ 37:2352(10), 37:2360(A)(1)–(2)).) Lastly, Defendants argue that these provisions are

37

"no 'more extensive than is necessary to serve th[e] [state's] interest.'" (*Id.* at 30 (quoting *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 219 (5th Cir. 2011)).)

As for the Practice Provision, Defendants deny that it regulates Plaintiffs' speech at all. (*Id.*) According to Defendants, Plaintiffs currently use the same psychological principles, methods, and procedures as they did previously. (*Id.* at 31 (citing Doc. 50 at 10–11, 20, ¶¶ 48, 50–52, 103).) "And even if the Practice Provision could be stretched to reach Plaintiffs' conduct," Plaintiffs' as-applied challenge to the provision would fail along the same lines as Plaintiffs' as-applied challenges to the Title Provision and the Services Provision. (*Id.*)

b.   Plaintiffs' *Opposition* (Doc. 82)

Plaintiffs start with the Practice Provision, asserting that Defendants merely repeat "their jurisdictional argument that the statute does not regulate [P]laintiffs' conduct." (Doc. 82 at 20 (citing Doc. 71-1 at 30–31).) As a result, Plaintiffs say, Defendants "have waived any substantive justification" for the provision. (*See id.* (citing *Alleman*, 780 F. Supp. 3d at 649).)

Next, Plaintiffs address the Title Provision, arguing that, even if the provision only regulates commercial speech, "such speech is protected by the First Amendment." (*Id.* at 22.) Plaintiffs note that the *Amended Complaint* discusses, at length, the broad meanings of terms like "psychology" and "psychological," as well as Plaintiffs' study and application of psychological principles, methods, and procedures. (*Id.* at 23 (citations omitted).) "Louisiana does not own words and cannot prevent people from using them" as they would normally. (*Id.* at 23–24 (citing, *inter alia*, *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 489–90 (5th Cir. 2019)).) Plaintiffs contend that their use of terms like "psychology" is accurate, given common usage and Plaintiffs' own backgrounds and work. (*See id.*; *see also* Doc.

38

50 at 13, ¶¶ 66–68 (using Merriam-Webster's online dictionary to define the terms "psychological" and "psychology").)

Plaintiffs add that *Abramson v. Gonzales* is no longer fatal to Plaintiffs' case, because Plaintiffs are challenging the Practice Provision, not just the Title Provision. (Doc. 82 at 24 (citing *Alleman*, 780 F. Supp. 3d at 641–42 (citing *Abramson v. Gonzales*, 949 F.2d 1567, 1576–77 (11th Cir. 1992)))).) Plus, Defendants concede that Plaintiffs can (and do) use some psychological principles, methods, and procedures in their current work, in which case Plaintiffs can accurately use terms like "psychology" and "psychologist." (*See id.* at 24–25 (citations omitted); *see also id.* at 7–8 (making essentially the same argument); *id.* at 25 n.8 (arguing that *Abramson* did not reach the issue of whether it is misleading for someone who is not a licensed psychologist to use the term "psychological" in a trade name); *id.* at 26 (citing *Serafine*, 810 F.3d at 362).)

According to Plaintiffs, "Defendants fail the remainder of the *Central Hudson* test." (*Id.* at 26.) Plaintiffs have called into question not only the purpose asserted by Defendants but also whether the Title Provision is narrowly tailored to the stated purpose. (*See id.* at 26–27 & n.9 (citations omitted) (using the example of "psychological associates").)

Lastly, Plaintiffs argue that the Title Provision's "expert qualifications" language prohibits the use of terms like "psychology" and "psychological" in non-commercial contexts, not just commercial ones. (*Id.* at 28 (citing *Phi Theta Kappa Honor Soc'y v. HonorSociety.org, Inc.*, No. 24-60452, 2025 WL 1030240, at *2–3 (5th Cir. Apr. 7, 2025) (per curiam)).). Further, Plaintiffs say, such restriction on non-commercial speech is content-based. (*Id.*) Plaintiffs therefore contend that the Title Provision triggers (and fails) strict scrutiny. (*Id.* at 28–29 (citations omitted).)

Plaintiffs assert that the Services Provision fails "under the same precedents, and for the same reasons," as the Title Provision fails. (*Id.* at 30.)

c.    Defendants' *Reply* (Doc. 84)

Defendants reiterate that the Title Provision regulates commercial speech, as does the Services Provision. (Doc. 84 at 13.) At base, "Plaintiffs want to sell [their] counseling services as 'psychology/psychological,'" because those terms "signal a particular professional credential and level of expertise." (*Id.*) Such commercial speech would be misleading—as a business name or as a description of services. (*Id.* at 13–14.) It therefore "receives no protection." (*Id.* (citing *Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 306 (5th Cir. 2017)).) *Serafine* does not compel a different result, because the Plaintiff in *Serafine* was "seeking votes, not clients." (*Id.* at 13 n.3 (quoting *Serafine*, 810 F.3d at 360–61).) Even if Plaintiffs' as-applied challenges could "clear the 'not misleading' threshold," they would fail under the other *Central Hudson* factors. (*Id.* at 14.)

Defendants also posit that the Practice Provision does not regulate speech at all. (*See id.* at 13 (suggesting that Plaintiffs are "try[ing] to repackage the Practice Provision as a speech case").) But in any event, Plaintiffs have not demonstrated that the provision "proscribe[s] their actual course of conduct." (*Id.*; *see also id.* at 15 (citing Doc. 50 at 10–11, ¶¶ 45, 49, 53) ("Plaintiffs cannot turn a licensing rule governing who may engage in the practice of psychology into a speech case when they (and the Board) simultaneously insist that their actual counseling is lawful within the scope of their existing licenses.").)

### 2.  *Applicable Law*

Commercial speech is "[e]xpression related solely to the economic interests of the speaker and [her] audience." *Express Oil Change*, 916 F.3d at 487 n.2 (citing *Cent. Hudson*, 447 U.S. at 561); *see also Book People*, 91 F.4th at 339 ("The commercial speech doctrine rests heavily on the common-sense distinction between speech proposing a commercial transaction and other varieties of speech." (cleaned up)); *Serafine*, 810 F.3d at 364 ("Commercial speech is speech 'that *proposes*

40

a commercial transaction,' not 'speech for profit.'" (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989))). "Although the Constitution protects commercial speech, that protection is more limited than for most other speech." *Express Oil Change*, 916 F.3d at 487 (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)). The test is as follows:

> At the outset, [a court] must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, [a court] ask[s] whether the asserted governmental interest is substantial. If both inquiries yield positive answers, [a court] must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson*, 447 U.S. at 566. "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983). "This burden is a heavy one and may not be satisfied by mere speculation or conjecture." *Express Oil Change*, 916 F.3d at 487–88 (cleaned up). "[R]ather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993); *accord Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283–84 (5th Cir. 2024) (citing *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995)).

Commercial speech which is actually or inherently misleading "do[es] not enjoy the protections of the First Amendment." *Express Oil Change*, 916 F.3d at 488. "[A] statement is actually or inherently misleading when it deceives or is inherently likely to deceive." *Id.* (quoting *Joe Conte Toyota, Inc. v. La. Motor Vehicle Comm'n*, 24 F.3d 754, 756 (5th Cir. 1994)). *Potentially* misleading statements "are safeguarded by the First Amendment." *Id.* (citing *In re R.M.J.*, 455 U.S. 191, 203 (1982) ("States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not

deceptive.")). Thus, in order to regulate such statements, "a state actor must show that [a] restriction directly and materially advances a substantial state interest in a manner no more extensive than necessary to serve that interest." *Id.* (cleaned up) (quoting *Am. Acad. of Implant Dentistry*, 860 F.3d at 308); *see also id.* at 493 (discussing tailoring, including the possibility of using disclaimers "to address consumer deception" (quoting *Am. Acad.*, 860 F.3d at 311)).

### 3. *Analysis*

Previously, Defendants limited their Rule 12(b)(6) challenge to the Title Provision. *Alleman*, 780 F. Supp. 3d at 636. Consequently, the Court looked exclusively at that provision. *Id.* Now, however, the Court must also consider the Services Provision and the Practice Provision.

Thus, it is worth briefly revisiting the statutory scheme. Again, Defendants propose that the Title Provision prohibits any person who is not a licensed psychologist from using "any title . . . incorporating the words 'psychology', 'psychological', or 'psychologist'" or from using "any other terms which imply that [the person] is qualified to practice psychology or . . . possesses expert qualification in any area of psychology." La. R.S. § 37:2352(10). The Services Provision prohibits any person who is not a licensed psychologist from using "any . . . description of services incorporating the words 'psychology', 'psychological', or 'psychologist'" or from using "any other terms which imply that [the person] is qualified to practice psychology or . . . possesses expert qualification in any area of psychology." *Id.* And the Practice Provision prohibits any person who is not a licensed psychologist from "offer[ing] to the public or render[ing] to individuals or to groups of individuals services defined as the practice of psychology in [Chapter 28]." *Id.* These provisions comprise the sub-section defining "psychologist," and they encompass the ways in which "[a] person represents h[erself] to be a psychologist." *Id.* It is a misdemeanor for any person

who is not licensed as a psychologist (1) "to represent h[erself] as a psychologist" or (2) "to engage in the practice of psychology." *Id.* § 37:2360(A)(1)–(2).

### a. Title Provision

Like last time, the Court has little difficulty concluding that, as applied to Plaintiffs, the Title Provision restricts commercial speech. *See Alleman*, 780 F. Supp. 3d at 647. Plaintiffs wish to change the name of their business back to "Psychological Wellness Institute" and to use terms which imply their expertise in certain areas of psychology. (Doc. 50 at 20–23, ¶¶ 104, 112–16.)

Although Plaintiffs aver that the Title Provision sweeps in non-commercial speech (e.g., the discussion of expert qualifications at seminars and conferences, on panels, and in papers), the Court disagrees. In *Abramson*, the plaintiffs—"dozens of practicing psychologists, clinical social workers and therapists"—challenged Florida's Psychological Services Act and Clinical Counseling Act, which prohibited unlicensed individuals from "holding [themselves] out by any title or description incorporating" words like "psychologist, psychology, [and] psychological." 949 F.2d at 1570–71. The plaintiffs argued that Florida's laws "burdened non-commercial speech . . . because unlicensed psychologists [could] not refer to themselves as psychologists in social settings or confidential conversations, even if no commercial relationship [wa]s contemplated." *Id.* at 1574. But the Eleventh Circuit found:

> [T]he Psychological Services Act and the Clinical Counseling Act do not place an unconstitutional burden on the non-commercial speech of these plaintiffs *because all of the speech restricted by the statutes is commercial in nature*. The restriction on the plaintiffs' ability to hold themselves out as psychologists clearly limits only commercial speech, for surely the sole purpose for holding oneself out as a psychologist is to gain commercial advantages. Even if the plaintiffs wish to hold themselves out as psychologists at cocktail parties or over private dinners, such expression is "related solely to the economic interests of the speaker and its audience." [*Cent. Hudson*, 447 U.S. at 561] (defining commercial speech).

* * *

43

> [W]e simply fail to see how the expressive abilities of the plaintiffs are affected here. Though the public may have an interest in letting more psychologists hold themselves out as such, that interest arises for purely commercial reasons unrelated to the expression of differing viewpoints or alternative ideas that we traditionally associate with protected first amendment speech.

*Id.* at 1574–75 (emphasis added).

Plaintiffs do not seriously contend that the name of their business is non-commercial speech. *See also Serafine*, 810 F.3d at 360 ("States' ability to limit the use of titles and trade names to protect the public from 'false, deceptive, and misleading' advertising is well-established." (quoting *Maceluch v. Wysong*, 680 F.2d 1062, 1069 (5th Cir. 1982) (per curiam))). And even if Plaintiffs wish to use terms implying their expert qualifications in areas of psychology at seminars and conferences, where there is no direct commercial advantage, Plaintiffs have not adequately alleged that such speech is non-commercial in nature. *See Abramson*, 949 F.2d at 1574–75. Plaintiffs' as-applied challenge to the Title Provision concerns only commercial speech.[11]

This Court has already considered the *Central Hudson* factors with respect to the Title Provision. *See Alleman*, 780 F. Supp. 3d at 637–46. The Court largely reincorporates its analysis here. *See id.* Crucially, though, Plaintiffs' *Amended Complaint* fills in substantial gaps. Specifically, Plaintiffs now allege, at length, that they have extensive backgrounds in areas of psychology; that their respective professions involve the application of some psychological principles, methods, and procedures; that Louisiana's statutory scheme purports to allow Plaintiffs to "render services consistent with their professional training and code of ethics," even if it is dubious whether the scheme functionally does so, *see* La. R.S. § 37:2365(A); and that the common

---

[11] This fact distinguishes Plaintiffs' as-applied challenge to the Title Provision from the as-applied challenge in *Serafine*, where the speech at issue was political. *See Serafine*, 810 F.3d at 360–61 ("The Board did not order Serafine to cease and desist because she used the word 'psychologist' on a promotional flyer seeking clients . . . . Instead, the Board directed her to cease describing herself as a psychologist on her political campaign website. Yet Sera[f]ine was seeking votes, not clients. . . . Serafine's speech . . . was political speech of the highest form . . . .").

meanings of terms like "psychology" and "psychological" are sufficiently broad that Plaintiffs' accurate use of such terms is neither actually nor inherently misleading. Plaintiffs further allege that the Title Provision (among others) is more extensive than is necessary to advance Louisiana's asserted interest and that "[a]ny interest in consumer protection could be met by requiring additional disclosures." (Doc. 50 at 24, ¶ 125.)

Plaintiffs have cleared the pleading hurdles which the Court identified in its initial *Ruling and Order*. *See Alleman*, 780 F. Supp. 3d at 641–42. That is, construing all allegations in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, the Court now finds that Plaintiffs have adequately pled that, as applied to them, the Title Provision infringes their right to engage in commercial speech. *See id.* at 646 (observing that the Rule 12(b)(6) bar is low and that "*Abramson* and *Express Oil* [*Change*] readily identif[ied] ways in which Plaintiffs could satisfy th[e] pleading requirement"); *see also Valadez v. Paxton*, No. 21-519, 2022 WL 22895564, at *6 (W.D. Tex. Mar. 31, 2022) (discussing the "low" bar at this stage). Specifically, Plaintiffs have alleged that that their desired trade name—"Psychological Wellness Institute"—is not actually or inherently misleading. *See id.* at 641. Likewise, Plaintiffs have alleged that Louisiana's statutory scheme is more restrictive than is necessary to advance its interests. *See id.* at 645. And with their new allegations, Plaintiffs demonstrate that *Abramson* and *Maceluch v. Wysong*, among others, are no longer a bar to their as-applied challenge to the Title Provision. *See id.* at 641–42. The Court will analyze this challenge in greater detail below, in the context of Plaintiffs' *MPI*.

b.  Services Provision

*Abramson*'s logic applies with equal force to Plaintiffs' as-applied challenge to the Services Provision; that is, even if Plaintiffs wish to describe their services, e.g., to colleagues during a seminar or conference, the point of the description is still apparently commercial, if indirectly so.

*See Abramson*, 949 F.2d at 1574–75 ("Even if the plaintiffs wish to hold themselves out as psychologists at cocktail parties or over private dinners, such expression is 'related solely to the economic interests of the speaker and [her] audience.'" (quoting *Cent. Hudson*, 447 U.S. at 561)); *Byrum v. Landreth*, 566 F.3d 442, 444 (5th Cir. 2009) (straightforwardly applying the commercial speech standard to a Texas law prohibiting unlicensed interior designers from using certain terms "to describe their trade and the services they provide").[12] Plaintiffs do not suggest a plausible instance in which a description of their services is divorced from their business and does not propose a commercial transaction. *See also Serafine*, 810 F.3d at 360–61 (noting that the plaintiff was engaged in *political* speech by virtue of running a campaign and not practicing psychology). Indeed, it seems to the Court that the quintessential purpose for which Plaintiffs might describe their services would be the attraction of business from a non-client, whether directly or indirectly. Finally, the Court notes that both parties appear to appreciate the substantial overlap between analysis of the Title Provision and analysis of the Services Provision. (*See, e.g.*, Doc. 71-1 at 29–30; Doc. 82 at 30.) And seeing as Plaintiffs' as-applied challenge to the Title Provision implicates commercial speech, the Court concludes that Plaintiffs' as-applied challenge to the Services Provision implicates same.

Like Plaintiffs' as-applied challenge to the Title Provision, Plaintiffs' as-applied challenge to the Services Provision survives Defendants' *MTD*. Again, the Court largely reincorporates its analysis of the Title Provision. *See Alleman*, 780 F. Supp. 3d at 637–46. And again, Plaintiffs' *Amended Complaint* alleges that Plaintiffs have extensive backgrounds in areas of psychology, that

---

[12] *See also Am. Acad. of Implant Dentistry v. Parker*, 152 F. Supp. 3d 641, 648 (W.D. Tex. 2016) ("The individual Plaintiffs desire to . . . use the terms 'specialty' or 'specialist' to describe the dental services they provide. . . . Plaintiffs mount facial and as-applied challenges to Rule 108.54, arguing it violates their First Amendment right to freedom of *commercial speech* . . . ." (emphasis added)); *Am. Acad. of Implant Dentistry*, 860 F.3d at 306 ("This case involves commercial speech, which is protected by the First Amendment.").

their respective professions involve application of same, that Louisiana's statutory scheme purportedly allows Plaintiffs to apply same, and that the common meanings of terms like "psychology" and "psychological" are sufficiently broad that Plaintiffs' accurate use of such terms in descriptions of their services is neither actually nor inherently misleading. Plaintiffs further allege that they "share mutual clients with psychologists" and "refer clients to psychologists when necessary." (Doc. 50 at 21, ¶ 106.) Finally, Plaintiffs allege that the Services Provision is more extensive than is necessary to advance Louisiana's asserted interests and that "[a]ny interest in consumer protection could be met by requiring additional disclosures." (*Id.* at 24, ¶ 125.)

Construing all allegations in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, the Court finds that Plaintiffs have adequately pled that, as applied to them, the Services Provision infringes their right to engage in commercial speech. *See also Valadez*, 2022 WL 22895564, at *6 (noting the "low" bar).

c.   Practice Provision

Primarily, Defendants re-heat their challenge to Article III standing. The Court appreciates that La. R.S. § 37:2365(A) permits "[m]embers of other professions who are licensed or certified in accordance with" Louisiana law to "render services consistent with their professional training and code of ethics," so long as they "do not represent themselves as psychologists or their work as psychological." But again, "[a] person represents h[erself] to be a psychologist . . . by using any . . . terms which imply that [s]he is qualified to practice psychology or that [s]he possesses expert qualification in any area of psychology, or if [she] offers to the public or renders to individuals or to groups of individuals services defined as the practice of psychology in [Title 37, Chapter 28]." La. R.S. § 37:2352(10). The "practice of psychology" is rather broadly defined. *See id.* § 37:2352(8). Indeed, the term encompasses "the observation, description, evaluation,

47

interpretation, and modification of human behavior, by the application of psychological principles, methods, and procedures." *Id.* It includes, e.g., "counseling, psychoanalysis, psychotherapy, hypnosis, stress management, biofeedback, [and] behavior analysis and therapy," as well as "diagnosis and treatment of . . . alcoholism and substance abuse." *Id.*

Conceivably, then, Chapter 28 places certain professionals in something of a bind: Their respective professions incorporate some psychological principles, methods, and procedures and allow (if not expect) application of same. *See, e.g., id.* §§ 37:1103(5)–(7), (9), 37:1116(E)–(F), 37:2703(15)(a), 37:2708(B), 37:3386.1(1)–(2). But by applying psychological principles, methods, and procedures—or, simply, by discussing same with clients—such professionals represent themselves as psychologists. *See id.* § 37:2352(10). Plaintiffs therefore suggest that La. R.S. § 37:2365(A) gives little, if any, shelter to professionals like Plaintiffs. (*See* Doc. 50 at 18, ¶ 89; *see also id.* at 12, ¶ 55 (citing La. R.S. § 37:2365) ("Louisiana law prohibits Alleman and Catrett from describing their work as 'psychological,' even though it is."); *id.* at 20, ¶ 103 ("[Plaintiffs] are reasonably concerned that [D]efendants will charge them with the practice of psychology in violation of Louisiana law.").)

Here, Plaintiffs allege that they hold various professional licenses and that they have extensive backgrounds in areas of psychology, not to mention training in and experience with applying certain psychological principles, methods, and procedures. (*Id.* at 7–9, ¶¶ 30–39.) Plaintiffs further allege that, in their current work, they "diagnose and treat severe mental illness, major disorders, and mental disorders," including by use of psychological methods like EMDR and Brainspotting. (*Id.* at 9–10, ¶¶ 40–43, 48.) Plaintiffs' respective professions "permit [them] to use psychotherapy with their clients." (*Id.* at 10, ¶ 45 (citations omitted).) And La. R.S. § 37:2365(A) purports to allow Plaintiffs "to treat their clients consistent with their professional

training and code[s] of ethics." (*Id.* at 11, ¶ 49; *see also id.* at 7–9, ¶¶ 30–39 (noting that Plaintiffs (1) have been trained to, *inter alia*, diagnose psychological disorders using the DSM, and (2) apply certain psychological principles, methods, and procedures in their respective practices).)

Plaintiffs allege that Chapter 28 proscribes the practice of those portions of their respective professions incorporating psychological principles, methods, and procedures. (*See* Doc. 50 at 12, 23, ¶¶ 55, 116, 118.) At a minimum, Plaintiffs cannot "us[e] speech that incorporates their knowledge of psychology and psychological principles, methods, and procedures" when treating clients. (*See id.* at 18, ¶ 89.) As a consequence, Plaintiffs say, they currently "avoid using" certain prohibited terms, including when practicing their respective professions. (*See id.* at 21, ¶¶ 105–06.) Lastly, Plaintiffs allege that, as applied to them and generally, Chapter 28's broad proscription violates the First Amendment. (*Id.* at 23–24, ¶¶ 117–21.) Again, Defendants do not propose a plausible alternative interpretation of Chapter 28, but rather take the position that Plaintiffs "cannot represent their services as psychology." (*See, e.g.*, Doc. 71-1 at 12, 21, 30–31.)

Closely related to the above, Defendants posit that the Practice Provision does not regulate speech or, at the very least, does not regulate *Plaintiffs'* speech. (*See, e.g.*, Doc. 84 at 13.) The Court disagrees. *See also Serafine*, 610 F.3d at 364–65 (treating the practice of psychology as speech). Recently, in *Chiles v. Salazar*, the Supreme Court reiterated that "a law regulating the content of speech cannot avoid searching First Amendment review just because it mostly regulates non-expressive conduct." 146 S. Ct. 1010, 1022 (2026) (citing *Cohen v. California*, 403 U.S. 15, 16, 18 (1971); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8–9, 16, 21–22, 27–28 (2010)). The Court added: "[T]he First Amendment's protections extend to licensed professionals much as they do to everyone else." *Id.*

In *Chiles*, a licensed counselor who conducted talk therapy sessions challenged Colorado's law "prohibiting licensed counselors from engaging in 'conversion therapy' with minors." *Id.* at 1017–18. Colorado argued that its law "d[id] not 'regulate expression' at all, only 'conduct,' 'treatment,' or a 'therapeutic modality.'" *Id.* at 1023. The Supreme Court disagreed, reasoning:

> In many applications, the State's law banning "conversion therapy" may address conduct—such as aversive physical interventions. But here, Ms. Chiles seeks to engage only in speech, and as applied to her the law regulates what she may say. Her speech does not become conduct just because the State may call it that. Nor does her speech become conduct just because it can also be described as a "treatment," a "therapeutic modality," or anything else. The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by "mere labels." *NAACP v. Button*, [371 U.S. 415, 429 (1963).]

*Id.*; *see also id.* at 1025 ("If a government could reclassify talk therapy as speech incident to conduct, it might just as easily do the same for speech incident to 'teaching or protesting.'" (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020))).

Plaintiffs allege that, functionally, Louisiana's statutory scheme prohibits them from applying certain psychological principles, methods, and procedures and/or discussing same, despite their respective professional licenses and professional codes of conduct. *See* La. R.S. §§ 37:2352(10), 37:2365(A). In other words, much like the licensed counselor in *Chiles*, Plaintiffs are limited in what they may say in the course of treating clients. Seemingly, Plaintiffs cannot use terms like "psychological" or describe forms of psychotherapy like EMDR to clients without representing themselves as psychologists, thereby running afoul of Louisiana's statutory scheme. *See* La. R.S. § 37:2352(8), (10). The alleged content-based restriction on Plaintiffs' speech is not incidental, nor can Plaintiffs' speech be re-cast as conduct simply because Plaintiffs are professionals providing treatment.

Secondarily, Defendants argue that Plaintiffs' as-applied challenge to the Practice Provision fails along the same lines as Plaintiffs' as-applied challenge to the Title and Services Provisions.

50

The Court's reasoning above addresses this contention. But the Court emphasizes that the Practice Provision is somewhat separate from the Title and Services Provisions—because the unlicensed "practice of psychology" is an independent violation, not simply a way of representing oneself as a psychologist. *See* La. R.S. § 37:2352(8), (10); *see also id.* § 37:2360(A)(1)–(2). Perhaps more importantly, the Fifth Circuit has been clear that "merely receiving compensation for psychological services cannot be commercial speech." *See Serafine*, 810 F.3d at 365 ("Commercial speech is speech 'that *proposes* a commercial transaction,' not 'speech for profit.'" (quoting *Fox*, 492 U.S. at 482)). So, whereas the Title and Services Provisions restrict only Plaintiffs' commercial speech, the Practice Provision restricts Plaintiffs' non-commercial speech (i.e., Plaintiffs' speech for profit).[13] Defendants' arguments concerning the Title and Services Provisions therefore do not map neatly onto the Practice Provision.

In short, the Court cannot agree with Defendants that Plaintiffs have failed to state a claim here. Count I of the *Amended Complaint* passes muster under the Rule 12(b)(6) standard. Likewise, the challenge to the Practice Provision implicit in Count III of the *Amended Complaint* survives. *See* La. R.S. § 37:2360(A)(1) (prohibiting unlicensed individuals from representing themselves as psychologists); *see also id.* § 37:2352(10) ("A person represents h[erself] to be a psychologist . . . if that person offers to the public or renders to individuals or to groups of individuals services defined as the practice of psychology in [Chapter 28].").

## C.    Overbreadth Challenges

### 1. *Parties' Arguments*

Defendants note that "facial challenges are disfavored." (Doc. 71-1 at 31 (quoting *Moody*

---

[13] The Court reiterates that its prior ruling only addressed the Title Provision when considering Defendants' Rule 12(b)(6) challenge. *See Alleman*, 780 F. Supp. 3d at 636, 646–47 ("[T]he Court does not consider whether Plaintiffs have stated viable claims . . . under the Services Provision or Practice Provision.").

*v. NetChoice, LLC*, 603 U.S. 707, 744 (2024)).) More fundamentally, though, Plaintiffs' facial challenges fail because "[t]he overbreadth doctrine does not apply to commercial speech." (*Id.* (quoting *Serafine*, 810 F.3d at 364); *accord* Doc. 84 at 14–15.)

Plaintiffs respond that, like the provision in *Serafine*, the Practice Provision regulates non-commercial speech. (Doc. 82 at 20 (citing *Serafine*, 810 F.3d at 365).) "Indeed, [*Serafine*] held that a prohibition on the practice of psychology that was narrower than the one at issue in this case was nonetheless overbroad and facially unconstitutional." (*Id.* at 20–21 (citing Doc. 56-1 at 14–15).) Plaintiffs add that the Board's "extraordinary discretion" to decide whether conduct runs afoul of the Practice Provision is "untenable" given *Serafine*. (*Id.* at 21 (citing *Serafine*, 810 F.3d at 369).)

As for the Title and Services Provisions, Plaintiffs emphasize that commercial speech "is a fairly narrow category." (*Id.* at 29–30 (citing *Fox*, 492 U.S. at 473–74).) And according to Plaintiffs, the Title and Services Provisions cover more than just this category. (*Id.*) Plaintiffs' facial overbreadth challenge therefore survives. (*See id.*)

### 2. *Applicable Law & Analysis*

"The overbreadth doctrine does not apply to commercial speech." *Serafine*, 810 F.3d at 364–65 (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 496–97 (1982)). Where, however, a statute concerns commercial *and* non-commercial speech, "an overbreadth challenge still may be considered with respect to [the] non-commercial speech." *Id.* The court simply "confine[s] [its] analysis" to same. *See id.*

Previously, the Court considered only the Title Provision, ultimately determining that Plaintiffs' challenge to that provision concerned commercial speech. *See Alleman*, 780 F. Supp. 3d at 646–47 (quoting at length *Abramson*, 949 F.2d at 1574–75); *see also id.* at 647 ("Plaintiffs challenge the restriction prohibiting the use of 'psychological' in their business's name. This is

clearly commercial speech."). Now, however, Plaintiffs challenge La. R.S. § 37:2360(A)(1) and (2) as overbroad. (Doc. 50 at 24–25, ¶¶ 120–21, 129–30.) As discussed above, these sub-sections involve the "practice of psychology," which encompasses non-commercial speech. *See Serafine*, 810 F.3d at 365. At this time, the Court need not determine to what extent it must "confine [its] analysis" of La. R.S. § 37:2360(A)(1) and (2). *See id.* It suffices to say that Plaintiffs' overbreadth challenges survive at least to the extent of the non-commercial speech implicated.

The Court agrees with Defendants that "facial challenges are disfavored." *Moody*, 603 U.S. at 744. Here, "[t]he question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). In other words, under the First Amendment, a law is only facially invalid "if [its] unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. "The first step in the proper facial analysis is to assess the state law['s] scope." *Id.* That is, "[w]hat activities, by what actors, do[es] the law[] prohibit or otherwise regulate?" *Id.* The second step "is to decide which of the law['s] applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.

Plaintiffs specifically allege that La. R.S. § 37:2360(A)(1) and (2) impose restrictions on free speech which "are unconstitutional and outweigh [the statute's] limited legitimate sweep." (Doc. 50 at 20, ¶ 101.) Plaintiffs give numerous examples of the purported unconstitutionality of the challenged sub-sections. (*Id.* at 17–19, ¶¶ 88–96.) Indeed, anyone who uses psychological principles, methods, and procedures "has engaged in the practice of psychology and represented himself or herself as a licensed psychologist," thereby violating the relevant sub-sections. (*Id.* at 18, ¶ 90.) Plaintiffs' allegations sufficiently put Defendants on notice that Plaintiffs are mounting overbreadth challenges to the relevant sub-sections. *See, e.g.*, *McAllister v. Clark Cnty.*, 746 F.

Supp. 3d 918, 939–40 (D. Nev. 2024) ("The County doesn't argue that plaintiffs must plead every alleged unconstitutional application of the law, and [the court] find[s] that such a level of detail is not required . . . ."); *cf. Deep S. Today v. Murrill*, 779 F. Supp. 3d 782, 820–21 (M.D. La. 2025) (deGravelles, J.) (allowing leave to amend a facial challenge where plaintiffs merely "allege[d] that the [law] 'sweeps in an enormous breadth of protected speech and newsgathering'").

For the foregoing reasons, the Court will deny Defendants' *MTD in toto*. The Court therefore turns to Plaintiffs' *MPI*.

## V.    MOTION FOR PRELIMINARY INJUNCTION

### A.    Preliminary Injunction Standard

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In order to obtain a preliminary injunction, a plaintiff must show that (1) "there is a substantial likelihood that [she] will succeed on the merits," (2) "there is a substantial threat that [she] will suffer irreparable injury if the district court does not grant the injunction," (3) "the threatened injury to the plaintiff outweighs the threatened injury to the defendant," and (4) "granting the preliminary injunction will not disserve the public interest." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); *accord Book People*, 91 F.4th at 336 (quoting *Winter v. Nat. Res. Council, Inc.*, 555 U.S. 7, 20 (2008)).

In lawsuits against the Government, items (3) and (4)—the balance of equities and the public interest—"merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Additionally, "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People*, 91 F.4th 340–41 (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012)). "Indeed, the Supreme Court has said

that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 341 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

## B. As-Applied Challenges

### 1. Parties' Arguments

#### a. Plaintiffs' *MPI* (Doc. 85)

Plaintiffs reiterate that they (1) have backgrounds in psychology, (2) "us[e] the psychological knowledge and techniques [which] they have acquired over time" in order to "offer their clients oral psychological assistance for improving their . . . lives," and (3) "clearly identify the licenses [which] they possess, and have never represented to the public or told their clients that they are licensed psychologists." (Doc. 85-1 at 6–7 (citing *Alleman Statement*, Doc. 85-4 at 2–5, ¶¶ 4, 6–15; *Catrett Statement*, Doc. 85-6 at 2–5, ¶¶ 4–6, 8–14, 16–17).) Consistent with the codes governing their respective professions, Plaintiffs use some psychological principles, methods, and procedures in their work. (*Id.* at 7 (citing Doc. 85-4 at 5, ¶ 17; Doc. 85-6 at 5, ¶ 20).)

Plaintiffs first argue that La. R.S. § 37:2360(A)(2) is a content-based restriction. (*Id.* at 16.) Specifically, the sub-section proscribes speech which "is related to an effort to modify human behavior through [the] application of . . . psychological principles, methods, and procedures." (*Id.*) Consequently, Plaintiffs say, the sub-section receives strict scrutiny. (*Id.* (citing *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011)); *see also id.* at 16–17 ("[T]he Government bears the burden of proving the constitutionality of its actions." (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000))).) According to Plaintiffs, the sub-section cannot satisfy that demanding standard. (*See id.* at 17–18.) "[A]s the Fifth Circuit noted in *Serafine* . . . '[t]he ability to provide guidance about the common problems of life . . . is a foundation of human interaction and society.'" (*Id.* (quoting *Serafine*, 810 F.3d at 369).) A moratorium on the unlicensed practice

of psychology is, according to Plaintiffs, "particularly unwarranted as applied to [them]," given their education, training, and respective professional licenses. (*Id.* at 18.) Further, Plaintiffs argue, Defendants cannot show that the challenged sub-section is narrowly tailored. (*Id.* (citing *Playboy Ent. Grp.*, 529 U.S. at 823–24).) There are, after all, "common-law rules of malpractice and fraud that protect the public." (*Id.* at 18–19.)

Next, Plaintiffs contend that their as-applied challenge to La. R.S. § 37:2360(A)(1) is also likely to succeed because: (1) "to the extent that [sub-]section reaches commercial speech, [D]efendants cannot meet their burden under *Central Hudson*," and (2) "to the extent [it] reaches non-commercial speech, [D]efendants cannot" show proper tailoring. (*Id.* at 20–21 (citing, *inter alia*, *Cent. Hudson*, 447 U.S. at 566; *Byrum*, 566 F.3d at 446).) According to Plaintiffs, the use of the term "psychological" in the title of their business is not misleading because Plaintiffs do, in fact, properly use psychological principles, methods, and procedures. (*Id.* at 22.) "Louisiana does not own words and cannot prevent people from using them" consistent with their common meanings. (*Id.* (citing *Express Oil Change*, 916 F.3d at 489–90; *Am. Acad. of Implant Dentistry*, 860 F.3d at 308; *Byrum*, 566 F.3d at 447).) And the term "psychological" is broad enough that it appropriately characterizes at least some of Plaintiffs' work. (*See id.* at 23–24.)

Further, Plaintiffs deny that the relevant sub-section advances Louisiana's interests in consumer protection. (*Id.* at 24.) Really, Plaintiffs' argument concerns tailoring: Louisiana's statutory scheme restricts Plaintiffs' use of terms like "psychological" but allows, for example, the licensing of "psychological associates," whose services are more limited than Plaintiffs'. (*Id.* at 24–25 (citing La. R.S. § 37:2356.4(C), (E)(2)(b)).) Likewise, Defendants cannot establish "any plausible connection" between the proscription of terms implying expertise in certain areas of psychology (e.g., "psychopathology") and consumer protections. (*Id.* at 25.)

Plaintiffs maintain that the Title Provision affects non-commercial speech because it "precludes them from communicating anything that implies expert qualifications in any area of psychology." (*Id.*) According to Plaintiffs, any mention of their expertise, "regardless of context, and regardless of whether they use any of the prohibited words, constitutes a 'representation'" that Plaintiffs are licensed psychologists. (*Id.* at 26 (emphasis omitted).) This restriction is content-based, and Defendants cannot show that it satisfies strict scrutiny. (*Id.* at 26–27.) The Services Provision fails for essentially the same reasons as the Title Provision fails. (*Id.* at 27–28.)

b.  Defendants' *Opposition* (Doc. 88)

Defendants again argue that Plaintiffs are "careful to say [that] their conduct is not the practice of psychology and falls squarely within their current licenses." (Doc. 88 at 11 (citing Docs. 85-4, 85-6).) They emphasize that a preliminary injunction "is an extraordinary and drastic remedy," which is "never awarded as of right." (*Id.* (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).) Plaintiffs "must 'clearly carr[y] the burden of persuasion with respect to all four factors.'" (*Id.* at 12 (quoting *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)).) Here, Defendants say, "jurisdiction is lacking and [Plaintiffs'] claims are not cognizable." (*Id.*) Further, Plaintiffs' delay and their engaging in mere commercial speech both undercut their request for a preliminary injunction. (*Id.*)

Defendants repeat that "[s]overeign immunity . . . forecloses Plaintiffs' claims against the Board Defendants." (*Id.* at 13; *see also id.* at 13–14 (rehashing sovereign immunity arguments).) And Defendants again contend that Plaintiffs lack standing to challenge the Services Provision and the Practice Provision. (*Id.* at 14.) This time, Defendants point to Plaintiffs' Declarations, asserting that Plaintiffs "continue providing counseling services using the same 'psychological principles, methods, and procedures' [as] they used before this lawsuit." (*Id.* (citing Doc. 85-4 at 5, ¶¶ 17–18;

57

Doc. 85-6 at 5, ¶ 20).) Defendants also aver that Plaintiffs have not altered or abandoned any practices and "'do not view their conduct as' violating the statute." (*Id.* at 14–15 (quoting *Neese*, 123 F.4th at 753).) Finally, Defendants argue that, absent "past enforcement, present threats, or prosecutorial signaling, Plaintiffs cannot establish" the imminence necessary for standing. (*Id.* at 15 (citing *Neese*, 123 F.4th at 753; *Turtle Island Foods*, 65 F.4th at 215–16).)

Next, Defendants argue that the Title and Services Provisions regulate commercial speech. (*Id.* at 16 (citing, *inter alia*, *Book People*, 91 F.4th at 339).) According to Defendants, these provisions pass the *Central Hudson* test. (*See id.*) Plaintiffs' "desired company name and services descriptions . . . signal licensure and operate as marketplace representations about credentials and qualifications." (*Id.* (citing *Friedman v. Rogers*, 440 U.S. 1, 11 (1979); *Express Oil Change*, 916 F.3d at 487 & n.2); *see also id.* at 17 (citing Doc. 85-4 at 3–4, 7, ¶¶ 6–14, 26; Doc. 85-6 at 2–4, 6, ¶¶ 4–16, 24).) The use of "psychological" in the name of Plaintiffs' business "would likely inherently mislead consumers by implying psychologist licensure [Plaintiffs] do not hold." (*Id.* at 17 (citing *Alleman*, 780 F. Supp. 3d at 641–42).) And "[t]he same consumer-confusion logic applies to service descriptions invoking psychological expertise or expert qualifications in areas of psychology." (*Id.* (citing *Maceluch*, 680 F.2d at 1068–70; *Joe Conte Toyota*, 24 F.3d at 756).) "Plaintiffs' insistence that their preferred terminology is 'accurate' does not change the statutory and marketplace meaning of those representations." (*Id.*)

Defendants add that "Louisiana's interest in protecting the public from [the] unauthorized and unqualified application of psychology and ensuring accurate professional information in the marketplace is substantial." (*Id.* at 18.) And the Title and Services Provisions "directly advance that interest by preventing unlicensed actors from using licensure-linked terminology." (*Id.*) Lastly, Defendants emphasize that the statutory scheme "is reasonably tailored." (*Id.*) "Plaintiffs remain

58

free to advertise counseling services, describe treatment modalities, and list credentials they actually possess . . . ." (*Id.* at 18–19 (citing *Fox*, 492 U.S. at 480).)

Lastly, Defendants argue that the Practice Provision "still does not regulate the conduct . . . [Plaintiffs] intend to perform." (*Id.* at 20.) "[I]f Plaintiffs instead believe [that] they should be permitted to practice psychology without a license, that is a challenge to Louisiana's licensing framework—not a First Amendment problem." (*Id.* at 20–21.) Further, Defendants contend that La. R.S. § 37:2360(A)(2) is a licensing requirement, not a "speech code." (*Id.* at 21.) Plaintiffs' "effort to collapse professional treatment into 'speech' is a semantic sleight of hand that would constitutionalize large swaths of occupational licensing." (*Id.*) Finally, Defendants argue that Plaintiffs' challenge to the Practice Provision should fail for the same reasons as their challenges to the Title and Services Provisions fail. (*Id.* at 22.)

c.    Plaintiffs' *Reply* (Doc. 90)

Plaintiffs first respond that Defendants' jurisdictional arguments "are virtually the same as the ones" made in support of Defendants' *MTD*. (Doc. 90 at 6.) Plaintiffs acknowledge that, on their *MPI*, they "cannot rely solely on the allegations of their amended complaint." (*Id.*) But they direct the Court to Plaintiffs' Declarations, as well as the January 2024 letter. (*Id.* (citing Doc. 85-4 at 2, ¶ 2; Doc. 85-6 at 2, ¶ 2).) "Plaintiffs have adequately described their desire to engage in speech violative of the law." (*Id.* at 7 (citing, *inter alia*, Doc. 85-4 at 2, 7, ¶¶ 2, 27–29; Doc. 85-6 at 2, 6–7, ¶¶ 2, 25–27).) And Defendants do not disavow enforcement or suggest that the statute is moribund. (*Id.* at 8 (citations omitted).)

Plaintiffs dispute Defendants' position that the Practice Provision regulates conduct instead of speech. (*Id.* at 9.) According to Plaintiffs, their challenge "is no different from the challenge in *Serafine*," where the Fifth Circuit "concluded that the thing being regulated was speech,"

59

specifically non-commercial speech. (*Id.* at 9–10 (citing *Serafine*, 810 F.3d at 365; *Hines v. Pardue*, 117 F.4th 769, 777–78 (5th Cir. 2024); *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020); *Richwine v. Matuszak*, 148 F.4th 942, 954 (7th Cir. 2025)).)

As for the Title and Services Provisions, Plaintiffs argue that Defendants have "reinterpret[ed] the statute" so that the provisions only apply to misleading uses of terms like "psychology" and "psychological." (*Id.* at 11.) "[T]his argument . . . mischaracterizes the statute." (*Id.*) But it also concedes that there are some uses of the proscribed terms which are not misleading. (*Id.* at 12.) And Defendants do not explain why Plaintiffs' proposed use of the terms is inherently misleading. (*Id.* (citing *Express Oil Change*, 916 F.3d at 491).) Plaintiffs also note that other individuals, such as psychological associates, are able to use the term "psychological" without running afoul of the statute, "even though such individuals are *less* able to treat serious psychological problems than [are] [P]laintiffs." (*Id.* at 13 (citation omitted).) Plaintiffs have "presented the standard dictionary definition of 'psychological,' which is broad . . . and does not imply any licensure qualifications." (*Id.* (citations omitted).) "Defendants offer no alternative definition, much less provide authority that the word 'psychological' has only one meaning, involving licensure." (*Id.* (citing, *inter alia*, *Express Oil Change*, 916 F.3d at 490).)

### 2. *Jurisdictional Challenges*

The Court will briefly revisit Defendants' jurisdictional challenges. First, Defendants' *Opposition* to the *MPI* repeats Defendants' sovereign immunity arguments. (*See* Doc. 88 at 12–14.) For the reasons above, the Court disagrees with Defendants. The *Ex parte Young* exception applies here. *See* Section III.C, *supra*.

Second, Defendants' *Opposition* reintroduces the issue of Article III standing. (*See* Doc. 88 at 14–15.) At the preliminary injunction stage, Plaintiffs "must make a 'clear showing' that

[they are] 'likely' to establish each element of standing."[14] *See Murthy*, 603 U.S. at 58 (quoting *Winter*, 555 U.S. at 22). For substantially the same reasons given at the motion to dismiss stage, the Court finds that Plaintiffs have cleared this higher threshold. Worth repeating, the January 2024 letter (1) mentioned "multiple violations" by Plaintiffs, (2) explained that the Board is "mandated by law to take legal action against persons who engage in the unlicensed practice of psychology" (writ large), and (3) warned that Plaintiffs' failing to take corrective action would result in the Board's "filing for civil injunctive relief and making referrals to the appropriate law enforcement agencies." (Doc. 50-2 at 2.) Although the Board dismissed the complaint against Plaintiffs after Plaintiffs changed the name of their business to "P. Wellness Institute," (*see* Doc. 50 at 13, ¶¶ 62–65; Doc. 85-4 at 6, ¶¶ 21–25; Doc. 85-6 at 5–6, ¶¶ 21–23), nothing in the letter itself suggests that the Board is concerned only with enforcing the Title Provision, (*see* Doc. 50-2 at 2–4). Nor does the statute limit the Board's concern to enforcement of the Title Provision. *See* La. R.S. § 37:2361(A)–(B). Defendants do not disavow enforcement of any part of the statute. *See also Consumer Data Indus.*, 2023 WL 4744918, at *5.

Further, Plaintiffs' Declarations establish that (1) Plaintiffs hold various professional licenses, which they clearly identify; (2) Plaintiffs have extensive backgrounds in at least some areas of psychology; (3) Plaintiffs' respective professions involve the application of psychological principles, methods, and procedures; (4) due to prior investigation by the Board, Plaintiffs refrain from using terms like "psychology" or "psychological" when communicating with clients and non-clients alike; and (5) Plaintiffs are concerned that Defendants will take action against them for practicing psychology, even though such practice is consistent with Plaintiffs' training and

---

[14] The Court notes as well that, "[w]here . . . the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence." *Murthy*, 603 U.S. at 58 (quoting *Lujan*, 504 U.S. at 561). But crucially, there has been no discovery in this case. Defendants filed a motion to stay discovery, (Doc. 64), which was granted pending resolution of Defendants' *MTD*, (*see* Doc. 77 at 1).

respective professional licenses and codes. (*See* Docs. 85-4, 85-6.) In other words, Plaintiffs aver that they have changed how they describe their services and how they practice their respective professions (e.g., how they communicate with clients). (*See, e.g.*, Doc. 85-4 at 7, ¶¶ 28–29.)

Given the above, the Court finds that Plaintiffs have established the elements of Article III standing at the preliminary injunction stage. On account of the statute and the January 2024 letter, Plaintiffs currently self-censor. Not only that, Plaintiffs have stated their "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Braidwood Mgmt.*, 70 F.4th at 924–25. And they have shown that "there exists a credible threat of prosecution under the statute." *Turtle Island Foods*, 65 F.4th at 215. As discussed previously, there is at least "some evidence" (e.g., the January 2024 letter and attachments) that the Services and Practice Provisions will be applied to Plaintiffs. *See Schlissel*, 939 F.3d at 766. And Defendants still have not disavowed enforcement or presented (1) evidence undermining "the assumption of future enforcement" or (2) evidence that the provisions are moribund. *See Inst. for Free Speech*, 148 F.4th at 329; *see also Consumer Data Indus.*, 2023 WL 4744918, at *5. Lastly, the Court finds that Plaintiffs' injury-in-fact is both fairly traceable to these Defendants, *see* La. R.S. §§ 37:2360(B), 37:2361(A)–(B), and redressable by the relief sought, (*see* Doc. 50 at 25).

### 3. Title Provision

As discussed in the context of Defendants' *MTD*, the Title Provision implicates only Plaintiffs' commercial speech, and so the Court considers the *Central Hudson* test. The Court emphasizes that, although Plaintiffs bear the burden of demonstrating entitlement to a preliminary injunction, *see Book People*, 91 F.4th at 336, *Defendants* bear the burden of justifying a restriction on Plaintiffs' commercial speech, *see Bolger*, 463 U.S. at 71 n.20. "Thus, when considering the likelihood of success, the district court should . . . inquire[] whether there is a sufficient likelihood

62

the State will ultimately fail to prove its regulation constitutional." *Byrum*, 566 F.3d at 446; *accord Siders v. City of Brandon*, 123 F.4th 293, 301 (5th Cir. 2024) ("In other words, once [the plaintiff] has demonstrated that the government is infringing her speech, she has presumptively carried her burden at this stage of the litigation unless the government can rebut that presumption."). Defendants' burden "is a heavy one . . . and may not be satisfied by mere speculation or conjecture." *Express Oil Change*, 916 F.3d at 487–88 (cleaned up).

### a.  Inherently or Actually Misleading

The first issue is whether Plaintiffs' use of the term "psychological" in the title of their business "would concern lawful activity and [would] not be misleading." *See id.* at 487 (quoting *Cent. Hudson*, 447 U.S. at 566). "[A] statement is actually or inherently misleading when it deceives or is inherently likely to deceive." *Joe Conte Toyota*, 24 F.3d at 756. In *Express Oil Change*, the Fifth Circuit explained that the fact that the common use of a term does not align with the defendant's "preferred definition" does not render the common use inherently misleading. *Express Oil Change*, 916 F.3d at 489–90. And here, Plaintiffs are correct that the common meanings of the terms "psychology," "psychological," and "psychologist" are broad. *See, e.g.*, *Psychology*, *Webster's Third New Int'l Dictionary* 1833 (2002) ("[T]he science of mind or of mental phenomena and activities[;] . . . the science of behavior . . . ."); *Psychological*, *Webster's Third New Int'l Dictionary* 1833 (2002) ("[R]elating to, characteristic of, directed toward, influencing, arising in, or acting through the mind esp[ecially] in its affective or cognitive functions[;] . . . dealing with mental phenomena esp[ecially] as interpreted or elucidated by the application of principles of psychology . . . ."); *Psychologist*, *Webster's Third New Int'l Dictionary* 1833 (2002) ("[A] student of the mind or of behavior[;] . . . a specialist in one or more branches of psychology[;] . . . a practitioner of clinical psychology, counseling, or guidance[.]").

63

Perhaps more importantly, Plaintiffs point to their educational and experiential backgrounds in some areas of psychology. And the statutes governing the various professional licenses which Plaintiffs hold define Plaintiffs' respective professions with direct and indirect references to some psychological principles, methods, and procedures. *See, e.g., id.* §§ 37:1103(5)–(7), (9), 37:1116(E)–(F), 37:2703(15)(a), 37:2708(B), 37:3386.1(1)–(2). In their current work, Plaintiffs "diagnose and treat severe mental illness, major disorders, and mental disorders," including by use of psychological methods like EMDR and Brainspotting. (Doc. 50 at 9–10, ¶¶ 40–43, 48; *see generally* Docs. 85-4, 85-6.) Their respective professions "permit [them] to use psychotherapy with their clients." (Doc. 50 at 10, ¶ 45 (citations omitted); Doc. 85-4 at 5, ¶¶ 17–19; Doc. 85-6 at 5, ¶¶ 19–20.) Plaintiffs' backgrounds and professions not only illustrate that Plaintiffs' use of the proscribed terms can be accurate, but also reify Plaintiffs' argument that the proscribed terms have substantially broader meanings than Chapter 28 contemplates.

Given the foregoing, the Court concludes that Plaintiffs are likely to succeed on the argument that Plaintiffs' accurate use of terms like "psychology," "psychological," and "psychologist" is not inherently misleading. *See also Byrum*, 566 F.3d at 447 ("The descriptive terms 'interior designer' and 'interior design' . . . merely describe a person's trade or business. The terms can be employed deceptively, for example if a person does not actually practice interior design, but the speech is neither actually nor inherently misleading.").[15] Specifically, the business title "Psychological Wellness Institute" uses "psychological" as a modifier for "wellness institute." (*See* Doc. 85-7 at 4, ¶ 12 ("[T]he plaintiffs in this case were accused of having represented

---

[15] By now, Plaintiffs have adequately distinguished cases like *Maceluch*. *See* 680 F.2d at 1069–70. Whereas in *Maceluch* the plaintiffs—osteopaths—sought to use the specific designation "M.D." as opposed to "D.O.," here Plaintiffs seek to use the adjective "psychological" as a modifier for the term "wellness institute." *See id.* Likewise, Plaintiffs wish to accurately use terms like "psychology," "psychological," and "psychologist," including when discussing and practicing their respective professions. As Plaintiffs have demonstrated, these terms are sufficiently broad that they can be used accurately by Plaintiffs without being inherently misleading. Indeed, Plaintiffs' respective professions are defined with direct and indirect references to such terms. *See, e.g.*, La. R.S. § 37:1103(5)–(7).

themselves as psychologists licensed by the Board by using the adjective 'psychological' to describe 'wellness.'").) In *Express Oil Change*, the Fifth Circuit reasoned that "[t]he term 'engineer' can mean many things in different contexts, and it is certainly not limited to those professionals licensed by Mississippi to practice engineering." 916 F.3d at 490. This logic is even more applicable here: The term "psychological" cannot be circumscribed so heavily as to refer only to individuals licensed as psychologists under Louisiana law, especially not when other adjacent licensing regimes define the professions which they regulate in psychological terms and contemplate the application of psychological principles, methods, and procedures. Likewise, Plaintiffs' use of terms like "psychology" is not, *ipso facto*, inherently misleading. (*See* Doc. 50 at 10, ¶ 47 (noting that Plaintiffs "clearly identify the licenses that they possess" and "have never represented to the public or told their clients that they are licensed psychologists"); Doc. 85-4 at 5, ¶ 15 (same); Doc. 85-6 at 5, ¶ 17 (same); Doc. 85-7 at 4, ¶ 12 ("Given that they did not represent themselves as psychologists, but rather as other kinds of counselors, I did not and do not view that use of the adjective 'psychological' [as] misleading.").) The terms at issue here are not "devoid of intrinsic meaning." *See Am. Acad. of Implant Dentistry*, 860 F.3d at 307 (quoting *Peel v. Att'y Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 112 (1990) (Marshall, J., concurring)).

Defendants do not suggest that "Psychological Wellness Institute" is an *actually* misleading title. Or, at the very least, Defendants do not carry their burden of demonstrating that the title is actually misleading. *See, e.g.*, *Express Oil Change*, 916 F.3d at 490–91 ("[T]he Board was required to present evidence of deception."); *Peel*, 496 U.S. at 106 ("Given the complete absence of any evidence of deception in the present case, we must reject the contention that petitioner's letterhead is actually misleading."). Likewise, Defendants have not shown that Plaintiffs' accurate use of terms like "psychology," "psychological," or "psychologist" is actually misleading.

b.  Potentially Misleading

Despite the above, it is conceivable that the business title "Psychological Wellness Institute" and/or the use of proscribed terms is potentially misleading. *See Byrum*, 566 F.3d at 448 (citing *Peel*, 496 U.S. at 109–10). Thus, the Court advances to the remainder of the *Central Hudson* test. *See, e.g.*, *Express Oil Change*, 916 F.3d at 492. "Under *Central Hudson*, a restriction on commercial speech survives First Amendment scrutiny if: (1) 'the asserted governmental interest is substantial,' (2) the regulation 'directly advances' that interest, and (3) the regulation 'is not more extensive than is necessary to serve that interest.'" *Id.* (quoting *Pub. Citizen*, 632 F.3d at 219). As this Court noted in its initial *Ruling and Order*, "[t]he first two requirements are straightforward in this case." *See Alleman*, 780 F. Supp. 3d at 643. State licensing boards "ha[ve] a substantial interest in 'ensuring the accuracy of commercial information in the marketplace.'" *Id.* (quoting *Express Oil Change*, 916 F.3d at 492). And here, the Court grants that Louisiana's statutory scheme, including the Title Provision, "directly advances" the aforementioned interest. *See Express Oil Change*, 916 F.3d at 492.

The question, then, is whether the Title Provision is "more extensive than is necessary to serve" the stated interest in consumer protection. *Id.* (quoting *Pub. Citizen*, 632 F.3d at 219); *see also Byrum*, 566 F.3d at 448 (identifying the third element of the *Central Hudson* test as the "critical inquiry" (quoting *Cent. Hudson*, 447 U.S. at 569–70)). "[T]he free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing . . . the harmless from the harmful . . . ." *Express Oil Change*, 916 F.3d at 492–93 (quoting *Fox*, 492 U.S. at 480); *see also In re R.M.J.*, 455 U.S. at 203 ("[T]he interference with speech must be in proportion to the interest served."). Consequently, the provision at issue "must

66

be 'narrowly tailored to achieve the desired objective,'" although it need not be the least restrictive means of doing so. *Express Oil Change*, 916 F.3d at 493 (quoting *Fox*, 492 U.S. at 480).

At this step, Defendants stumble. The current record suggests that Louisiana's statutory scheme is not narrowly drawn. For example, it allows individuals to hold themselves out as "psychological associates"—and to practice in this capacity independently—even though such individuals are less able to apply psychological principles, methods, and procedures than, say, licensed professional counselors and licensed social workers. *See* La. R.S. § 37:2356.4; *see also id.* § 37:2356.3 (discussing "specialists in school psychology"); *id.* § 37:2365(E) (allowing university or college faculty with specific degrees to "use the title 'psychologist' in conjunction with their academic or research activities").

More importantly, though, "[t]he record does not support the need for a total ban on the use of" the proscribed terms. *See Express Oil Change*, 916 F.3d at 493. Specifically, Defendants have not so much as argued that less-restrictive means like disclaimers would not, in this instance, accomplish the goal of protecting the public as well as proscription. *See id.*; *see also Abramson*, 949 F.2d at 1577 ("[W]hen the first amendment is at issue, 'the preferred remedy is more disclosure, rather than less.'" (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 375 (1977))); *Peel*, 496 U.S. at 108–09 (discussing a "presumption favoring disclosure over concealment"); *Am. Acad. of Implant Dentistry*, 860 F.3d at 311 ("Sufficient disclaimers are a means to address consumer deception."). As a result, Defendants have not "satisf[ied] the required burden of demonstrating a reasonable fit between [the] regulation and the constitutionally-protected speech." *Express Oil Change*, 916 F.3d at 493.

Plaintiffs already "clearly identify the licenses [they] possess" and do not "represent[] to the public or t[ell] [their] clients" that they are licensed psychologists. (Doc. 85-4 at 5, ¶ 15; Doc.

85-6 at 5, ¶ 17.) With respect to the Title Provision, the Court will grant the *MPI* insofar as it will allow Plaintiffs to revert the name of their business to "Psychological Wellness Institute" and to accurately use terms like "psychology," "psychological," and "psychologist." But the Court cautions that—while Plaintiffs have, at this time, demonstrated a likelihood of success on the merits of their as-applied challenge to the Title Provision—the Court in no way resolves the challenge here. *Cf. Am. Acad. of Implant Dentistry*, 860 F.3d at 312 ("Although the Board has not met its burden in this case, a 'regulation that fails *Central Hudson* because of a lack of sufficient evidence may be enacted validly in the future on a record containing more or different evidence.'" (quoting *Pub. Citizen*, 632 F.3d at 221)).

### 4. Services Provision

The parties suggest that analysis of the Services Provision is essentially the same as analysis of the Title Provision. (*See* Doc. 85-1 at 27–28; Doc. 88 at 17.) The Court agrees and therefore will not belabor the point: Defendants have not demonstrated that the provision's interference with speech is "in proportion" to the interest which the provision serves. *See In re R.M.J.*, 455 U.S. at 203. Once again, Defendants have not established "the need for a total ban on the use of" the proscribed terms. *See Express Oil Change*, 916 F.3d at 493. Nor have they addressed the possibility that disclaimers would achieve the same interest without trampling nearly the same amount of commercial speech. The upshot is that Defendants have not shown "a reasonable fit between [the Services Provision] and the constitutionally-protected speech." *See id.*; *see also Speaks v. Kruse*, 445 F.3d 396, 400–02 (5th Cir. 2006) (instructing the district court to grant a preliminary injunction where the statute at issue "fail[ed] the third prong of *Central Hudson* because the[] [relevant interest] c[ould] be served as well by a more limited restriction"). As with the Title Provision, then, it seems likely that Defendants will fail to prove that the Services

Provision is constitutional as applied to Plaintiffs. *See Byrum*, 566 F.3d at 447–48 ("If the State fails to sustain any of the additional *Central Hudson* prongs, the appellants have succeeded in showing a substantial likelihood of success on the merits."); *id.* at 449 ("Because the State has not demonstrated a reasonable 'fit' between its regulation and the constitutional speech at issue, we reverse and remand for entry of a preliminary injunction.").

The Court pauses to address two of Defendants' contentions, which are applicable to both the Title Provision and the Services Provision. First, Defendants argue that the scheme is narrowly tailored because "Plaintiffs remain free to advertise counseling services, describe treatment modalities, and list credentials they actually possess." (Doc. 88 at 18–19 (citing *Fox*, 492 U.S. at 480).) This simply isn't so. Or, at the very least, Louisiana's statutory scheme hampers Plaintiffs' ability to do any of the above. For example, in their current practice—and consistent with their respective professions—Plaintiffs use psychological methods like EMDR and Brainspotting. (*See, e.g.*, Doc. 85-4 at 4–5, ¶¶ 10–19.) But under the statutory scheme, Plaintiffs are prohibited from accurately describing EMDR and Brainspotting as psychological methods. *See* La. R.S. § 37:2352(10). Similarly, Plaintiff Alleman is, among other things, a licensed professional counselor. (Doc. 85-4 at 1, ¶ 3.) A licensed professional counselor provides mental health counseling services, which include "treatment . . . of mental, emotional, behavioral, and addiction disorders" by means of psychotherapy. La. R.S. § 37:1103(7). But the broadly defined "practice of psychology" includes "counseling," "psychotherapy," and the "treatment of mental and emotional disorder or disability, alcoholism and substance abuse." *Id*. § 37:2352(8). How, then, is Plaintiff Alleman to advertise her services or to discuss her professional license without also unintentionally violating the statute (i.e., by representing herself as a psychologist)? *See id.* § 37:2352(10). How is she to explain to a prospective client that "part of [her] services might be referring a client to a

69

psychologist for psychological testing"? (Doc. 85-4 at 7, ¶ 28.) Defendants neither propose an interpretation of the statute that plausibly addresses such concerns nor discuss how, despite such restrictions, the statute is narrowly tailored to the stated interest of consumer protection.

Second, Defendants argue that Plaintiffs' accurate use of the proscribed terms "does not change the statutory and marketplace meaning" of Plaintiffs' representations. (Doc. 88 at 17.) Crucially, though, Defendants do not supply a "marketplace" meaning of the proscribed terms. And Plaintiffs have demonstrated that the common meaning of the proscribed terms is sufficiently broad that the accurate use of such terms is not inherently likely to give ordinary persons the impression that the person using them is a licensed psychologist, as defined by Title 37, Chapter 28. Defendants are, in other words, taking the untenable position that the statutory meaning is co-extensive with the marketplace meaning and/or exclusive of all other meanings. *See Express Oil Change*, 916 F.3d at 489–90 ("That this definition of 'engineer' does not meet the Board's preferred definition does not make its use inherently misleading."); *Byrum*, 566 F.3d at 447 ("The State advances a circular argument that the speech inherently tends to mislead consumers. It runs: Texas created a licensing regime; therefore, unlicensed interior designers who refer to themselves as interior designers will confuse consumers who will expect them to be licensed.").

Again, Plaintiffs already "clearly identify the licenses [they] possess" and do not "represent[] to the public or t[ell] [their] clients" that they are licensed psychologists. (Doc. 85-4 at 5, ¶ 15; Doc. 85-6 at 5, ¶ 17.) Plaintiffs' services include psychological methods like EMDR and Brainspotting. The Court will grant the *MPI* insofar as it will allow Plaintiffs to use the proscribed terms accurately when describing their services.

### 5.  *Practice Provision*

Here, the Court reincorporates much of the analysis in Section IV.B.3, *supra*. In particular,

the Court re-emphasizes the Fifth Circuit's holding that "merely receiving compensation for psychological services cannot be commercial speech." *Serafine*, 810 F.3d at 365. Although *Serafine* is not, in all respects, similar to the instant case, it does persuade the Court that, here, the Practice Provision restricts non-commercial speech. *See id.* at 364–65. So, too, does *Chiles*. *See Chiles*, 146 S. Ct. at 1022–23 ("As a talk therapist, all Ms. Chiles does is speak with clients . . . . Colorado seeks to regulate the content of Ms. Chiles's speech."). "[T]he First Amendment's protections extend to licensed professionals as much as they do everyone else." *Id.*; *see also id.* at 1025 ("If a government could reclassify talk therapy as speech incident to conduct, it might just as easily do the same for speech incident to 'teaching or protesting.'"). Consequently, Defendants are incorrect that the Practice Provision does not implicate speech. (*See* Doc. 88 at 20–21.) And because the Practice Provision restricts non-commercial speech, analysis of the provision does not mirror analysis of the Title and Services Provisions. (*See id.* at 22.)

Finally, Defendants are incorrect that the Practice Provision does not restrict *Plaintiffs'* speech. As discussed previously, La. R.S. § 37:2352(8) and (10) and § 37:2365(A) appear to place Plaintiffs in a bind: Purportedly, Plaintiffs may "render services consistent with their professional training and code of ethics." *See* La. R.S. § 37:2365(A). But because Plaintiffs may not "represent themselves or their services as psychological," (Doc. 88 at 10, 20)—and because Louisiana's statutory scheme specifies that a person "represents h[erself] to be a psychologist" by using proscribed terms or otherwise engaging in the "practice of psychology"—Plaintiffs are effectively prohibited from accurately discussing psychological methods like EMDR and Brainspotting with their clients in the course of treatment, even though their respective professions incorporate (indeed, are defined with reference to) such psychological principles, methods, and procedures, *see id.* §§ 37:2352(8), (10), 37:2365(A). Plaintiffs are careful to note that, while the application of

71

certain psychological principles, methods, and procedures is consistent with their professional training and their respective professional codes, they are concerned that Defendants can and will label Plaintiffs' work as the "practice of psychology," and that adverse consequences will therefore flow from Plaintiffs' practicing their respective professions. (*See* Doc. 85-4 at 5, 7–8, ¶¶ 15–19, 27–32; Doc. 85-6 at 5–7, ¶¶ 17–20, 25–30.) Likewise, Plaintiffs aver that they are hampered in their ability to speak with clients in the course of practicing their respective professions. (*See* Doc. 85-4 at 5, 7–8, ¶¶ 15–19, 27–32; Doc. 85-6 at 5–7, ¶¶ 17–20, 25–30.)

Defendants do not propose a plausible alternative interpretation of Chapter 28. On the contrary, Defendants straightforwardly declare that a person cannot "'engage in the practice of psychology' without a license." (Doc. 88 at 7 (quoting La. R.S. § 37:2360(A)(2)); *see also* Doc. 71-1 at 12 (noting that Plaintiffs can practice their respective professions, "so long as they do not represent themselves or their services as psychological"); Doc. 88 at 20 ("[Plaintiffs] again acknowledge that Louisiana law permits them to provide counseling services consistent with their professional training so long as they do not represent themselves or their services as psychological." (internal quotation marks omitted).) Defendants seek shelter in the fact that Plaintiffs "are not licensed psychologists," arguing that Plaintiffs "*counsel* and do not engage in the practice of psychology." (Doc. 88 at 8–10.) But this position—that counselors counsel, whereas psychologists practice psychology—is tautological. And it overlooks the broad definition of the "practice of psychology," as well as the definitions of Plaintiffs' respective professions. At a minimum, the Practice Provision restricts Plaintiffs' practice of their respective professions insofar as it limits what Plaintiffs may say to clients in the course of treatment.

Plaintiffs argue that La. R.S. § 37:2360(A)(2) is a content-based restriction because it "prohibits speech only if it is too 'psychological.'" (Doc. 85-1 at 16.) "[A] law is content based on

its face if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (per curiam) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Likewise, "a facially content-neutral law is nonetheless treated as a content-based regulation of speech if it 'cannot be justified without reference to the content of the regulated speech' or was 'adopted by the government because of disagreement with the message the speech conveys.'" *Id.* at 70–71 (internal quotation marks omitted) (quoting *Reed*, 576 U.S. at 164). Where a law is content-based, strict scrutiny requires that it be "the least restrictive means of achieving a compelling state interest." *Free Speech Coal.*, 606 U.S. at 471 (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)); *accord TikTok*, 604 U.S. at 67 ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." (quoting *Reed*, 576 U.S. at 163)).

"In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . ." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). In other words, courts "will sustain a content-neutral law 'if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *TikTok*, 604 U.S. at 67 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997)). "While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government . . . ." *Hines*, 117 F.4th at 799. "[T]he burden of justification is demanding and it rests *entirely* on the State." *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

Plaintiffs are likely to succeed on the argument that La. R.S. § 37:2360(A)(2) is a content-based restriction, prohibiting unlicensed individuals from engaging in speech which amounts to

the broadly defined "practice of psychology" (e.g., speech which seeks to modify human behavior through the application of psychological principles, methods, and procedures). *See Holder*, 561 U.S. at 27 ("If plaintiffs' speech . . . communicates advice derived from 'specialized knowledge' . . . then it is barred. . . . The law here may be described as directed at conduct, . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message."); *cf. Rosemond v. Markham*, 135 F. Supp. 3d 574, 578–79, 585 (E.D. Ky. 2015) ("[T]he Board used [Kentucky's law] to restrict Rosemond's speech because it took issue with the message he was conveying. Such government regulation is content-based, and only constitutional if it survives strict scrutiny."). But regardless of the level of scrutiny—strict or intermediate—Defendants have not demonstrated adequate tailoring.

Plaintiffs have explained that their respective practices include the application of certain psychological principles, methods, and procedures, such as EMDR and Brainspotting. (*See* Doc. 85-4 at 4, ¶¶ 10–12.) Separately, Plaintiffs have argued that "common-law rules of malpractice and fraud . . . protect the public," such that La. R.S. § 37:2360(A)(2) is gratuitous. (*See* Doc. 85-1 at 18–19.) Defendants do not tackle these points head-on, but rather take the position that any challenges to the Practice Provision "fail for the same reasons" that challenges to the Title and Services Provisions fail. (Doc. 88 at 22.) As discussed above, the Court disagrees that the as-applied challenges to the Title and Services Provisions fail. And in fact, Defendants' reference to the preceding commercial-speech analysis illuminates another basis for concluding that La. R.S. § 37:2360(A)(2) is substantially more restrictive than necessary: Adequate disclaimers would likely palliate concerns over confusion in the course of Plaintiffs' practicing their respective professions. In other words, it would likely be as effective to require Plaintiffs to disclose their licenses and to disclaim being licensed psychologists when treating patients as it is to prohibit

74

Plaintiffs from discussing and/or applying psychological principles, methods, and procedures consistent with their training and their respective professional licenses and codes of ethics.

As in the commercial-speech context, it is Defendants' burden to demonstrate adequate tailoring. Regardless of which level of scrutiny applies, Defendants have not carried this burden at this stage. *See Siders*, 123 F.4th at 301 ("In other words, once [the plaintiff] has demonstrated that the government is infringing her speech, she has presumptively carried her burden at this stage of the litigation unless the government can rebut that presumption.").

### C.    Overbreadth Challenges

The Court need not get into the weeds of the overbreadth challenges. Again, "[t]he question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Moody*, 603 U.S. at 723 (quoting *Ams. for Prosperity Found.*, 594 U.S. at 615). In other words, under the First Amendment, a law is only overbroad "if [its] unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. "The first step in the proper facial analysis is to assess the state law['s] scope." *Id.* That is, "[w]hat activities, by what actors, do[es] the law[] prohibit or otherwise regulate?" *Id.* The second step "is to decide which of the law['s] applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.

Courts decide as-applied challenges first, proceeding to overbreadth challenges "only if 'it is determined that [a] statute would be valid as applied'" to the litigant(s). *Buchanan v. Alexander*, 919 F.3d 847, 852, 854 (5th Cir. 2019) (quoting *Serafine*, 810 F.3d at 362–63); *accord United States v. Jubert*, 139 F.4th 484, 489, 492 (5th Cir. 2025). As the Supreme Court has explained: "[A]lthough the occasional case requires [courts] to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, [courts] neither want nor

75

need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (citations omitted); *accord Serafine*, 810 F.3d at 363 ("Applying the overbreadth doctrine is strong medicine and is also more difficult to resolve than the as-applied challenge, since it requires consideration of many more applications than those immediately before the court." (cleaned up)); *see also Moody*, 603 U.S. at 723 ("For a host of good reasons, courts usually handle constitutional claims case by case, not en masse. . . . Th[e] [Supreme] Court has . . . made facial challenges hard to win.").

Because Plaintiffs have demonstrated that they are likely to succeed on the merits of their as-applied challenges, the Court need not reach the corresponding overbreadth challenges.[16] *Cf. Jubert*, 139 F.4th at 489, 492 ("Considering that Jubert's as-applied challenge fails, we turn to his facial claim."). That is just as well, because Plaintiffs do not seriously undertake to analyze their own overbreadth challenges. (*See* Doc. 85-1 at 19–20, 27; Doc. 90 at 10–11.) Mainly, they point to *Serafine*. *But see Serafine*, 810 F.3d at 365 ("Facial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort." (cleaned up)). As suggested above, however, *Serafine* is, in meaningful ways, distinct and therefore cannot independently carry Plaintiffs' overbreadth challenges. More importantly, though, *Moody v. NetChoice, LLC* has since underscored the substantial requirements for an overbreadth challenge. *See* 603 U.S. at 723–25. While, at the motion to dismiss stage, Plaintiffs adequately alleged that a substantial number of the statute's applications are unconstitutional, they have not performed the requisite *Moody* analysis, even though it is their burden to show that they are substantially likely to succeed on the merits of their claims. *See, e.g.*, *Book People*, 91 F.4th at 336; *see also N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 14 (1988) ("[A]ppellant must demonstrate from the text of [the law] and from

---

[16] Consequently, the Court need not recount the parties' exchange over these challenges, nor will the Court perform the analysis required by *Moody v. NetChoice, LLC*. *See* 603 U.S. at 723–25.

actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally."); *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (same); *United States v. Hansen*, 599 U.S. 762, 784 (2023) (same).

### D.    Remaining Factors

#### 1. *Parties' Arguments*

##### a.   Plaintiffs' *MPI* (Doc. 85)

Plaintiffs emphasize that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (Doc. 85-1 at 28 (quoting *Elrod*, 427 U.S. at 373).) And they contend that, because their First Amendment rights are daily violated, they have not "wait[ed] too long . . . to move for a preliminary injunction." (*Id.* at 29.) Finally, Plaintiffs observe that, here, the balance of equities and the public interest merge. (*Id.* at 30 (citing *Book People*, 91 F.4th at 341).) "Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." (*Id.* (quoting *Book People*, 91 F.4th at 341).)

##### b.   Defendants' *Opposition* (Doc. 88)

Defendants argue that "alleged harms tied to commercial speech are typically economic in nature." (Doc. 88 at 23 (citing, *inter alia*, *Tracy Rifle & Pistol LLC v. Harris*, 637 F. App'x 401, 402 (9th Cir. 2016) (mem.)).) They add that Plaintiffs have waited too long to seek a preliminary injunction. (*Id.* at 24 (citing, *inter alia*, *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 799 (M.D. La. 2018) (deGravelles, J.)); *see also id.* at 24–25 (citing, *inter alia*, *Gonannies, Inc. v. Goaupair.Com, Inc.*, 464 F. Supp. 2d 603, 606 (N.D. Tex. 2006)).) Lastly, Louisiana's statutory scheme functions to protect consumers. (*Id.* at 25 (citing La. R.S. § 37:2351).) Defendants assert that "both the Board and the public at large would suffer from an injunction prohibiting

enforcement of duly enacted state laws." (*Id.* (citing *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021)).) Thus, Defendants say, the balance of equities "plainly favors the State." (*Id.*)

### c.    Plaintiffs' *Reply* (Doc. 90)

Plaintiffs contend that Defendants have "misrepresent[ed] the 'delay,'" noting that Plaintiffs renewed their motion for a preliminary injunction shortly after filing their *Amended Complaint*. (Doc. 90 at 14.) Plaintiffs also observe that the Fifth Circuit has deemed restriction of commercial speech an irreparable harm. (*Id.* at 15 (citing *Byrum*, 566 F.3d at 449).) And here, Plaintiffs add, the restrictions "extend to non-commercial speech." (*Id.*)

### 2.    *Irreparable Injury*

The chilling of speech constitutes irreparable harm. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod*, 427 U.S. at 373); *Book People*, 91 F.4th at 340–41 (quoting *Elrod*, 427 U.S. at 373). Previously, this Court identified a line of cases proposing that infringement of non-commercial speech does not warrant preliminary injunctive relief. *See Alleman*, 780 F. Supp. 3d at 649 (citing *Keyoni Enters., LLC v. County of Maui*, No. 15-86, 2015 WL 1470847, at *9 (D. Haw. Mar. 30, 2015)). Defendants now seize upon that same line of cases in arguing that infringement of commercial speech is typically tied to economic harm. But as the Court observed in its initial *Ruling and Order*, such cases appear to take "the minority position" and are "possibly not indicative of the rule in this circuit." *Id.* Defendants do not cite any in-circuit cases reinforcing their contention, and a second survey by this Court has revealed none. On the contrary, cases like *Byrum v. Landreth* and *Healthy Vision Association v. Abbott* at least tacitly endorse the position that the chilling of even purely commercial speech constitutes irreparable harm warranting preliminary injunctive relief. *See Byrum*, 566 F.3d at 451; *Healthy Vision Ass'n*, 138 F.4th at 408; *see also Speaks*, 445 F.3d at 399–402 (vacating and remanding,

78

with instructions to preliminarily enjoin a law restricting commercial speech).[17] Consequently, the Court cannot agree with Defendants that the chilling of commercial speech is an injury unworthy of preliminary injunctive relief. As well, the Court notes that, here, the Practice Provision implicates non-commercial speech, and so this argument by Defendants is not dispositive.

Second, Defendants argue that the delay in seeking a preliminary injunction should preclude such relief. The Court disagrees. *See Alleman*, 780 F. Supp. 3d at 648–49 ("Defendants do not reconcile th[eir] [delay argument] with other law governing injunctions and First Amendment cases.") For one, Plaintiffs' First Amendment injury is ongoing. That is, their speech—commercial and non-commercial—remains chilled. (*See, e.g.*, Docs. 85-4, 85-6.) Further, Plaintiffs are correct that "[d]elay in seeking an injunction *may* be one factor that weighs against granting an injunction, but it is not determinative" given the nature of Plaintiffs' injury.[18] *See Trinseo Eur. GmbH v. Kellogg Brown & Root, L.L.C.*, 165 F.4th 399, 423 n.14 (5th Cir. 2026) (emphasis added) (citing *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975)); *see also Alleman*, 780 F. Supp. 3d at 648–49 (addressing the same argument). Lastly, the fact that this case has already been pending for some time does not militate in favor of one or another party.

---

[17] *See also Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1236 (10th Cir. 2005) ("[T]he injury incurred through the deprivation of commercial speech rights cannot be quantified solely in terms of transaction costs and lost profits to a single market participant."); *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1300–01 (11th Cir. 2017) (affirming preliminary injunction); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993) (suggesting that courts should not exaggerate "the distinction between commercial and noncommercial speech" and, in the process, "underestimate[] the value" of the former).

[18] In other cases, "this Court has recognized that delays of only a few months can warrant denying a motion for preliminary injunction." *See, e.g.*, *Walker v. Nat'l Collegiate Athletic Ass'n*, No. 25-514, 2025 WL 1901907, at *6 (M.D. La. July 1, 2025) (deGravelles, J.). That remains true, of course: There are cases where delays—although relatively short—demonstrate "that the harm would not be serious enough to justify a preliminary injunction." *PASI*, 334 F. Supp. 3d at 799 (quoting 11A *Wright & Miller's Federal Practice & Procedure* § 2948.1 (3d ed. 2018)). But again, the Supreme Court and the Fifth Circuit have emphasized repeatedly that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Book People*, 91 F.4th at 341 (quoting *Elrod*, 427 U.S. at 373). Particularly since Plaintiffs' First Amendment injury is ongoing, the Court cannot conclude that the delay here so strongly undercuts Plaintiffs' claims of irreparable harm that preliminary injunctive relief is unwarranted.

Aside from a relatively short initial delay in seeking a preliminary injunction, (*see* Doc. 29), Plaintiffs have consistently sought such relief, *see also Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 570–71 (S.D. Tex. 2014) ("Plaintiff's initial delay of perhaps four months does not preclude it from recovering the equitable preliminary relief it seeks in the present motion.").

Plaintiffs have demonstrated that "there is a substantial threat that [they] will suffer irreparable injury" if the Court does not grant the injunction. *See Sierra Club*, 992 F.2d at 551.

### 3. Balance of Equities & Public Interest

Again, in lawsuits against the Government, the balance of equities and the public interest "merge." *Nken*, 556 U.S. at 435. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Book People*, 91 F.4th at 341 (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017)). Further, the Court grants that the State's interest here—consumer protection—is "particularly strong." *See Ohralik*, 436 U.S. at 460. "But neither the State nor the public has any interest in enforcing a regulation that violates federal law." *Book People*, 91 F.4th at 341 (cleaned up). "Indeed, '[i]njunctions protecting First Amendment freedoms are *always* in the public interest.'" *Id.* (emphasis added) (quoting *Opulent Life Church*, 697 F.3d at 298). "Because Plaintiffs are likely to succeed on the merits of their [as-applied challenges], the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." *See id.* In other words, the balance of equities and public interest favor a preliminary injunction here.

Plaintiffs have demonstrated that the remaining preliminary injunction factors weigh in their favor. *See Sierra Club*, 992 F.2d at 551. Consequently, they have demonstrated their entitlement to preliminary injunctive relief.

## VI.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' *MTD* (Doc. 71) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' *MPI* (Doc. 85) is **GRANTED**. Defendants are preliminarily enjoined from taking any adverse action against Plaintiffs under Title 37, Chapter 28, of the Louisiana Revised Statutes for: (a) Plaintiffs' reverting the name of their business to "Psychological Wellness Institute"; (b) Plaintiffs' using terms like "psychology," "psychological," or "psychologist" in any accurate description of their services; (c) Plaintiffs' accurately using terms which refer to their expert qualifications, including in areas of psychology; and (d) Plaintiffs' practicing their respective professions, consistent with their professional training, licenses, and codes of ethics. Plaintiffs must continue to clearly identify their respective licenses and must not otherwise represent that they are licensed psychologists when they are not so licensed.

Signed in Baton Rouge, Louisiana, on July 30, 2026.

 

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**